## 1

74939ADS
IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:07-12387-RGS

_____
SOCIETY OF THE HOLY TRANSFIGURATION MONASTERY,
INCORPORATED,

Plaintiff,

vs.

ARCHBISHOP GREGORY OF DENVER, COLORADO,

Defendant.
_____

DEPOSITION OF ARCHBISHOP GREGORY - VOLUME I
August 25, 2009
Pursuant to Notice taken on behalf of the Plaintiff at
303 East 17th Avenue, Suite 565, Denver, Colorado
80203, at 9:13 a.m., before Diane K. Scholl,
Registered Professional Reporter and Notary Public
within Colorado.

## 2

APPEARANCES:

AMY L. BROSIUS and MARIA HAMILTON, Attorneys at Law, from the Law Firm of Fish & Richardson P.C., 225 Franklin Street, Boston, Massachusetts 02110, appearing on behalf of the Plaintiff.

CHRIS L. INGOLD, Attorney at Law, from the Law Firm of Irwin & Boesen, 4100 East Mississippi Avenue, 19th Floor, Denver, Colorado 80246, appearing on behalf of the Defendant.

Also Present: Bishop John.

## 3

I N D E X

EXAMINATION:                         PAGE
By Ms. Brosius                        11
                    INITIAL
                  REFERENCE
DEPOSITION EXHIBITS:
1 Articles of Incorporation, 7-12-79        19
2 Articles of Amendment to the Articles of
   Incorporation, 12-13-79                  23

3 Biennial Report of a Corporation or
   Limited Liability Company, 7-7-99        29
4 Articles of Amendment to the Articles
   of Incorporation, 8-8-94                 36

5 The Psalter According to the Seventy,
   Copyright 1974
6 Pentecostarian, Copyright 1984            90
7 The Great Horologin or Book of Hours,
   Copyright 1997                          104

8 A Prayer Book for Orthodox Christians,
   Copyright 1987                          107
9 The Ascetical Homilies of Saint Isaac
   The Syrian, Parts One and Two,
   Copyright 1984                          112
10 The Octoechos, Copyright 1982           118
11 Collected Dismissal Hymns, Kontakia, and
   Megalynaria for the Liturgical Year     123

12 The Pentecostarian, Copyright 1990      129

13 Pentecostarian, pages 266 through 487   130

14 The November Menaion, Copyright 2005    130

15 The Psalter According to the Seventy,
   Copyright 1974                          131

## 4

16 Theotokion, Copyright 1975             133
17 First through Fourth Tones             135
18 Plagal of First Tone (5th Tone)        139
19 April                                  142
20 The Menaion, starting with page 216,
   November 29                            144

21 Menaion, The Month of October,
   Holy Theotokos Monastery               145
22 The Service of Matins                  147
23 Service of the Small Supplicatory Canon
   to the Most Holy Mother of God         155

24 Service of the Small Supplicatory Canon
   to the Most Holy Mother of God, with
   illustration on front page             157

25 Archbishop Gregory's Responses to Society
   of the Holy Transfiguration Monastery's
   First Set of Interrogatories           162

26 Archbishop Gregory's Responses to Society
   of the Holy Transfiguration Monastery's
   First [sic, taken by the defendant to mean
   "second"] Set of Interrogatories       162
27 Defendant's Responses to the First Set
   of Requests for Admission              163

28 Affidavit of Archbishop Gregory, 2-12-08    166

29 Second Affidavit of Archbishop Gregory,
   8-7-08                                 167
30 Archbishop Gregory's Responses to Society
   of the Holy Transfiguration Monastery's
   Third Set of Interrogatories           181
31 Printout from TrueOrthodoxy.info,
   "Welcome"                              182

32 Printout from TrueOrthodoxy.info,
   "Miscellaneous Index"                  182

**5**

33 January The Circumcision of our Lord Jesus Christ.
   St. Basil the Great, Archbishop of Caesarea
   of Cappadocia                          186
34 February                              188
35 Complaint                             189
36 March                                 192
37 April                                 196
38 May                                   196
39 June                                  196
40 July                                  196
41 August                                196
42 September                             196
43 October                               196
44 November                              196
45 December                              196
46 Dismissal Hymns and Kontakia of the
   Pentecostarian                        196

47 Home Prayer Rule (with no lines)          196

48 Home Prayer Rule (with lines)             196

49 The Akathist to the Virgin Mary,
   the Theotokos                         196
50 A Divine Service Book for Home Use,
   Dormition Skete 1999                  196

51 The All Night Vigil                   196

52 The Octoechos                         196

53 Service of the Small Supplicatory
   Canon to the Most Holy Mother of God      196
54 Palm Sunday According to the Rubric of

**7**

71 Homily on Faith, Repentance, Love, and
   the Fear of God By St. Isaac the Syrian,
   Copyright 2005                        197
72 Settlement Agreement, 7-24-06             231
73 Articles of Amendment, 8-18-05            246
74 Invoice to Dormition Skete from
   St. Nectarios Press, 4-5-04               260

75 Invoice to Nordblum from HTM, 10-24-08    261

76 Invoice to Mother Mariam from St. Nectarios
   Press, 6-4-07                         263
77 Invoice to Mother Mariam from HTM, 10-24-08  264
78 Invoice to Mother Mariam from HTM, 8-10-05   265
79 Invoice to Mother Mariam from HTM, 9-29-05   265
80 Invoice to Mother Mariam from HTM, 4-11-07   265
81 Invoice to Seco from HTM, 9-12-07          265
82 Statute Concerning Monasteries of the
   Russian Orthodox Church Abroad,
   October 30/November 12, 1959          275
(Enclosed, with no copies to counsel.)

**6**

55 The Holy and Great Sunday of Pascha      196
56 The Sunday of Holy Pentecost According
   to the Rubrics of the Holy Orthodox Church
   1999                                  196
57 The Nativity According to the Flesh of
   Our Lord God and Savior Jesus Christ     196

58 The Universal Exaltation of the Precious
   and Life-Giving Cross                 196
59 Synodicon of the Holy and Ecumenical
   Seventh Council for Orthodoxy            197

60 The Order of the All Night Vigil
   Consisting of Great Vespers and Matins    197
61 The Divine Liturgy of Our Holy Father
   Among the Saints John Chrysostom         197

62 The Divine Liturgy of Our Holy Father
   Among the Saints John Chrysostom For Use
   When Serving Without a Deacon            197

63 The Divine Liturgy of Our Holy Father Among
   the Saints Basil the Great, Archbishop of
   Caesarea in Cappadocia                   197

64 The Divine Liturgy of Our Holy Father
   Among the Saints Basil the Great, Archbishop
   of Caesarea in Cappadocia For Use When
   Serving without A Deacon                 197
65 The Office of Holy Baptism The Prayers
   at the Reception of Catechumens, The Office
   of Holy Chrismation                      197
66 The Rite of Holy Matrimony
   The Betrothal Service                    197

67 Prayers Read When it Happeneth that
   One is Tempted in Sleep by the Malice
   of the Devil                             197

68 After Communion Prayers                   197

69 Order for a Beginner Taking the Rason      197

**8**

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure:

ARCHBISHOP GREGORY, having first duly affirmed to state the whole truth, testified as follows:

MS. BROSIUS: We're ready to go on the record. I'd just like to state for the record that according to counsel for defendants, there is a third party present here at the deposition by the name of Bishop John. Bishop John was not disclosed to us as participating in this deposition as an advisory witness.

I understand that Mr. Ingold believes he has the right to be here and listen. I just want to lodge an objection, a standing objection to his presence here today because we were not notified in advance of that and dispute the applicability of Rule 615 to allow him to be present.

I also want to note for the record that because he's not a party here today to this lawsuit -- he's not a party to the lawsuit, yet he's here today, any discussions that you have with him, I understand you're waiving your privilege over those communications. So any communications at break will

9

be -- I'll be able to ask you questions about the substance of those conversations.

I think we're ready to get started.

MR. INGOLD: I'm going to respond to that record that you just made.

First of all, it's my understanding of the Federal Rules of Evidence pursuant to Rule 1101 that the rules do apply also to the takings of deposition. And as I pointed out to you, pursuant to Rule 615 the parties whose presence is shown by a party to be essential to the presentation of the party's cause is entitled to not be excluded from a proceeding, which is why Bishop John is present.

He's essential to the presentation of our cause. He's listed on our 26(a)(1)s, and I am unaware of any rule, any statute, any order, any case law that would require me to have in advance notified you that someone like this would be present today.

Furthermore, I would object strenuously to you telling my client, Archbishop Gregory, what he can and cannot claim privilege to. If you want to ask me to let my clients know where privilege goes and what you may inquire about, I'll be happy to do that with them. But please don't take license to go ahead and advise my clients on what they may or may not

10

claim is privilege.

The other thing is you have indicated that perhaps you will go into highly confidential, attorneys' eyes only documents with my client during the deposition today. If you can show me where Bishop John is not entitled to look at that information, that's fine, he'll step out of the room during those periods of time. But of course, since these documents are highly confidential, attorneys' eyes only, I haven't shown them to my own client or discussed those documents with him, and at such time as you want to go over those documents with him I will exercise the right to provide him legal counsel necessary for his defense in private, and then we'll proceed from there. Is that fair?

MS. BROSIUS: I also want to note for the record that Bishop John is not a party to this lawsuit. He is not a signator to the protective order, and he has no ability to listen to confidential or otherwise confidentially designated testimony or view confidential documents.

MR. INGOLD: And I will dispute that without line and reference in the protective order, which I'm looking at right now.

MS. BROSIUS: Why don't we --

11

MR. INGOLD: So I may withdraw that objection.

MS. BROSIUS: Why don't we get started. Would you mind swearing the witness. Thank you.

ARCHBISHOP GREGORY, having first duly affirmed to state the whole truth, testified as follows:

EXAMINATION

BY MS. BROSIUS:

Q. Archbishop Gregory, my name is Amy Brosius. I represent the Society of the Holy Transfiguration Monastery. I'm going to refer to my client, the plaintiff, as HTM. Is that fair?

A. Yes.

Q. How do you prefer that I address you?

A. How do you address me?

Q. How do you prefer that I address you?

A. Bishop Gregory.

Q. Bishop Gregory. I am going to ask you questions today. You're obliged to answer my questions. If for some reason you don't understand a question, please stop me, ask me to rephrase my question, I'm happy to do that. Otherwise, if you provide an answer to one of my questions, I'll assume that you understood it.

12

MR. INGOLD: I'm going to jump in, here. Don't tell my client that he's obliged to do something or not do something. You can ask him questions. You cannot advise him as to what his rights or obligations are during this deposition. Is that fair?

MS. BROSIUS: Chris, are you disputing that your client is here sitting for a deposition, and he is required to answer questions that you do not instruct him otherwise under a privilege objection not to answer?

MR. INGOLD: I'm disputing your lack of right to tell my client anything about what his obligations are or are not. Simply ask your questions or ask him whether he understands what his obligations are, but don't instruct him. That's what I'm disputing here.

MS. BROSIUS: Okay. I'm just going to continue.

A. Can I ask --

Q. (BY MS. BROSIUS) Any -- no, you cannot ask me any questions. But what I'm going to actually mention is if there is -- we're on the record here, and the questioning that we're allowed is seven hours, Chris, and we're going to take all seven hours. So to the extent you intend to object or otherwise be

13

obstreperous in the manner in which we're going to take seven hours of deposition testimony here today, you need to understand that we'll have to go over until tomorrow, so --

MR. INGOLD: I have no problem with that. Ms. Brosius, I cannot believe that you're saying it's obstructive or obstreperous for me to remind you that you don't advise my client about anything.

MS. BROSIUS: I need to get started with the deposition.

MR. INGOLD: That's fine. I would like you to.

Q. (BY MS. BROSIUS) I need you to speak up if you -- if that's okay, because what the court reporter is doing is taking down every question that I ask you and is taking down every answer that you provide. So you need to answer verbally, obviously.

A. Um-hum.

Q. Uh-huhs or head shakes can't be described by the court reporter. Is that clear?

A. Um-hum.

Q. Okay. Great.

A. Yes.

Q. You're going to hear your attorney lodge objections from time to time. That is not an

14

instruction from him not to answer my question. You do need to answer my question until --

MR. INGOLD: I object again.

Q. (BY MS. BROSIUS) Until --

MR. INGOLD: Don't tell my client --

Q. (BY MS. BROSIUS) Until he --

MR. INGOLD: Don't tell my client what my advice to him is or is not based on what I do or don't do. That's instructing my clients. That's setting a stage for his understanding of a deposition, and it's inappropriate.

MS. BROSIUS: Chris, I'm simply making clear that he is going to hear objections from you and that does not mean that he does not still need to answer the question.

MR. INGOLD: So --

MS. BROSIUS: Unless you instruct him not to answer the question.

Q. (BY MS. BROSIUS) Is that fair, Father Gregory?

MR. INGOLD: Ask him a question. Don't instruct him.

Q. (BY MS. BROSIUS) Father Gregory, is that clear, what I just said -- asked you or what I just said?

15

A. Yes, I understand.

Q. Okay. Great. If you need to take a break at any time, you can obviously ask me that you need a break and I'm happy to have the court reporter break the session of the deposition and we'll take a break.

My only request is that you don't take a break while I have a question pending to you, that you finish the answer to the question. Is that clear?

A. Yes.

Q. Great. Is there any reason you can't testify under oath fully and truthfully here today?

A. No.

Q. Is there -- are there any medications that you're taking that might make it difficult for you to answer questions I ask you, or --

A. No.

Q. -- or give answers to those questions?

A. No.

Q. Okay.

A. Are both of you lawyers for HTM?

Q. Yes. Can you state your name, please.

A. Bishop Gregory.

Q. Have you gone by any other names?

A. Before I was a bishop, it was Father

16

Gregory.

Q. And before that, any other names?

A. Before I was tonsured a monk, it was Robert George.

Q. Robert George. Can you describe your educational background, starting with high school.

A. High school, and then --

Q. Where did you attend high school?

A. Boston Tech. And then college, Northeastern University.

Q. After Northeastern, was that the --

A. I didn't -- I didn't finish Northeastern University.

Q. And what year was that?

A. 1965.

Q. Okay. So you have a high school degree; is that correct?

A. Yes.

Q. Okay. Is --

A. And three years Northeastern University.

Q. Is English your first language?

A. Yes.

Q. Do you speak any other languages?

A. A little bit of Greek. A little bit of Arabic.

17

Q. Is that it?
A. Um-hum. A little bit of Russian.
Q. Anything else?
A. (Shook head.)
Q. Do you read any other languages besides English?
A. A little bit of Greek. That's about it.
Q. Is that it?
A. Yes.
Q. Describe your vocation, please.
A. I'm a clergyman.
Q. Are you familiar with Dormition Skete, Inc.?
A. Yes.
Q. What is Dormition Skete, Inc.?
A. It's a monastery.
Q. Is it also an entity?
A. What do you mean by that?
Q. A corporate entity.
A. Yes.
Q. Does it have a corporate status?
A. Yes.
Q. What is that corporate status?
A. Nonprofit religious corporation.
Q. Where is it incorporated?

18

A. Colorado.
Q. Where is it located?
A. Buena Vista, Colorado.
Q. Do you have a role at Dormition Skete, Inc.?
A. Yes.
Q. What is your role there?
A. President.
Q. Of the corporation?
A. (Nodded head.)
Q. Do you have any other roles?
A. No.
Q. Who is the Abbott of the monastery?
A. I am.
Q. I want to remind you to just give your answers verbally.
A. Okay.
Q. Thank you. So you're the -- you're the Abbott of the monastery; is that correct?
A. Correct.
Q. And you're also the president of Dormition Skete, Inc.; is that correct?
A. Correct.
Q. What is your role as Abbott of the monastery?

19

A. To instruct, teach the monks the monastic life.
Q. What are your day-to-day responsibilities?
A. That.
Q. Anything else?
A. I don't think so. Just to, you know, be an example to the monks in a virtuous life.
Q. When was Dormition Skete founded?
A. 1979 -- or 8.
Q. You're not sure which?
A. I have to look at my corporation papers.
Q. Okay. I think I have a copy of those.
    MS. BROSIUS: I'd like to introduce as Exhibit 1.
    (Deposition Exhibit 1 was marked.)
Q. (BY MS. BROSIUS) I'd like you to take a look at that document.
A. '79.
Q. 1979 you're saying is the year --
A. Yeah, I see it.
Q. -- that the -- Dormition Skete was -- was founded?
A. Right.
Q. Who founded it?

20

A. I did.
Q. Alone, or with others?
A. With others.
Q. Who were the others?
A. Archbishop Seraphim and Father Peter Burlakov, as you can see on --
Q. Those are the individuals listed as directors; is that correct?
A. Um-hum.
Q. And they were the directors at the founding of Dormition Skete; is that correct?
A. Correct.
Q. Who's Archbishop Seraphim?
A. He's the ruling bishop of the Diocese that I was in.
Q. Which Diocese is that?
A. Chicago and Central America.
Q. What was his role in founding the Dormition Skete with you?
A. Giving his blessing.
Q. What does that mean?
A. That means he permits me to start the monastery in his Diocese.
Q. So does that mean you are in communion with him?

21

A.  Yes.

Q.  And Dormition Skete was intended to be in communion with Dormition Skete --

A.  Right.  It was under him.

Q.  -- under him.  Does that mean he controlled it?  Or --

A.  That means he's the spiritual -- well, the bishop of the Diocese, and he controls all of the religious organizations in his Diocese.

Q.  And who's Father Peter Burlakov?

A.  He was a priest in Denver.

Q.  So was he physically present with you at the founding of Dormition Skete?

A.  Yes.

Q.  He was here in Colorado?

A.  Yes.

Q.  Was there anyone else here with you in Colorado when Dormition Skete was founded?

A.  When you say with me, what does that mean?

Q.  Here in Colorado involved in the founding of Dormition Skete.

A.  No.  All the parishioners, if you want to say, all the parishioners of the parish.

Q.  You're saying that the parishioners of --

22

A.  Well, you said did anybody help you.  You said --

Q.  I asked who the founders were, and you said Archbishop Seraphim, Father Peter Burlakov and yourself; is that correct?

A.  Yes.

Q.  Were there any other founders of Dormition Skete, Inc.?

A.  No.

Q.  No.  And who were the parishioners you just referred to?

A.  Could you ask did anybody help you.

Q.  I understand.  Who were the parishioners who were -- what do you mean by the parishioners?

A.  Parishioners of All Saints of Russia Orthodox Church.

Q.  And where is that located?

A.  On Iliff.

Q.  And where is that?

A.  Denver.

Q.  So that was the parish -- that at the time was the parish affiliated with Dormition Skete; is that correct?

A.  No, they were a parish under Archbishop Seraphim.

23

Q.  What was the relationship between that parish and Dormition Skete?  Did you --

A.  We were in the same church -- same church.

Q.  Did you give services there?

A.  Yes.

Q.  Were there any other fathers who would give or bishops who would give services there but you?

A.  And Father Peter.

Q.  Just the two of you?

A.  Um-hum.  There was no other priest here.

Q.  Do you recognize the document you're looking at?

A.  Yes.

Q.  And what is it, please?

A.  My corporation papers.

Q.  Your original articles of incorporation; is that correct?

A.  Yes.

Q.  I'd like to show you another document, and have it marked as Exhibit 2.

(Deposition Exhibit 2 was marked.)

Q.  Do you recognize that document?

A.  Amendment of corporation.

Q.  Do you recognize that document?

24

A.  Yes, I think.  I --

Q.  Can you look at the second page, please.  Do you recognize the -- do you recognize the second page?

A.  Okay.  Okay.  Yes, I think.

Q.  What is it?

A.  Articles of amendments.  I have to read it.

Q.  Is that your signature down at the end?

A.  Yes.

Q.  Why does it say George in parentheses?

A.  In the Russian Church, they -- since there are many Father Gregorys, they put the last name in parentheses.

Q.  So your legal name was Gregory George; is that correct?

A.  At that time, I think my legal name was Father Gregory.

Q.  But where I see Father Gregory George, that's you.

A.  Yes.

Q.  Is that correct?

A.  Yes.

Q.  On documents?

A.  Right.

25

Q.  Okay.  So is this an amendment to the original articles of incorporation?

A.  Yes.

Q.  And does it say here in the third paragraph that begins, "Upon the dissolution of the corporation the board of trustees shall after paying or making provision for the payment of all of the liabilities of the corporation."

Do you see where that language is --

A.  Um-hum.

Q.  -- in the third paragraph?

A.  Yeah.

Q.  You have to say yes or no.

A.  Yes.

Q.  Does that mean that if Dormition Skete, Inc., is ever dissolved, the liabilities of the corporation must be paid first?

A.  Upon dissolution -- dissolution -- is it dissolution of the corporation, is that the right word?

Q.  Um-hum.

A.  The board of trustees shall, after paying or making provision for the payment of all liabilities of the corporation, disburse -- dispense of all the assets of the corporation exclusively for the purpose

26

of the corporation in such manner or to the Diocese of Chicago of the Russian Orthodox Church outside of Russia.

Q.  Let me interrupt you there.  So does that initial sentence -- portion of the sentence mean that if Dormition Skete is dissolved the liabilities of the corporation must be paid?

A.  I imagine so, yes, if that's what it says.

Q.  Is that your signature there?

A.  Yes.

Q.  Do you remember filing this document?

A.  Yes, to the Diocese of -- okay.

Q.  Does Dormition Skete, Inc., have officers?

A.  Yes.

MR. INGOLD:  I'm going to object.  I think he was actually still responding when you asked your next question.

Q.  (BY MS. BROSIUS)  I think I asked you -- and unfortunately I don't have Livenote up and running, but I believe what I asked you was if that sentence states that after -- upon dissolution of the corporation, that Dormition Skete is obliged to pay or make provision for the payment of all of the

27

liabilities of the corporation.  Is that what it says?

MR. INGOLD:  And I'm going to object that it calls for a legal conclusion.

Q.  (BY MS. BROSIUS)  Is that what the document says?

MR. INGOLD:  Same objection.

Q.  (BY MS. BROSIUS)  Is that what the document says?

MR. INGOLD:  Same objection, you can answer.

A.  From what I understand, that's what it says.

Q.  (BY MS. BROSIUS)  Okay.  And does Dormition Skete have officers?

A.  Yes.

Q.  Who -- do you recall who the original officers of the corporation were?

A.  Yes.

Q.  Who were they?

A.  Bishop Seraphim, Father Peter and Father Gregory.

Q.  Now, they were all directors as well as officers; is that correct?

A.  Correct.

Q.  Do you remember what their -- strike

28

that.

Who are the current officers of the corporation?

A.  Archbishop Gregory.

Q.  Archbishop Gregory?

A.  Or Bishop Gregory.

Q.  That's you, correct?

A.  Correct.

Q.  What is your officer role?

A.  President.

Q.  President, okay.

A.  Um-hum.  Um-hum.

Q.  And who else?

A.  Bishop John.

Q.  What is his officer title?

A.  I think he's secretary.

Q.  Anyone else?

A.  Or vice president.  Yes.  Mother Mariam.

Q.  And what is her title?

A.  I think she's a secretary.  Wait.  The secretary-treasurer and vice president.  And I -- I'm not sure.  I have to look at the document.  I think -- let me see if I can remember.

Q.  Let me see if I can give you a document that might refresh your recollection.

29

A. Bishop John is vice president, and Mother Mariam -- no. Bishop John is treasurer and Mother Mariam is secretary and vice president. And you have to give me the document and I'll look for sure.

Q. Um-hum.

A. But that was a good guess.

Q. So I'm going to show -- have marked as Exhibit 3.

(Deposition Exhibit 3 was marked.)

Q. Just take a look at that document, please.

A. Okay.

Q. Do you recognize that document?

A. Yes.

Q. What is it?

A. It's a biennial report, a corporate or limited liability company, State of Colorado.

Q. For Dormition Skete; is that correct?

A. Yes.

Q. And is it dated 1999?

A. 1999, correct.

Q. Do you see where it lists officers' name and address?

A. Yes.

Q. Does it list George -- yourself as

30

president?

A. Yes.

Q. And does it list -- is that Mother Mariam? Is that Mariam Lizardos? Is that the same person?

A. Correct.

Q. And she's listed as the S. Do you know what that is?

A. I think probably vice president, secretary.

Q. Okay. And who is George -- George Egan is listed as TR. Is that treasurer?

A. Um-hum. Yes.

Q. Did you -- okay. Were those the officers at the time this document was filed?

A. Yes.

Q. And if you look under where it says Directors, the same names are listed. Those were the three directors of the Dormition Skete at the time; is that correct?

A. Correct.

Q. Do you know if there's been any change to the directors or to the officers since 1999?

A. I don't think so, no.

Q. So Bishop John, in fact, is not on this

31

list, correct?

A. Bishop John is George Egan.

Q. Ah. And is that -- did you instruct Mother Mariam to file this document?

A. It's -- it -- we have to file it, a bi -- biennial report.

Q. Did you --

A. This is what the corporate officers have to file.

Q. Understood. And you, in your role as president, would you be responsible for the filing of these corporate documents?

A. Yes, I imagine.

Q. For making sure they were filed?

A. I imagine.

Q. Do you remember talking to Mother Mariam about having to file these on an annual basis?

A. I -- yes, I guess you could say I remember talking to her. I --

Q. So as president, you do have administrative duties; is that correct?

A. Yes.

Q. What are some of the -- in addition to filing corporate papers for the company, what other administrative duties do you have in your role as

32

president or as director?

A. Other than filing papers? Is that what you said?

Q. Other than being responsible, as you believe -- as I believe you just testified, for making sure these annual corporate documents are filed, yes. Any other responsibilities?

A. What does a person do.

Q. Tell you what, we'll get back to that.

A. I don't know.

Q. Let me ask you another question.

Mother Mariam -- I'm going to call Mariam Lizardos Mother Mariam. She's listed here as vice president/secretary. Do I understand she's still currently vice president/secretary? Is that correct?

A. Correct.

Q. And also George Egan, Bishop John is currently still treasurer?

A. Correct.

Q. And these are the only officers and directors of the company; is that correct?

A. Correct.

Q. Who is Mother Mariam?

A. She's the Abbess of Holy Apostle Convent.

Q. What is Holy Apostle Convent?

33

A. It's another monastery for women.

Q. And what are her roles and responsibilities -- what are her responsibilities as vice president and secretary of Dormition Skete, Inc.?

A. To be present at corporate meetings, I'm -- I assume.

Q. You know, or you assume?

A. I know.

Q. Are there such meetings?

A. Yes.

Q. How often do those meetings occur?

A. Average, once or twice a year.

Q. What is the purpose of those meetings?

A. To discuss necessary business, I imagine, or to fill out documents.

Q. Documents for the corporation?

A. Um-hum.

Q. Anything else?

A. I don't think so.

Q. Who attends those meetings?

A. The corporate officers.

Q. Meaning these three individuals listed here?

A. Um-hum.

Q. Yourself, Bishop John and Mother Mariam;

34

is that correct?

A. Um-hum.

Q. Anyone else?

A. No.

Q. What other things besides corporate documents are discussed at these meetings?

A. Nothing.

Q. So you have a meeting, you fill out documents, and that's it?

A. Yeah.

Q. And this happens twice a year?

A. I -- you know, I'm not absolutely sure. Could be more, could be less. But you know, we're all -- we're all -- they're together, you know, at all times. You know, I could pick up a phone and we could have a conference call and --

Q. So there may be other times when you discuss your responsibilities to the corporation outside of these biennial meetings; is that right?

A. Yes, I guess you could say that. Yeah.

Q. What are Bishop John's duties as treasurer of the corporation?

A. Treasurer.

Q. What is the treasurer responsible for?

A. I guess the books.

35

Q. What kind of books?

A. The financial books.

Q. The financial books of the company?

A. Yeah.

Q. So I just want to clarify. No changes, to your knowledge, to the officers or directors since 1999; is that right?

A. Correct.

Q. Who owns the land where Dormition Skete resides?

A. Dormition Skete.

Q. Dormition Skete owns the land?

A. Correct.

Q. That's the name that's on the title?

A. Correct.

Q. When was the land obtained by Dormition Skete, Inc.?

A. 1978. Almost certain, yes.

Q. Was -- who was the land owned prior to that? By -- excuse me. Who owned the land prior to Dormition Skete owning the land?

A. A person by the name of Forest Woodland.

Q. And Dormition Skete purchased the land from Forest Woodland?

A. Purchased, no. He donated it.

36

Q. It was given to Dormition Skete?

A. Correct.

Q. Has the title ever changed since Dormition Skete acquired it?

A. No.

Q. So Dormition Skete is still listed as the owner of the land. Who owns Dormition Skete's assets?

A. Dormition Skete. Or --

Q. Solely? So who would you say owns Dormition Skete?

MR. INGOLD: Objection, calls for legal conclusions, and it's just a confusing question.

MS. BROSIUS: I'm going to introduce a document and have it marked as Exhibit 4. It's our only copy so can I have it back, please.

MS. HAMILTON: It's our only copy of the document.

MR. INGOLD: I need to take a look at it first, before we start going down that road.

MS. BROSIUS: Um-hum. Of course.

(Deposition Exhibit 4 was marked.)

Q. (BY MS. BROSIUS) I'd like to have you take a look at Exhibit 4.

A. Yes.

Q. And tell me if you recognize that

37

document.

A. Okay. Yes.

Q. And what is it?

A. Colorado Secretary of State corporate office -- corporation office visits, Dormition Skete, an eastern orthodox monastery.

Q. Excuse me.

A. Is it amendment -- articles of amendments.

Q. It's an articles of amendments dated -- what's the date on that?

A. Where's the date? 1994.

Q. Do you recall filing that amendment?

A. I signed it. I must have. But to recall it is something else, you know, I --

Q. You want to --

A. -- probably forgot it. Yes.

Q. Okay.

A. If I have my signature on it, I filed it. But memory of it --

Q. Okay.

A. -- is gone from me.

Q. Fair enough. Fair enough. Let's take a look at what it says. The first line, "Dormition Skete is independently and solely owned and operated

38

by the board of directors."

Do you see where it says that?

A. Yes.

Q. And you previously testified that the board of directors is comprised of you, Mother Mariam and Bishop John; is that correct?

A. Correct.

Q. Okay. So the -- does this say -- does this document at least say that the board of directors owns Dormition Skete, Inc.?

A. Yes.

Q. Do you, Archbishop Gregory, own anything in your own name?

A. No.

Q. No property?

A. No. I'm a poor man.

Q. Everything -- is everything that you use at Dormition Skete owned by Dormition Skete?

A. Yes.

Q. Okay. And Dormition Skete, in turn, is owned by the board of directors?

A. Yes.

Q. Which is you and two other individuals; is that right?

A. Yes.

39

Q. Does Dormition Skete have liability insurance?

A. Does Dormition Skete what?

Q. Have liability insurance?

A. No.

Q. You're sure of that?

A. Yeah, I don't buy insurance. I have --

Q. Okay.

A. I have God.

Q. Are you an officer of any other company?

A. No.

Q. Are you a director of any other company?

A. No.

Q. I want to talk about the other -- besides the board of directors and officers, who are these three individuals we've just been speaking about, are there any other members of Dormition Skete?

A. Members meaning what? Members of the corporation, or members of Dormition Skete?

Q. Let's start with both. So of the corporation, any other officers or directors?

A. No.

Q. What about any other -- let me back up.

Do you reside at Dormition Skete?

A. Yes.

40

Q. And does Bishop John?

A. Yes.

Q. And does Mother Mariam?

A. No.

Q. Where does she live?

A. In her convent.

Q. Where is that?

A. Two -- 29020 -- 29001 County Road 187.

Q. Okay. And the -- the land that you said Dormition Skete is on, is that the same land that the convent is on?

A. Yes, they're -- yes.

Q. So Dormition Skete --

A. They're adjacent.

Q. Excuse me. Sorry. They're adjacent.

But my question was, is the land on which the convent resides the same land that you just described that Dormition Skete owns?

A. It's on the same land.

Q. It's on the same land --

A. Yeah.

Q. -- as Dormition Skete?

A. Yeah.

Q. So Dormition Skete, Inc., owns the land on which the convent -- Mother Mariam's convent is

41

located?

A. I believe so.

Q. Okay. So any other members of Dormition Skete? And by that, I mean any other individuals residing at Dormition Skete with you, other than --

A. Say that -- say that again.

Q. Other than you and Brother John, are there any other individuals who reside at Dormition Skete --

A. Yes.

Q. -- the monastery?

A. Yeah.

Q. And how many?

A. Right now there are two others.

Q. Two others. And what are their names?

A. Patrick Mills.

Q. Is he a novice?

A. Yeah, I should call him Novice -- Novice Patrick.

Q. Novice Patrick. Mills is his last name?

A. Yes.

Q. And who is the other individual?

A. Isaac Johnson.

Q. Is Isaac Johnson also a novice?

A. No.

42

Q. What is his role at the monastery?

A. He is staying to -- I guess you could say to -- to get himself straightened out.

Q. Does he -- he lives on the -- at the monastery?

A. For one more month, yes.

Q. When did he arrive?

A. Two months ago.

Q. Two months ago. How long has Novice --

A. I'm --

Q. Excuse me.

A. I'm -- roughly two months ago.

Q. That's fine. When did Novice Patrick arrive at the monastery?

A. Over a year -- over a year -- I could say safely, over a year ago.

Q. So summer of 2008, approximately?

A. Okay.

Q. Is that fair?

A. Fair, I guess.

Q. You have to say yes or no. Sorry.

A. My memory is not -- you know, I'm not too good for remembering.

Q. What is Novice Patrick's role in the monastery? What does he do as a novice?

43

A. He practices the monastic life. He lives under obedience.

Q. Can you describe for me the buildings that make up Dormition Skete.

A. Yes.

Q. Can you do that, please.

A. There's the main building where we paint icons. There's a church. There's another building that, you know, we all live -- most of the people live there. And there is a building that we -- a shop that we cut wood. And on top of that, I have a little apartment.

Q. Okay. So there's the church?

A. And there's another church.

Q. Two churches?

A. Three churches. There's a church in the main building. I mean, in the building.

Q. Where you paint icons?

A. Where we paint icons, right. That's the original where we -- where we originally lived. So there's a small chapel in there.

Q. Okay. So there's the -- it's a -- one large building, a portion of which is dedicated to a chapel?

A. Oh, wait a minute. I made a mistake

44

previously. It just dawned on me. Father Peter. You asked me who other -- who others live there.

Q. Um-hum.

A. I forgot Father Peter lives there. He's another monk, so --

Q. Okay.

A. So don't hold me on that. I'm a little nervous.

Q. Father Peter. Okay. Father Peter lives there, as well. All right.

When did he arrive at the monastery?

A. When did he arrive. I don't know. From what I remember, maybe eight, nine, ten years ago.

Q. What -- okay.

A. Now go back to the --

Q. No, let me ask you one more question about Father Peter, similar to what I just asked you about Novice Patrick. What is Father Peter's role at the monastery?

A. He lives a monastic life, like Novice Patrick.

Q. Does he have any particular duties or responsibilities that you assign, or anyone there assigns?

A. Yes.

45

Q. What are those?
A. He cuts wood and mounts icon pictures on the wood.
Q. He assists in the creation of icons?
A. Um-hum.
Q. Is that right?
A. Um-hum.
Q. Who else works on the icon creation?
A. I guess you could say we all do.
Q. Including Isaac Johnson?
A. No. No, he's -- he does outside work.
Q. Okay. So the icons you just mentioned, are those something that the Dormition Skete sells?
A. Yes.
Q. To whom does it sell also icons?
A. To the public, except -- yeah, to the public. Except for, you know, there's no need to sell them to atheists.
Q. How does it -- how does it actually go about selling them? Do you have a store?
A. People place an order, and then we sell them. Yes, we have a web -- a web store.
Q. A web store?
A. And we have a catalog.
Q. A catalog, okay.

46

A. And we have a telephone.
Q. Okay. And so the web store, you take orders, you advertise; is that correct, on the website?
A. Yes.
Q. Which website is this?
A. dormitionskete.org.
Q. And you said you also sell through catalogues?
A. Um-hum.
Q. Do you distribute those catalogues?
A. Not anymore. Yes.
Q. How did -- how did you distribute them?
A. We mailed them out.
Q. To how -- what kind of mail list did you use?
A. Orthodox churches.
Q. Limited to Colorado, or elsewhere?
A. Elsewhere.
Q. Around the world?
A. You could say around the world, yes.
Q. Because that would be -- it's -- it wasn't just limited to individuals in the United States; is that right?
A. Well, say 99 and 44 percent United

47

States, but some went abroad.
Q. Do you still maintain sales over the website?
A. Yes.
Q. And what about through catalog offers?
A. What about?
Q. And al -- do you also still distribute the catalog?
A. No, we're all out of the catalogues for a long time.
Q. When was the last year you distributed the catalog?
A. I don't know. A couple years, I guess.
Q. And you said you also take telephone orders?
A. Um-hum.
Q. And you still do that?
A. Yes, um-hum. Yes.
Q. Can you describe the icons that you're selling.
A. Paintings of saints in the Orthodox Church, done in a traditional style. They're called icons.
Q. How much are they told for?
A. It varies. $20. $20, a mounted icon.

48

Q. It's a single price that you only make one kind?
A. Hmmm.
Q. Is there only one type of icon that you make?
A. No. There are many types of subjects.
Q. Understood. Is there just one --
A. But if they're on a piece of wood that's 10 inches by 8 inches, I think we charge $20.
Q. Are there any other icons you sell that are sold for any amount besides $20?
A. Yes. We paint icons also.
Q. Other than the ones that you paint on wood? Tell me --
A. No.
Q. -- about the other icons that you paint.
A. Yes, we paint icons for the walls of churches.
Q. I see. Are you compensated for those --
A. Absolutely.
Q. -- jobs? Okay.
A. Yes.
Q. So you sell icons mounted on the wood, you paint icons on wood mounted at buildings; is that right?

49

A. Yes. Mainly on canvas.

Q. On canvas, okay. Are there any other goods you make at Dormition Skete for the purpose of sale?

A. No.

Q. Just the icons?

A. That's how we live, yes.

Q. Any other services that you render, other than painting canvases for buildings?

A. For monetary gain?

Q. Correct.

A. No, I don't think so.

Q. So this -- there's nothing else beyond the icons that you sell?

A. I -- I can't -- let me think. Icons -- incense we've stopped.

Q. When did you sell incense?

A. When we had someone to make it.

Q. When was that?

A. I think about five years ago.

Q. Okay.

A. Icons, incense. That's about it that we sell.

Q. So icons, currently, the canvas and --

A. Oh, and we have books.

50

Q. You have books?

A. We have books.

Q. Let me ask -- excuse me. Let me ask you one more question about the canvases that you paint.

What are you compensated -- what have you been compensated for painting a canvas for a building?

A. It depends on the size.

Q. Can you give me an example of what you have been compensated.

A. Yes. If something is like 7 or 8 feet high, you know, the height of this -- one saint, approximately a thousand dollars.

Q. Are the larger --

A. And that -- and that includes installation.

Q. Okay. A thousand dollars --

A. Um-hum.

Q. -- for the painting and installation --

A. Um-hum.

Q. -- of an 8 foot -- approximately 8 foot tall painting. Are there any other sizes that you've painted?

A. Any size that they would want, we could paint.

Q. And you have done different sizes?

51

A. Correct.

Q. Have you ever been compensated more than a thousand dollars?

A. Yes.

Q. How much more?

A. I don't know exactly, but if a person --

Q. Can you estimate?

A. Yes. If a person buys 12 of those, it's $12,000.

Q. Has that ever happened?

A. Yes.

Q. Is $12,000 the most you've ever earned from these types of canvas paintings?

A. No.

Q. What's the most that Dormition Skete has ever earned?

A. You mean altogether for one church?

Q. If that's -- a good -- an easy way to do it, sure.

A. I have to think. The most. That would probably be -- let me think, now, how much. You know, it's got to be -- it's got to be maybe 60 -- it's got to be around the dome, back wall, four --

Q. Maybe we can get at it this way. Do you have a memory of what you earned -- what you did over

52

the last year?

MR. INGOLD: Counsel, I think he's actually sitting there trying to calculate something in his mind.

THE DEPONENT: Um-hum.

MR. INGOLD: Which I think is responsive to the question.

MS. BROSIUS: You can object. You can object, Chris, but I don't want to hear narrative on the record. Thank you.

A. Okay. I think maybe $200,000.

Q. (BY MS. BROSIUS) Is that over a course of years?

A. Yes.

Q. Do you have an estimate for how much you've earned from the sale of icons painted and canvas paintings installed or not installed, say, during 2008?

A. 2008, do I have a record of what? How many?

Q. Do you have a recollection of general -- an estimate of how much the Dormition Skete earned from the sales of icons in any form during 2008?

A. 2008 would probably be about 30 -- 30,000.

53

Q. And what about this year, 2009?
A. Probably about 20.
Q. 20,000 this year?
A. But I'm not sure. You can't hold --
Q. Oh, it's an estimate? That's fine.
A. Yeah.
Q. I'm just asking for your best estimate.
A. Yeah.
Q. About 20,000 --
A. Yeah.
Q. -- in 2009?
A. Yeah, I think we average about 30,000 if -- if we -- I shouldn't say average. But sometimes we get orders, sometimes we don't.
Q. 30,000 is an average for yearly intake of sales for icons?
A. Yeah, for four of us.
Q. Is there any other -- what other sources of income do you -- does the Dormition Skete have other than sale of icons?
A. None.
Q. None?
A. None.
Q. What about donations?
A. Donations, yes.

54

Q. What kind of -- can you give me an estimate for donations during 2008?
A. I would say maybe another 20.
Q. Okay. And this year, as well. What about this year, an estimate for the number of donations -- amount of donations you've received.
A. I would say about the same.
Q. Does the Skete get any other income other than donations and money from the sale of icons?
A. No.
Q. You'd mentioned books. What do you mean, does the Dormition Skete sell books?
A. We had one book that we just ran out of, and --
Q. What book was that?
A. Oh, no. We have two books. One is called the Teachings of the Orthodox Church.
Q. Teachings of the Orthodox Church?
A. Yes.
Q. Are you still selling that?
A. No, we ran out of it.
Q. When did you run out?
A. About three months ago, two months ago.
Q. When did you first begin selling it?
A. When did we print it? If I could ask

55

him, I would know. I don't know. Maybe about -- maybe ten years ago.
Q. And you sold it continuously for the past ten years, approximately?
A. Yeah.
Q. How much did you sell it -- how much did it cost?
A. To buy it, it's $14.
Q. How long was it?
A. Huh?
Q. How long was it? How many pages?
A. Maybe 200 pages.
Q. Who wrote it?
A. Father Michael Azkoul, and I edited it.
Q. Who is Father Michael?
A. He is a priest.
Q. Where?
A. Of the -- at that time of the Russian Church Abroad.
Q. Excuse me?
A. Of the Russian Church Abroad.
Q. Of the Russian Church Abroad?
A. At that time.
Q. Um-hum.
A. Subsequently he left with Father

56

Panteleimon and his group.
Q. So was he a member of Dormition Skete?
A. No.
Q. At any time?
A. No.
Q. What is the second book?
A. It's called Barlaam and Ioasph.
Q. Does that have an English translation to the title?
A. That's it.
Q. That's it?
A. That was English.
Q. And do you still sell that book?
A. Yes.
Q. When did you begin selling it?
A. I'm not sure, but I could guess maybe five years ago.
Q. And who wrote that book?
A. St. John of Damascus.
Q. And who is St. John of Damascus?
A. He was an author that -- he was an orthodox saint who lived in the 8th or 9th century.
Q. Was this a translation?
A. Yes.
Q. Who -- so when I say who authored the

57

work, I'm asking you who put together the text that formed the book that you then sold. And I understand that St. John was an original author?

A. Correct, yes.

Q. And were there edits made to his writings --

A. No.

Q. -- by anyone else?

A. No.

Q. Where did -- where did you obtain the source of those materials from -- of St. John?

A. A translation that was in the public domain.

Q. A translation in the public domain. Were you involved in the publishing of that book?

A. Yes.

Q. In what way?

A. Gave it to the printer -- or we gave it to the printer.

Q. Was it your idea to publish that book?

A. I don't know.

Q. You don't recall?

A. No. It could have been someone else's idea.

Q. Okay. But do you recall --

58

A. I --

Q. -- being involved in the production and publishing of that book?

A. Yes.

Q. And so were you involved in the selection of the St. John of Damascus text?

A. Yes. You could say that.

Q. How would you describe your role in selecting the material that appeared in that book?

A. My role in selecting the material? I selected it.

Q. From where?

A. From a printed text that was -- you know, that was available.

Q. A single -- so it was a single text that was a source for this, there were not numerous texts that you selected from; is that right?

A. There are numerous texts.

Q. Okay. But what --

A. I picked one.

Q. Okay. You picked one. Was it an English text?

A. Yes.

Q. And what did you do with that text to create the book that you later published?

59

A. I -- I had one of my parishioners typeset it.

Q. Um-hum.

A. Or type it out, and gave it to the printer.

Q. Did you make any changes?

A. I don't think so. Maybe. Maybe if there was something that was not clear, I changed it.

Q. Um-hum. Did you add any --

A. Photographs?

Q. No, excuse me. Did you add any text?

A. Well, to the -- maybe an introduction.

Q. You don't recall specifically?

A. Yes, an intro -- must be an introduction. Must be.

Q. When was -- when did this process take place, the -- you're having a parishioner typeset it? When did that take place?

A. I don't know, about five years ago.

Q. Five years ago. How long did the whole process take before it was finally printed?

A. I don't know. May have -- I could say three, four months.

Q. Who published it for you?

A. Who published it? I could guess -- a

60

printing house here in Denver.

Q. You just -- do you remember the name?

A. No.

Q. Can you spell the name of the title, please.

A. Barlaam, B-a-r-l-a-a-m, and Ioasph, I-o-a-s-p-h.

Q. Okay. Thank you.

A. Beautiful saints. I did that for the edification of the faithful.

Q. Do -- okay. Let me just make sure I have everything here. You, Dormition Skete, realizes income from the sale of icons, correct?

MR. INGOLD: Object to form.

A. Dormition Skete what?

Q. (BY MS. BROSIUS) You may answer. Does Dormition Skete -- I just want to clarify that I understand all of the sources of money that comes into the Skete. Sale of icons; is that correct?

A. Yes.

Q. And donations; is that correct?

A. Yes.

Q. And sale of books?

A. Right.

Q. Are there any other sources of income?

## 61

A. Well, right now, it's book.

Q. Book, understood. And that is the Barlaam and Ioasph, because the teachings of the orthodox church you no longer have for sale.

A. Right.

Q. Will you be reprinting that?

A. If we have the money, yes.

Q. So apart from the book and those other items, any other source of income for Dormition Skete?

A. I think so. My treasurer is right here, though. We could ask.

Q. Do you own any land? Does Dormition Skete own any other land?

A. No.

Q. What does Dormition Skete spend money on?

A. Nowadays, food.

Q. Anything else?

A. Living expenses. Gas. Just normal expenditures. Oh, mainly we give money to our priests. Our priests in the Congo.

Q. Okay.

A. We have to support not only the Congo, but Uganda. And we help the priests in Bulgaria.

Q. So you make donations to other members of --

## 62

A. Yes.

Q. -- the orthodox faith in general?

A. Yes.

Q. Not necessarily, though, Dormition Skete members; is that correct?

A. Members of the church.

Q. Of Dormition Skete?

A. No, members of the church.

Q. Okay. And when you say the church, which church are you referring to?

A. The Genuine Orthodox Church of America.

Q. Is that a church you founded?

A. No. It's founded by Christ. We're just a continuation of that -- with that -- with the current name.

Q. It's Genuine Orthodox Church of America?

A. Correct.

Q. I want to get back to -- actually, one further question on income. Do you give -- does Dormition Skete give money to the convent?

A. No. Well, we help the convent. Not monetarily. Let's see. Have we ever given money to -- no, I -- by and large, it supports itself.

Q. Does the convent give any money to Dormition Skete?

## 63

A. No.

Q. It's allowed to live on the land, however, correct? Is there a lease fee or anything -- kind of fee for residing there?

A. No.

Q. So there's no income that goes back and forth between --

A. No.

Q. -- either entity; is that correct?

A. No.

Q. I want to talk again about the -- I want to get back to talking about the buildings of Dormition Skete. You said there was a building where the icons are created; is that correct?

A. Yes.

Q. Internally to that is the chapel; is that right?

A. No, it's in the -- it's in the shop. What we call the shop.

Q. Is the shop part of the area where the icons of the building -- where the icons are created?

A. No. The icons are created as I paint them.

Q. Why don't you take me through the buildings. That's probably easier.

## 64

A. Come on. Let's go.

Q. So let's start with the residence. Where --

A. Okay. Their original residence was a building that we now paint icons in, but it's too cold to live in.

Q. Okay.

A. 'Cause we have -- we -- at that time we had no electricity.

Q. What do you call that building?

A. Well, it's called the studio. That's what we call it, yeah.

Q. Okay. So there's the studio.

A. Right.

Q. And what else?

A. What else is --

Q. What other buildings?

A. Okay. After that, we built the church, because we were given electricity. And then after that -- oh, there's a garage -- there's a garage.

Q. A garage?

A. A garage.

Q. What's that used for?

A. For the car -- cars. Then after that, what did we build? We built a shop, and that has

65

three rooms on top and one, say, big room underneath. And that's where we cut board.

Q.  In the room underneath?

A.  Right.

Q.  And the three rooms on top are your residence; is that correct?

A.  Well, I have one bedroom and the other rooms are a church room where we hold vestments.

Q.  Okay.  Vestments, okay.

A.  And then an office.

Q.  And an office?

A.  Um-hum.

Q.  Okay.

A.  And then there's a bathroom, yes.  And then the next building was a metal building where we have more rooms for everybody that's living.  And it's -- it has electricity and it's heated.

Q.  Is that where Novice Patrick and Father Peter live?

A.  That's where everybody else lives.

Q.  Everybody else lives.  Anybody else but Father Peter and Novice Patrick and Isaac Johnson?

A.  Guests.

Q.  Who else?  Oh, guests.  Okay.

A.  Guests count?  We have a guest list -- I

66

mean, a guest room.

Q.  What is that building called?

A.  What do we call it?  The main building --

Q.  The main building.

A.  -- I guess we could call it.  Or the big house.  The big house.

Q.  The big house?

A.  Yes.

Q.  Any other buildings?  You mentioned a chapel?

A.  Yes, we have a chapel.

Q.  Where is that?

A.  The cemetery.

Q.  A chapel and a cemetery?

A.  It's called the cemetery chapel.

Q.  Oh, okay.  Is that the single room building?

A.  Yes.  It's a small, unheated, no electricity.

Q.  What do you do in the chapel?

A.  Of the cemetery?  We bring in the bodies, and those go in there.

Q.  The cemetery.  I understand.  So that's reserved for services for the dead versus the church --

67

A.  Right.

Q.  -- where you would hold what?

A.  Yes.  And there's another church underneath in the main -- in the studio which we had initially.

Q.  What -- do you still use that as a church?

A.  Yes.

Q.  When do you use that church?

A.  For baptisms.

Q.  For baptisms.  So all the other main -- major services take place in the main church?

A.  Yes.

Q.  What's the name of the main church?

A.  Dormition.

Q.  Dormition, okay.

A.  Skete.

Q.  Skete.  Okay.  Does Dormition Skete have a library?

A.  Yes.

Q.  Where is that located?

A.  In the big house.  Yeah, we can call it the big house, right.

Q.  In the big house in its own, separate room?

68

A.  Yes.

Q.  Just books stored there, or what's stored in the library?

A.  Oh, now that you said bookstore.  We have a bookstore in the main -- in the studio.  Thanks for reminding me.  But we don't -- we don't sell very many books.  It's -- if people come, they want to see the monastery, then we show them the bookstore and they -- and they are Mother Mariam's books.

Q.  They're Mother Mariam's books --

A.  Mostly.

Q.  -- sold in the bookstore?

A.  Right.  So we -- we --

Q.  Are your -- are your books and/or book now sold in the bookstore?

A.  Yes.

Q.  Yes.  Okay.

A.  So we get them from her as a -- on bookstore rate, and we sell them for a -- a profit, 30 percent, normal bookstore rate.  Also, now that you refresh my memory, that we -- we sell belt buckles.

Q.  Okay.  Do you make them?

A.  No.

Q.  You buy them?  Where do you buy them?

A.  I have them made someplace in the country

69

here. I don't know where. I think --
Q. How much --
A. -- it was down South.
Q. How much do you sell them for?
A. I don't know. Let's see. Maybe $20 apiece.
Q. How many do you sell in a typical year, best estimate?
A. Maybe five, ten.
Q. Okay. So the library, that's a separate room of the big house?
A. Yes.
Q. What are the other rooms in the big house? Are they just bedrooms?
A. There are bedrooms, offices, then there's the main dining room, kitchen, and a guest room and a laundry room.
Q. Where -- where are the -- why don't you just actually take me through -- is the library in the main -- excuse me, the big house?
A. Yes.
Q. The only library on the property?
A. Yes.
Q. What's kept there?
A. All the books that I've -- I guess the

70

monastery's been given over the course of 30 -- 30 years.
Q. Does that include books that individuals donate to the -- to the monastery?
A. Could.
Q. Does it include books that you or any other member purchased?
A. Could.
Q. Brought in with you when you when you joined or founded in your case, the monastery?
A. Could.
Q. Where are -- are service books, liturgical texts kept? Are they kept in the library?
A. Perhaps, some.
Q. Are you guessing, or do you know that there are some service books there?
A. Well, you asked about the library. Perhaps there are some service books there. But they are kept probably in the church.
Q. They're kept in the church?
A. Yeah, but if they're old, used, you know, instead of throwing them away.
Q. Okay.
A. Maybe someone put them in the library. Could -- could be.

71

Q. Do all -- do all the members of Dormition Skete have access to the library?
A. Yes.
Q. And to the texts, any texts kept in the church?
A. Yes.
Q. Where else are books kept at Dormition Skete?
A. In bedrooms, I imagine. And --
Q. Individuals keep their own -- excuse me. Go ahead.
A. Yeah, they could put books, yeah, in the bedrooms. That's where normally they would stay.
Q. Do you have type of books in your own --
A. Do I have room?
Q. -- residences? Um-hum.
A. Do I have what?
Q. Do you have books in your own residence?
A. Yes.
Q. You do. So is it fair to say that the books that are being used during services are kept in the church?
A. Yes.
Q. Versus being stored in the library and brought to the church when they're needed?

72

A. Absolutely.
Q. What types of services books do you have in your Dormition cathedral now?
A. What types? Everything necessary to perform --
Q. Can you give me a list?
A. -- the service.
Q. Sorry. Can you give me a list of the service books by title that are in your church?
A. I could name books. There are a lot in Greek.
Q. Who --
A. There are in -- in English.
Q. How many are we talking about, just --
A. Oh, I don't know. Because I don't chant. I don't use them that often.
Q. Who uses them?
A. The chanters.
Q. What about other services books, do you --
A. Oh, for -- for me that I use? I use the service book for a bishop when I serve.
Q. What is that called?
A. I --
Q. Is there a single -- is it a single book?

73

A. Yes.

Q. So --

A. One for liturgy, one for vespers, or a service book that has both of them in it, either way.

Q. Do you have one that has both?

A. That I use, no. I use one that has -- when I serve from matins to vespers, that's a separate book. And the one for liturgy is a separate book.

Q. Is a separate book. Okay.

A. That's more efficient.

Q. Are any of those books HTM published books?

A. No.

Q. Who publishes those books?

A. The published -- at Holy Trinity Monastery, for one. And the other one I think is the OCA, and -- yes, and -- yeah.

Q. Are any of the other service books that, for instance, you said a chanter might use, are any of those HTM published books?

A. Yes. Now, we were donated the Horologion, I think, the Pentecostarion, and the Menaion.

Q. Those are the books that you have in your -- that Dormition Skete has currently that are

74

HTM published books?

A. Yes.

Q. The Horologion, the Pentecostarion and the Menaion; is that correct?

A. Right.

Q. Any other HTM books that Dormition Skete has?

A. I don't think so.

Q. Do you know -- actually, let's -- let me just ask you a couple other questions about this.

Does Dormition Skete -- okay. Beyond the cathedral and the library and other residences or rooms, where else are books kept at Dormition Skete?

A. Nowhere.

Q. Nowhere else?

A. The bookstore.

Q. The bookstore. For sale, correct?

A. Right.

Q. Does Dormition Skete own a computer?

A. Yes.

Q. How many?

A. Hmmm. Maybe five.

Q. Five. Is there one in your residence?

A. Yes.

Q. Is there one in Father Peter's residence?

75

A. Yes.

Q. Where else are -- where are the other three located?

A. The offices of Bishop John.

Q. Excuse me, I didn't hear that.

A. The office Bishop John.

Q. Of Bishop John, okay.

A. There's one in what we call the -- the foyer, and there's one in another office that's empty.

Q. Did -- do you have --

A. No. And there's one in the studio.

Q. Studio?

A. And there's one in the shop. So how many does that make it? 7.

Q. Studio, foyer, shop, Bishop John's office, your residence and Father Peter's residence?

A. Yes, and I forgot one other building, now that I'm counting the computers.

Q. Okay.

A. There's what we call the Kalebi.

Q. Kalebi. What is that?

A. It's just a one-room hut.

Q. What's that used for?

A. It's a catchall room.

Q. Storage?

76

A. Yeah, storage.

Q. Is there a computer there?

A. I don't know. I don't think so. We record -- use it as a recording room.

Q. Do you have Internet access?

A. Yes.

Q. To the computer in your room?

A. Yes.

Q. What about Father Peter?

A. Everybody does.

Q. Everybody does. Okay. What about copy machines?

A. One. No, copy machine like a --

Q. A xerox machine.

A. One.

Q. Where is that located?

A. My office.

Q. Your office, as opposed to your residence? Or it -- when you say your office, do you mean your residence?

A. Right. It's right next to my bedroom.

Q. What about scanners?

A. Yes.

Q. How many?

A. Two, I think.

77

Q.   Do you know where they're located?

A.   Bishop John's office and Father Peter's office.

Q.   And what about printers, meaning printers for -- does each computer have its own printer?

A.   The computers?  Yes.

Q.   So there are seven printers?

A.   No.

Q.   Do you have your own printer?

A.   Yes.

Q.   Does Father Peter?

A.   He and Bishop John share the same printer.  And the office -- the other office where there's no computer and the foyer one all share the same printer.

Q.   What do you use your computer for mostly?

A.   Answering e-mails.  Connecting, you know, con -- with the clergy, looking at news, since we don't have TV.

Q.   Anything else?

A.   Looking at scores -- well, scores of the Boston Red Sox.  Can I talk with my -- can I talk to my lawyer for a second?

MR. INGOLD:  That would -- that wouldn't work.

78

THE DEPONENT:  Wouldn't work?

MR. INGOLD:  I mean, unless --

Q.   (BY MS. BROSIUS)  Do you need to take a break?  Is that what you're asking?

A.   Yeah.  Do we have water?

Q.   Oh, of course.  Yes, yes.

A.   When are we going to take a break?

Q.   Why don't we take a five-minute break.

MS. BROSIUS:  We can go back on the record.

Q.   (BY MS. BROSIUS)  Oh, can I just ask, did you have any conversations with Bishop John at the break about the testimony you just gave?

A.   Nope.  He didn't -- he left.

Q.   So, no, you did not?

A.   No.

Q.   Okay.  And when we were just speaking, you said that Dormition Skete has the HTM versions of The Horologion, Pentecostarion and Menaion; is that right?

A.   Yes.

Q.   Any other HTM version publish -- let's say published books at Dormition Skete?

A.   From HTM?

Q.   Yes.

79

A.   I think what they -- what they published -- can you name them, and I'll tell you if I have them?

Q.   Sure.  Yeah, that's --

A.   I still have a floater in my eyes, you know.  If I look at you, I see this there -- a thing.

Q.   Oh, and you want to chase it.  I have one of those myself.

A.   Yeah.

Q.   How about the -- do you have HTM's version -- and when I say version, I mean the book of that title that is published by HTM -- the HTM version of The Psalter?

A.   Oh, absolutely.

Q.   Now, how --

A.   Now, I should have said The Psalter earlier, because it's a service --

Q.   And --

A.   Well, it's not a service book, but it's the Scriptures.

Q.   When -- how did -- when did you obtain it, do you recall?

A.   We have many copies.  I don't know when.

Q.   You have many copies of HTM's Psalter?

A.   Yeah.

80

Q.   Have you had it for more than five years?

A.   I was the one that put it together, physically put it together.  The first publication was in 1974, and they had a problem with the first page.  And I was the person who tipped in on the first page, because they published it without a first page.  And Father Panteleimon was so upset, and I'd come --

Q.   So you were involved in -- you were there at HTM when The Psalter was published in 1974; is that what you're saying?

A.   Correct.

Q.   I'm just going to show you, because what I'm asking -- the question I want to ask you is about the Dormition Skete's copies of The Psalter.  I'm not -- actually not going to -- well, let me just show this to you --

A.   Yes.

Q.   -- before we have it marked.

A.   Yes.

Q.   Does Dormition Skete have copies of that very book?

A.   Yes.

Q.   And is that what you referred to as having multiple copies?

A.   This and whatever came afterwards.

81

Q. Okay. So that -- if you look at the fly --

A. Pardon me?

Q. That's not it. Do you see the date on that book?

A. 1974.

Q. Okay. So you have the 1974 version at Dormition Skete?

A. I think so.

Q. Okay. And my question --

A. You see this page? I put it there.

Q. Okay. Thanks for pointing that out.

A. See how it's glued like that?

Q. Um-hum.

A. Poor man went crazy when he saw that there's no first page.

Q. I see. So I have another question about that. You don't recall --

A. You see this sketch?

Q. You know what, Father, I don't want to interrupt you.

A. Okay.

Q. I don't want to be rude. It's just that unfortunately we're on the clock, and I want to, of course, get you out of here as soon as possible.

82

A. Okay.

Q. So my question before was whether you recall when you first obtained the 1974 book, and --

A. 1974.

Q. So you came to Dormition Skete, you -- when you founded Dormition Skete in 1979, you had a copy of The Psalter with you?

A. I don't know. I don't know if it was --

Q. You don't remember?

A. No.

Q. But sometime between 1979 and when did you -- do you recall obtaining the first copy of that?

A. No, but the likelihood is that I had a Psalter coming, but I'm not sure. I -- when I came to the monastery, I had The Psalter.

Q. You had this book?

A. Yeah, 'cause that -- probably, yeah. Because it was printed -- it was printed in 1974.

Q. Okay. And then subsequent to '79, you have obtained other copies of that book?

A. Yes.

Q. Do you remember when the last time is that you obtained --

A. No.

Q. -- the HTM version?

83

A. No.

Q. Would you order -- do you recall ordering books from HTM?

A. No.

Q. Do you recall anyone else from Dormition Skete ordering books from HTM?

A. No. These are probably books that were given to us.

Q. Given to you?

A. From our people who came with -- with books.

Q. I guess we'll have that --

A. I --

Q. I think we'll have that marked, actually, as Exhibit 5. I know I produced this actual book to you, so I don't have a copy for you today.

MR. INGOLD: That's fine.

MS. BROSIUS: We'll provide you a copy of the exhibit-stamped front page. So that will be 5.

(Deposition Exhibit 5 was marked.)

Q. (BY MS. BROSIUS) Did you ever ask anyone at the convent to order any books for you?

A. Sure.

Q. From HTM?

A. Yes.

84

Q. The Psalter?

A. Could be -- could be, because once I found out that they were homosexuals, I did not purchase from them directly. But if we needed -- if we needed -- if we needed any books, I went through a third party.

Q. So you asked the convent to order books for Dormition Skete; is that correct?

A. Not necessarily from the monastery, but from their bookstore -- from their bookstore affiliates like St. Nectarios Press.

Q. Understood. Okay. So The Psalter. What about the Pentecostarion? Do you have a copy of HTM's version of that book?

A. I think so.

(Deposition Exhibit 5 was marked.)

Q. And so I'm going to have you take a look at that.

MR. INGOLD: Can we take a quick break? This is an unexpected call and it's probably really urgent.

MS. BROSIUS: Sure. Go off the record. Thank you.

(A break was taken.)

Q. (BY MS. BROSIUS) So, Archbishop, I just

85

handed you a document.

A. Yes.

Q. Do you recognize that document?

A. Looks like it's the Pentecostarion.

Q. Do you -- does Dormition Skete have a copy of this HTM version of the Pentecostarion?

A. I don't know for sure.

Q. Actually, let me just ask you one further question.

Do you recognize this as HTM's version of the Pentecostarion?

A. If you say it is, I'm -- look at -- I'm trying to remember this. There's three sets of books that we have on the chanting stand, three sets. One is The Menaion.

Q. And who publishes that?

A. Boston.

Q. Excuse me?

A. HTM.

Q. HTM publishes the Menaion that you use?

A. Currently, yeah. Well, not current -- exclusively the one we use, but --

Q. But you use it, it's the HTM version of the Menaion?

A. Yes.

86

Q. When did you obtain that?

A. About three, four months ago.

Q. Three or four months ago. You didn't have --

A. When -- well, I can't ask.

Q. Go ahead.

A. We have -- go ahead?

Q. No, I'm saying go ahead with your answer. You said three or four months ago you believe you obtained it?

A. Mother Mariam's father died. She wanted to do something in his memory, so she bought us the Menaion. Now, that has been -- oh, no, it's probably -- I don't know. Maybe it's six months -- maybe six months ago, I don't know.

Q. And prior to that, you did not have a version of the HTM Menaion?

A. No, not to my knowledge. We have other Menaion.

Q. What other HTM books? You said The Psalter, correct?

A. I'm trying to think of what's on the chanting stand.

Q. You know, as you're thinking, let me just ask you the questions I need to ask you. The Psalter

87

you say you do have?

A. Yes. Yes, The Psalter.

Q. And when -- you said you've had that for at least five years?

A. No, from the -- probably from the -- since the time I left the monastery.

Q. So at least five years?

A. Oh, yes.

Q. What about this Pentecostarion that's just disappeared?

A. I'm -- yeah, I think that that's one of the books that's --

Q. That you do have?

A. Yes.

Q. And do you know when you obtained the Pentecostarion?

A. Probably about a year ago. And I don't know how we got it.

Q. How do you remember that it was one year ago?

A. I'm giving a guess.

Q. So it could have been you -- it could be that you've had it longer; is that right?

A. Could be, but we're -- we're always using the Menaion from -- I mean, the Pentecostarion from --

88

from the Russian Monastery.

Q. But you can't say for sure that you did not have HTM's Pentecostarion longer than one year ago; is that right?

A. I cannot say for sure.

Q. Um-hum.

A. I cannot say for sure that I've had it longer.

Q. Do you know when the HTM Pentecostarion was published?

A. No. 1984. It says it right here. Well, that's when it -- it's --

Q. And you don't recall getting a copy of that --

A. (Shook head.)

Q. -- in the '80s?

A. Never.

Q. '90s?

A. No, I wouldn't use their version.

Q. But you have a copy of it now; is that right?

A. Yeah, I shouldn't have said that. I wouldn't buy from them from 1984. They -- I didn't know they printed it in 1984.

Q. When did you think they printed it?

89

A.  I don't know, because I never -- we just got a copy of this lately.  And I -- like I said, I don't know how we got a copy.  I don't know who gave it me.

Q.  Is it a hard copy book?

A.  Yes, that's how I remember, because it's got a red cover, I think.  I'm sure.

MR. INGOLD:  And, Counsel, just so that the record is correct or -- or clear.  The copy that you've shown the deponent doesn't match what was sent me as an exemplar.  They're typeset differently.  They may be substantively the same, but they're typeset differently.  I don't know if that makes a difference, but --

MS. BROSIUS:  Okay.  Noted.

MR. INGOLD:  Do you have a copy of what you're giving the deponent that I can have?

MS. BROSIUS:  Oh, I do.

MS. HAMILTON:  No.  These --

MS. BROSIUS:  Oh, no, no, no.  Sorry. Not now.  Sorry.  These are the single sets that were -- we'll have them admitted.

MR. INGOLD:  And that's fine, but The Psalter is typeset the same as what I have.  But the Pentecostarion is typeset differently, which leads me

90

to believe that there may be differences between what you're showing him and what I have.

MS. BROSIUS:  Understood.  So I'm -- I'd like to have this introduced as Exhibit 6.

MR. INGOLD:  Okay.  And I would ask just that as a follow-up to clear due process issues, you provide me with a copy of that exemplar.

MS. BROSIUS:  Certainly.

(Deposition Exhibit 6 was marked.)

A.  Ooh, I'm clear now.  There's no floaters. My --

Q.  (BY MS. BROSIUS)  Okay.  I have a few other questions on The Psalter, so -- this book here.

When you were describing the process by which you created the Barlaam and Ioasph --

A.  Ioasph.

Q.  -- Ioasph book, you said you took a book, had a parishioner typeset it, and then published it; is that accurate?

A.  Accurate.

Q.  Did you ever create -- did you ever -- did you ever do that with HTM's Psalter?

A.  Did I ever print their Psalter?

Q.  Did you ever use their Psalter to create a typeset version?

91

A.  Of their Psalter, no.

Q.  What about to create PDFs?

A.  Of what?  I mean --

Q.  Of other -- of their Psalter or portions of their Psalter.

A.  No.

Q.  Did you ever reproduce any portion of the H -- of this HTM Psalter on your website?

A.  Perhaps.

Q.  Why do you say perhaps?

A.  Because I don't know for sure if we -- if we -- when we put up services, if we corrected The Psalters that -- I mean, the psalms that were in -- in the services that they -- that we put up.

Q.  Okay.  So your answer, then, is yes, it's -- it's your testimony that some portion -- at least some portion of the HTM Psalter was reproduced on your website?

MR. INGOLD:  Objection.  Asked and answered, and it misstates the deponent's testimony.

Q.  (BY MS. BROSIUS)  Can you answer that question.

MR. INGOLD:  Same objection.  Go ahead.

A.  Yes.

Q.  (BY MS. BROSIUS)  Your answer is yes?

92

A.  Yes.

Q.  Was it portions of the HTM Psalter or was it the entire work?

A.  Portions.

Q.  Can you identify which portions?

A.  On one.

Q.  And what is that?

A.  The 50th Psalm.

Q.  The 50th Psalm was reproduced on your website; is that correct?

A.  I'm pretty sure.  It must have been. It's in a lot of services.  So if we've been using the 50th Psalm for 40 years --

Q.  But that's not my question.  My question is whether the HTM version -- and you said as an example of the 50th Psalm that appears here in the HTM, in this HTM Psalter.  Is it the HTM version that you've reproduced on the website?

MR. INGOLD:  Object to form.

A.  I think the answer to -- it is.

Q.  (BY MS. BROSIUS)  It is?

A.  Yes.

Q.  And there could be others, you just can't identify others right now?

A.  There -- there are many others.  But you

93

said is it their 50th Psalm. I could say that it's
Brenton's 50th Psalm, which is identical.
Q. Okay. Here's my question.
Did you ever take this HTM book that you
have already testified that you have --
A. Yeah.
Q. -- right? At Dormition Skete? And did
you ever take the contents and have those contents
typeset?
A. Me?
Q. You personally. Did you ever do that?
A. No.
Q. Did you ever ask anyone to do that?
A. Perhaps. I'm not sure.
Q. You don't recall?
A. No.
Q. But you may have?
A. Yeah.
Q. Who may you have asked to typeset the HTM
Psalter?
A. Oh, never to have it typeset. But you
said to take a psalm?
Q. No, I said typeset. Would you -- is
there -- is -- did you -- you said you did not typeset
the HTM Psalter. Did you ever ask anyone else to

94

typeset the HTM Psalter?
A. No.
Q. What about make copies that would be
scanned into a computer?
A. Probably, yeah.
Q. Who did you ask to scan the HTM Psalter
into a computer?
A. Who did I ask? I could have asked
anybody that could scan it.
Q. Did -- my question is did you do that?
Do you have a recollection of doing that?
A. No. No.
Q. But you're saying you could have?
A. I probably did, yes.
Q. And you probably did?
A. Yeah, because it's been in -- it's been
in the Russian Church to 40 years.
Q. The HTM Psalter?
A. Yes, since 1974.
Q. Okay. But you don't have any specific
memory of asking, for instance, Father Peter to scan a
book. And --
A. No.
Q. -- did you ever witness him doing that?
A. No.

95

Q. Do you have any reason to think he did
that?
A. Any reason to think he did that?
Q. Do you think he did that?
A. I don't know, you know, because you could
ask me, Did -- did Father in -- in Pennsylvania ever
do it. You know, he could have done it. He could
have not. I don't know.
Q. That's fair enough. What I'm asking you,
though, is for your -- as you sit here today, your
recollection of your actions, including --
A. No, my actions --
Q. -- your knowledge or memory of what you
witnessed other people doing.
A. No.
Q. Okay.
A. I never saw Father Peter do it. And I
have no recollection of telling someone else to copy
their Psalt -- we use The Psalter. Now, when I tell
someone, you know, read the 50th Psalm, I'm assuming
they're going to read the 50th Psalm from The Psalter
that we've always used.
Q. Okay. And when the --
A. And if I tell them --
Q. And when the 50th Psalm appears on your

96

website --
A. It's --
Q. -- you know it's HTM's version of the
psalm?
A. Yes. Well --
MR. INGOLD: Counsel, you got to let him
talk.
Q. (BY MS. BROSIUS) You can finish. Go
ahead.
A. Okay.
Q. But first answer my -- finish -- answer
my question. Is that correct what I just asked you?
A. Is it --
Q. When it appears -- when the 50th Psalm
appears on your website, is that HTM's version of the
50th Psalm?
MR. INGOLD: Object to form. You can
answer.
A. If I could say to you that your -- H --
if HTM took The Psalter or the 50th Psalm from some
other source --
Q. (BY MS. BROSIUS) I'm not talking about
that. I'm saying how it appears here. Is this
version on your website?
A. Yes.

97

Q. It is?

A. Probably, yes.

Q. It is.

A. Yes. I would use -- I would use that, because it's always in the -- it's always been in the Russian Church.

Q. Okay. And apart from the 50th Psalm that's been our example of the last few minutes, are there other psalms or con -- portions of the HTM Psalter that also appear on your website?

A. Probably 142, which is in -- which is in the vespers. Portions of it, yes.

Q. Portions of it, of Psalm 142? Any other psalms?

A. Psalms, I don't -- I don't know. But wherever there's a psalm in the service, it's our practice to use the one of The Psalter that has been part of the Russian Church and accepted by our bishops.

Q. Which is the ATM -- which is the HTM version?

A. Yes.

Q. So in fact, if I see anything on your website that is from The Psalter --

A. You can assume that it's --

98

Q. The HTM version of The Psalter?

A. Right.

Q. Not someone else's version of The Psalter?

A. Oh, yes. It's someone else's, too.

Q. Let's go back to the Pentecostarion. You said you have a copy -- you have the HTM Pentecostarion at Dormition Skete; is that correct?

A. Yes.

Q. Do you want to take that? I know it's pretty big, but -- and you said you -- you believe you -- you obtained it at least one year ago; is that right?

A. Not more than a year ago. But I've noticed -- I don't think I've seen one. But like you said, I have the one that's bound.

Q. Okay. So if this is a copy -- if this is a copy of the bound version, you have the bound version?

A. Right.

Q. And how -- how are you sure, or -- or what is your recollection of how you obtained -- how Dormition Skete obtained a copy of the Pentecostarion?

A. I don't --

Q. The HTM Pentecostarion.

99

A. I don't know how they obtained it.

Q. You don't recall? Do you know if it was ordered or given to you?

A. It could have been either. I don't get involved with --

Q. Are you familiar -- when would the Pentecostarion be used during a service?

A. From Pascha -- no. From -- yeah, from Pascha until Pentecost.

Q. Okay.

A. Um-hum.

Q. Would any -- did you ever reproduce portions of the HTM Pentecostarion service text on your website?

A. No, I never did. I don't know. When you say did I --

Q. You did not?

A. No, I didn't do it.

Q. Who did do it?

A. I don't know if --

MR. INGOLD: Object to form.

A. I don't know who did it.

Q. (BY MS. BROSIUS) Do you have any knowledge of anyone using the HTM version of the Pentecostarion to reproduce portions on your website?

100

A. Do I have any knowledge of anybody that has taken -- no, I don't. If anybody has taken it -- I don't know if they -- they took this and put it on the website.

Q. Is it similar to this -- similar or different to the Psalter, in that if there are services contained in the Pentecostarion on your website, is it a fair presumption that they're the HTM version?

A. No. When it comes to other services, we have other sources which we -- which we would probably use.

Q. Like which published version?

A. Things that are available.

Q. Can you give me an example of some other publishers of the Pentecostarion whose texts you have and use?

A. We have, I believe -- now, you got to know that I don't use it. It's the chanters that use it -- versions by Father John Lewis, and from Holy Trinity Monastery and from whatever is probably on the Internet. I think maybe there is a -- a Serbian version that's also available. But they're all translating -- you know, they're all in English and all translating the same hymns, so there's no real

101

reason to use theirs.

Q.  Do you use the HTM version that you do have, the bound version?

A.  No, I don't use it.

Q.  Does anyone else there have it or use it?

A.  They may use it during the services. Maybe this was also donated to us.  And if it was donated to us and the people come to church, they would like to see it, you know, at least there.  So maybe we keep it there because we don't want to offend someone that they donated a copy and --

Q.  Ummm.  I think we produced this to you. Show you -- actually, let me take the Pentecostarion from you.  Excuse me.

A.  Okay.

Q.  I'm going to ask you if you recognize that book.

A.  Yes.

Q.  And what is it?

A.  The Great Horologion.

Q.  Is that the version published by HTM?

A.  That's what it says.

Q.  When was it published?

A.  1997.

Q.  1997.  Do you -- does Dormition Skete

102

have this book?

A.  Yes.

Q.  How many copies?

A.  Two.

Q.  Two.  Do you recall when it obtained the first copy?

A.  Just like the Pentecostarion, it showed up the same time.

Q.  So at least a year ago, but it could have been longer; is that correct?

A.  Not much.

Q.  That's not correct?

A.  No, it could -- it was printed in '79.  I don't know -- I don't recall when we got it.  And it may have been donated to us when Mother Mariam bought the Menaion.

Q.  Um-hum.  And what about the second copy? Do you recall how you obtained -- how Dormition Skete --

A.  Both.

Q.  -- obtained it?

A.  Both showed up at the same time, one for each side.  In the Orthodox Church, we have two choirs.

Q.  Did you ever -- so you never ordered this

103

book?

A.  No.

Q.  It was given to you, you believe?

A.  Yes, I think.

Q.  You think.  And do you have any recollection of ever asking anyone else to order it for you?

A.  No.

Q.  The convent?

A.  No.

Q.  No recollection of that?  Are portions of this -- this HTM version of The Horologion, are those versions -- are any portions produced on your website?

A.  Probably not.

Q.  Why do you say --

A.  No.  I would say no.

Q.  Why do you say no?

A.  Because we have The Horologion from other sources.  We wouldn't use this because it's copyrighted.

Q.  So you never asked anyone -- you never reproduced portions on your website of the HTM version of The Horologion?

A.  No.  No.

Q.  And you never asked anyone else to do it;

104

is that right?

A.  No.  No, but they're using my icons here.

Q.  Do you -- give me an example of some of the other publishers of The Horologion that you do have and use in services?

A.  We use a Horologion made by Jordanville, the Russian Monastery.

Q.  I'm going to have that introduced as Exhibit 7.  Can we just have the court reporter put a stamp on there.

A.  Yes.

(Deposition Exhibit 7 was marked.)

Q.  Thank you.  I think I'm done with that.

A.  Two of my icons in here so far.

Q.  I'm going to show you another book.  I'm going to ask you if you can identify that.

A.  Prayer book.

Q.  Is that the HTM version of the prayer book?

A.  Yes.

Q.  Do you know when it was published by HTM?

A.  It says 2005.

Q.  Do you have a copy of that book?

A.  Yes.

Q.  How many?

105

A.   One.
Q.   When did you obtain that book?
A.   I don't know.
Q.   Could it have been a month ago?
A.   It could have been a month ago.  It could have been --
Q.   Can you give me an estimate of how long ago you obtained it?
MR. INGOLD:  Objection, Counsel.  You're cutting him off.
A.   Okay.  It's probably more than a month, because it's -- it was very much beaten up.  It was used and -- you know.
Q.   (BY MS. BROSIUS)  You obtained a used version, not a new version; is that what you're saying?
A.   A used version appeared in our library.
Q.   And you don't know how it got there?
A.   No.
Q.   So --
A.   I could give you a very good -- a guest left it in his room.
Q.   A guest left it in his room?
A.   Yes.
Q.   You know that?

106

A.   That's why -- I'm pretty sure that's how it got there, because I didn't buy it.  And it was used.  It was worn out.
Q.   From -- it was -- was the 2005 version?
A.   I don't know.  How many how many versions did they --
Q.   What guest do you believe left it there?
A.   I don't know.
Q.   Then I guess -- I guess I'm a little puzzled why you think it was a guest, then.  But you have no other recollection of who, when, why, or it could have been --
A.   Let's put it this way.  I would never buy it.
Q.   Okay.
A.   And I did not buy it, I could tell you for sure.  You know, my memory is not that bad.
Q.   Did you ever ask anyone else to buy it for you?
A.   No.  No.
Q.   Is -- are any portions of this HTM version of the prayer book on your website?
A.   No.  How could they be?
Q.   I'm asking is that -- do you know if any portion of the HTM prayer book was reproduced on your

107

website?
A.   No, I have -- no, I don't know.
Q.   You don't know.  Did you ever ask anyone to reproduce any portion of the HTM prayer book on your website?
A.   Absolutely not.
Q.   Did you ever have a conversation with anyone about reproducing HTM materials on your website?
A.   No.
Q.   You never had a conversation with anyone about that?
A.   Never.
Q.   Never.  I'm going to have that marked as Exhibit 8.
(Deposition Exhibit 8 was marked.)
A.   They have my sketch here.
Q.   I'm going to show you another -- it's a two-volume set.  Want to show this to you and ask you if you recognize those documents.  Thank you.
A.   It says the Ascetical Homilies of St. Isaac The Syrian.
Q.   Do you recognize that as HTM's version of the St. Isaac one?
A.   Only because it says translated by HTM.

108

Q.   Do you have a copy of that publication, that HTM publication?
A.   This particular one?  1984?
Q.   Do you have -- yes, do you have that?
A.   No.
Q.   Do you have any HTM version of the St. Isaac --
A.   Yes.
Q.   -- work?
A.   Yeah.
Q.   What version do you have?
A.   I have the one that's bound thick -- the thickly hardbound one.
Q.   Okay.
A.   The first printing --
Q.   Got it.
A.   -- I guess you could say.
Q.   Do you recall when that first printing was?
A.   No.
Q.   If I represent to you that this is actually a spiral bound two-version soft cover copy of that, do you have any reason to distinguish this, what you're looking at here, from what you know you have in the bound version?

109

A. Do I have any reason to think that this is different?

Q. Correct.

A. If you say I -- it's identical, I will -- I will take your word for it. But it's not identical, because I saw this. You gave it to my lawyer and some of the sketches are not in it. And it's -- it's different. There are more pages in the bound one.

Q. Okay.

A. There's -- Father Panteleimon put a sketch of himself in it, and it's not in here.

Q. Okay. So can you tell me again the version of -- the HTM version of the St. Isaac work that you do have, how many copies do you have?

A. I think two.

Q. How did you obtain those copies?

A. Oh. I didn't buy it. Probably -- because they're very expensive. Probably someone donated them. I don't --

Q. Do you recognize --

A. I don't remember.

Q. You don't remember. You could have bought it, someone could have given it to you, you just don't recall how you got it?

A. I don't recall.

110

Q. Do you remember when you obtained those copies?

A. I don't remember. If they published it in '84, that's many, many moons ago.

Q. So it's possible you had it shortly after it was published?

A. It's possible.

Q. Did you ever reproduce any portion of this HTM version of the St. Isaac work on your website?

A. There's that one psalm, and I don't know if it's theirs. I forgot. It's identical to someone else's on -- on the Internet.

Q. On your website?

A. There is one homily, I think two paragraphs, that I'm told is identical to theirs and someone else's.

Q. So our website was -- I'm sorry, you said psalm or homily?

A. One homily.

Q. One homily, one St. Isaac homily was on your website and it was, you're saying, the HTM version of the St. Isaac -- of that same St. Isaac homily; is that correct?

A. I guess you could say -- you get to call

111

it the HTM version. There are other sets of homilies out there, but this particular one that was on my website, I don't know where I got it from because it was put up there way back. Probably when the website -- when my website was put up.

Q. Which was when?

A. I don't remember.

Q. But you have these works -- these HTM works that you said you have -- you had them before you had the website; is that right?

A. Yeah, most likely.

Q. What about any other -- does that homily have a name, the one you're referring to?

A. Yeah. Do we have -- it's very appropriate for them. It's love and repentance, something like this. I don't know the number. Do you remember the number, the chapter?

Q. You know what, if you don't recall it, I'm just interested in what your recollection is here right now. And if you don't remember the name --

A. I don't remember the name.

Q. That's okay.

A. I don't remember the name or the number.

Q. Okay.

A. But there is one that inadvertently was

112

left on the website after the settlement of the previous lawsuit.

Q. So I'm going to have that marked as Exhibit 9. It's a two -- both of them together.

(Deposition Exhibit 9 was marked.)

Q. I'm going to show you, now, two others. Do you recognize that book?

A. This is The Octoechos.

MR. INGOLD: Counsel, I'm going to object and notify you of a problem. I asked for exemplars of the works -- of the works the infringement was claimed regarding. This was not provided to me.

MS. BROSIUS: Okay. I'll make a note. It should have been.

Q. (BY MS. BROSIUS) Can you take a look at that, Father.

MR. BROSIUS: Actually, I need -- you know what, I need him to look at it, because he's the one answering the questions.

MR. INGOLD: And that's fine, but since I'm your counsel, I guess I need to take a quick look to see what you're showing him --

MS. BROSIUS: Okay.

MR. INGOLD: -- that should have been provided to me previously.

113

MS. BROSIUS:  Can we go off the record. Thank you.

(Discussion off the record.)

MR. INGOLD:  Okay.

MS. BROSIUS:  All right.  Let's go back on.

MR. INGOLD:  And hopefully, Counsel, that two-minute interlude didn't disrupt you too much.

MS. BROSIUS:  You know what, it didn't.

Q.  (BY MS. BROSIUS)  Okay.  Octoechos.  Do you recognize that book?

A.  It says The Octoechos, yes.

Q.  Do you recognize that as the HTM version of The Octoechos?

A.  Not unless there's their name.  Yeah, there's their name.

Q.  And the copyright is --

A.  1982.

Q.  Do you have a copy of this publication, or of this -- let's say of this work?

A.  No.

Q.  Do you have any copies of The Octoechos?

A.  I don't think so.  I don't know. Octoechos.

Q.  Are there any other English translations

114

of The Octoechos that you're aware of?

A.  That's been published this big?

Q.  I'm sorry.  I need to ask the questions.

A.  Oh.

Q.  Are you aware of any other English translations of The Octoechos?

A.  Absolutely.

Q.  Can you give me the names of any -- well, you don't have any?

A.  Oh, yeah.

Q.  Oh, you do?

A.  Other versions?  Yes.

Q.  Of The Octoechos?

A.  Yes.

Q.  English versions?

A.  Absolutely.

Q.  Can you give me an example of some of the publishers of those works that you do have.

A.  From the Russian Monastery.  All -- everything is available through them -- through that Russian Monastery.

Q.  What's the full name of that publisher?

A.  Holy Trinity Monastery.

Q.  And so you have the Holy Trinity Monastery version of The Octoechos; is that correct?

115

A.  Yes, and the -- well, it's the Russian one.

Q.  When you say Russian, do you mean the Russian language one?

A.  No.  Russian from the Russian Church. From the church that we belong to -- we belonged to.

Q.  But you just described -- defined it as the Holy Trinity Monastery Publishing.

A.  I think it comes from there, or it comes from the Russian person who translates it, who also -- does also translate it.  His name is Isaac Lambertson. He -- he's from the Russian Church, too, the headquarters in New York.  And there's a Russian Monastery in upper-state New York.  Both of them translate and offer services.

Q.  Octoechos is a -- the version you have, is that a bound version?

A.  I'm not sure.  Now, you showed me The Pentecostarion and you showed me an Horologion.

Q.  Um-hum.

A.  And I only have two -- two books that are thick, and I don't know whether one of them is The Octoechos, and now you're showing me three.  It probably has been printed with a red -- red cover, too, right?

116

Q.  I'm -- printed by whom?  I'm sorry.  Who are you --

A.  HTM.

Q.  HTM?  So my question was, do you have the HTM version of The Octoechos, and you said no; is that accurate?

A.  No, it's not accurate.

Q.  Oh.

A.  Because I have two thick books sitting in the shelf of the chanting stands, and now you showed me three, and I don't know which two I have.

Q.  Meaning you're not sure if you have The Horologion?

A.  There's The Horologion and there's The Pentecostarion.

Q.  Do you --

A.  And now you showed me The Octoechos.  I have two.

Q.  You have two what?

A.  Two of these books.

Q.  By HTM?

A.  By HTM.

Q.  So it could be The Octoechos, it could be The Horologion or it could be The Pentecostarion; is that right?

## 117

A. No. Two of them, yeah. And this is from memory looking at the chanting stand from the sides, because I don't use them.

Q. Who uses The Octoechos?

A. The chanters use The Octoechos.

Q. Okay. So you may have the HTM version, you just don't know?

A. I may have this, yes.

Q. And it also may be --

A. I know for sure I have two of them, like I said.

Q. And they're both red?

A. I don't use them for chanting.

Q. No, I'm saying what is the color of the binding?

A. Oh, yes, the red color.

Q. The red color?

A. Yeah, the ones I have are the red color.

Q. And they're red, and you know they're different? They're not the same red-covered HTM book?

A. HTM has the distinct red color.

Q. Oh, no. I mean, the two you have that you know are HTM.

A. Yes.

Q. Are they both red-colored?

## 118

A. Yes.

Q. They're different books? You know they're not the same?

A. Oh, yeah, yeah, yeah, yeah.

Q. So it's either Octoechos, The Horologion, or The Pentecostarian?

A. Yes.

Q. Okay.

A. Aside from The Psalter.

Q. So did you ever use any portion of HTM's Octoechos to be posted? Did you ever post any portion of the HTM Octoechos on your website?

A. No.

Q. Did you ever talk to anyone about doing that --

A. No.

Q. -- at Dormition Skete? Do you know if anyone at Dormition Skete ever did that?

A. No. If it's copyrighted by Dormi -- by HTM, we don't use it. Another book?

Q. This is the last one I'm going to show you. Well, actually -- sorry. I'm going to have this marked as Exhibit 10.

I think I'm going to need to start stacking them over here. Mark this first. Thank you.

## 119

(Deposition Exhibit 10 was marked.)

MR. INGOLD: And Counsel, anticipating what you're doing here, I'd just like a couple minutes to look at this real quick.

MS. BROSIUS: That's fine. It's Bates-stamped, so I'm finding it difficult to understand that you didn't receive those.

MR. INGOLD: Exactly. Well, I noticed the same thing.

MS. BROSIUS: But we'll look into that. So let me know.

(A pause occurred.)

MR INGOLD: And I would make the same request to you, Counsel, that I did regarding The Octoechos.

Q. (BY MS. BROSIUS) Can you take a look at that.

A. Yes.

Q. Can you tell me if you recognize what that is.

A. It looks like it says The Collected Dismissal Hymns, Kontakia, and Megalynaria For the Liturgical Year.

Q. Can you recognize if that's HTM's version of that work? Can you take a look at it and tell me

## 120

if you do?

A. It says HTM on the bottom. That's the only way I can make --

Q. Do you have any reason to think it's not HTM's version of it?

A. If it says HTM's. I hope you're not giving me somebody else's version that's not HTM's.

Q. Have you ever seen that book before?

A. No.

Q. Have you seen the work before?

A. The work?

Q. Yes.

A. Yeah.

Q. Whose work have you seen before?

A. The copy that we have from Father John.

Q. What copy is that?

A. The Dismissal and Kontakia and Megalynaria.

Q. And who publishes that?

A. I don't know if it's published. He's -- he's a person that with -- a priest of the Russian Church who gave me a copy of it, if you would call that publishing.

Q. So Father John who is affiliated with the Holy Trinity Church?

121

A. No, Holy --

Q. Trinity Monastery?

A. No. He's another priest at another -- he's from Florida.

Q. What monastery or church is he with? What's the name of his monastery or church?

A. At the time he was with the Russian Church Abroad.

Q. Okay.

A. Russian Church outside of Russia.

Q. At the time? And now?

A. He's deceased.

Q. He's deceased. When did he give you a copy of The Collected Dismissal Hymns?

A. Well, it must have been after -- it must have been in the '80s.

Q. Was that -- was that copy a work that you understood he wrote?

A. Yes. He speaks -- he's a translator. He's -- you know, he speaks Greek -- or translates from Greek, French, and Slavonic.

Q. Do you recognize -- do you recall seeing this work when you were at HTM?

A. This particular one?

Q. That work. Any portion of that work.

122

The Collected Dismissal Hymns.

A. I can't tell you for sure.

Q. Did you know that HTM was working on a translation of that work at any time?

A. Yes.

Q. When -- when did you have that understanding?

A. When I was there.

Q. Okay. So at the time you were there, you knew that HTM was working on a translation of The Collected Dismissal Hymns?

A. Yes.

Q. Did you ever see the work in progress?

A. I guess you could say, because I was there. I must have seen it on the chanting stand.

Q. Did you leave with a copy of The Collected Dismissal Hymns?

A. No.

Q. Do you know if any version of HTM's Collected Dismissal Hymns were posted on your website?

A. No.

Q. Do you ever recall talking with anyone about --

A. No.

Q. -- that?

123

A. No.

Q. You never asked anyone to do that?

A. No.

Q. Do you know if anyone did that?

A. No.

Q. What is Father John's full name?

A. Father John Lewis.

Q. Lewis. And what church was he with in Florida? Was there a --

A. It's called Holy Theotokos Monastery.

Q. Can you spell Theotokos.

A. T-h-e-o-t-o-k-o-s.

Q. When did he die?

A. I think it's maybe three years ago.

Q. Three years ago. Before he died --

A. Four years ago.

Q. Four years ago. He gave this to you before he died?

A. Way before.

Q. Yeah, I'm going to have that marked as Exhibit 11. I've lost track.

THE REPORTER: 11.

MS. BROSIUS: 11. Thank you.

(Deposition Exhibit 11 was marked.)

MS. BROSIUS: Can we take a five-minute

124

break, please.

MR. INGOLD: Not a problem.

(Discussion off the record.)

(A break was taken.)

MS. BROSIUS: Before we broke, we were just talking about HTM's collected dismissal hymns.

MS. HAMILTON: Oh, I'm sorry.

MS. BROSIUS: Yeah, let's wait just a moment. I'm sorry.

MS. HAMILTON: Okay.

Q. (BY MS. BROSIUS) You said your recollection is that you don't have a copy of the HTM Dismissal Hymns; is that right?

A. Right.

Q. But you do have a copy of someone else's Dismissal Hymns?

A. Yes.

Q. This is the one you were given from Father John Lewis?

A. Yes.

Q. Is that a bound copy?

A. No.

Q. It's a loose copy?

A. Yes. Pages.

Q. Pages. Similarly with The Octoechos, I

125

just want to make sure I had that understanding. You don't believe you have the HTM version that I just showed you, right?

A. (Shook head.)

Q. But you do have one?

A. (Nodded head.)

Q. You have a version?

A. Yes.

Q. And is that a bound version or a loose version?

A. Loose version.

Q. It's a loose version. Okay. All right. Thank you for clarifying that. So let me just show you a new exhibit.

Before we get started, actually, I just want to ask you about documents. Did you participate in the collection of documents to be produced to HTM in the lawsuit?

MR. INGOLD: I'll instruct you not to answer. That goes to work product.

Q. (BY MS. BROSIUS) Are you aware that you produced documents in this lawsuit?

A. Yes.

Q. So you're aware that documents were produced to HTM by you, correct?

126

A. No.

Q. And I have --

A. Wait a minute. They were produced to HTM, is that what you said?

Q. Are you aware that your attorneys -- we'll put it this way.

Are you aware that your attorneys produced documents to HTM in this lawsuit?

A. Yes.

Q. Did -- are you aware that those documents, some of them came from Dormition Skete?

A. Yes.

Q. Did you help your attorneys collect documents?

MR. INGOLD: I instruct you not to answer.

MS. BROSIUS: On what basis?

MR. INGOLD: It goes to work product. What he did or did not do to further aspects of this suit in his defense, that's work product.

Q. (BY MS. BROSIUS) Are you aware that documents were collected from Dormition Skete for production in this suit?

A. Yes.

Q. Okay. So some of the documents that were

127

produced to HTM came from Dormition Skete. Are you aware that they were produced to us through your attorneys without what we call Bates numbers?

A. I don't know what you mean.

Q. Okay. And by Bates number, I mean with a unique number and letter designation on each page of the produced documents.

A. So am I aware that --

Q. That Dormition Skete's documents produced by your attorneys were produced to HTM without Bates numbers.

A. I don't know.

Q. You don't know?

A. No.

Q. Do you -- have you seen the documents that were produced to HTM in this case?

A. I may have.

Q. Do you -- have you seen the documents that HTM produced to you in this case?

A. Specifically what documents?

Q. Do you -- well, have you seen any HTM documents that were produced in this case?

A. No. I don't remember.

Q. You don't remember?

A. But if you refresh my memory, maybe I do.

128

Q. Okay. So I'm going to show you documents that were produced by your attorneys to us, HTM.

A. Okay.

Q. And so even though these do not have Bates numbers, because they were not produced with Bates numbers, I'm going to represent to you that these documents I'm showing you were, let's say, printed from the materials produced by your attorneys in this case. So I want you to look at this document and show you -- ask you if you recognize that document.

A. Do I recognize this document?

Q. Um-hum.

A. It says -- the only way I could recognize it is by saying it's translated from the Greek by HTM.

Q. So --

A. 1990.

Q. Do you recognize that to be HTM's published version of The Pentecostarion?

A. I don't know. It's --

Q. Does it look to be a copy of the HTM Pentecostarion?

A. Yes. Yes.

Q. And you said the copyright is there as --

A. 1990.

129

Q.  As 1990.  So this is a document -- this represents a document -- a photocopy, excuse me, of a document you have at Dormition Skete; is that correct?

A.  If -- oh, did we submit it to you, is that what you're saying?

Q.  Yes.

A.  If we submitted it to you, it's at the monastery.

Q.  Okay.  And do you remember when you acquired this 1990 version of The Pentecostarion?

A.  No.

MS. BROSIUS:  Could I have that marked -- excuse me, as Exhibit --

(Discussion off the record.)

(Deposition Exhibit 12 was marked.)

Q.  (BY MS. BROSIUS)  Do you know if you obtained that 1990 version more than a year ago?

A.  No.

Q.  You don't know when you obtained it?

A.  No.  Can people actually remember when they purchased a book?

Q.  I'm just going to represent to you this is part -- this is labeled Part 2 of The Pentecostarion book that was produced by your attorneys.

130

A.  Okay.

Q.  Do you recognize this?

A.  It's Pentecostarion -- Pentecostarion.

Q.  Pentecostarion.  HTM's version, correct?  Is this their logo here on the back?

A.  Okay.

Q.  The last page?

A.  Okay.

(Discussion off the record.)

(Deposition Exhibits 13 and 14 were marked.)

Q.  I'm going to represent this is also a document produced to us by your attorney, not Bates-stamped, with a file name November Menaion Part 1, 2005 HTM.  Do you recognize this document?

A.  Menaion, November.

Q.  Is this the HTM version of The Menaion?

A.  Looks like it.

Q.  Do you recognize this as the document you produced to us?

A.  Okay.  Yes.  2005 copyright.

Q.  Do you know when you obtained this Menaion?

A.  About -- about a year ago when -- when George reposed.

131

Q.  I'm sorry?

A.  When George died.

Q.  George --

A.  The -- a parishioner died.  Someone donated the 12 to the monastery.  Two sets.

Q.  What was George's last name?

A.  Lizardos.

Q.  Can you spell that?

A.  L-i-z-a-r-d-o-s.

Q.  So was that Mary Mariam's brother?

A.  Father.

Q.  Father.  So after he died, these books -- this book was given to you?

A.  Right.

Q.  The Menaion?

A.  Right.

Q.  A complete set?

A.  Two complete sets.

Q.  Two complete sets?

A.  One for each side of the church.

Q.  Okay.  Thank you.  I'm going to have this marked as Exhibit 15.

(Deposition Exhibit 15 was marked.)

Q.  And I'll also represent this is a document produced to us by your attorneys titled The

132

Psalter 1974 HTM.  Do you recognize this document?

A.  Yes.

Q.  Is this a further copy of HTM's Psalter?

A.  Yes.

Q.  Thank you.  Do you remember -- I think we've been over -- you've had -- you've had that for some time; is that right?

A.  Ever since -- yes.  Yes, some time.  Quite a bit.  It's the only one we use.

Q.  Okay.  I'd like to have introduced as Exhibit 16.

(Deposition Exhibit 16 was marked.)

Q.  This is also a document produced to us by you, entitled Theotokian.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's The Dismissal Hymns.  No, it's the Canon, Canon of Resurrection.

Q.  Is that -- that's part of The Dismissal Hymns; is that right?

A.  No.  It's -- it looks like it's The Octoechos.

Q.  And what does it say on the bottom here on the first page?

133

A. "Copyright Holy Transfiguration Monastery, 1970" -- can't read that.

Q. Is it 1976?

A. Yes, it's 1976.

Q. Do you know where this is kept at the Dormition Skete?

A. Do I know where it's kept? No.

Q. It looks like it's three-hole punched. Do you know if it's in a binder?

A. Must be, if it's three-hole punched.

Q. Is this in your residence?

A. No.

Q. Do you know who keeps it, or if it's in the library?

A. I don't know. It's probably in the library, or the church.

Q. Do you recall how Dormition Skete obtained this copy of The Octoechos, the HTM Octoechos?

MR. INGOLD: Object to form.

A. No, I don't know how we ex -- how we received a copy, but --

Q. (BY MS. BROSIUS) When you say --

A. -- we received a copy.

Q. Okay. Sorry. When you testified a

134

little bit ago about having a copy of The Octoechos and it was not a bound copy, is this the one you were referring to? You said it was a loose copy.

A. No, I think I was talking about The Dismissal Hymns. Was I talking about The Dismissal Hymns? Yeah. The Octoechos, there were many versions out there. I don't know which ones we used. I mean, I know -- I don't remember using -- I don't use this.

Q. Was this on your website?

A. I don't know.

Q. What is Theotokian?

A. Theotokian. Where do you see Theotokian?

Q. At the top right.

A. Oh, that's a hymn to the Virgin Mary.

Q. And so Theotokian is originally part of The Octoechos?

A. No. There are many Theotokians. They're just hymns to the Virgin Mary.

Q. Where are they? Is this in a collective dismissal hymns book?

A. No. It could be in every -- every service book, there's an Theotokian to the Virgin Mary at the end, a group of hymns.

Q. Okay. Thank you. Let me show you another document. And ask to have this document

135

introduced as Exhibit 17.

(Deposition Exhibit 17 was marked.)

Q. I'm going to represent again, this is another document produced to us by you, the file entitled The Octoechos, Part 1, 1980. Do you recognize this document?

A. Um-hum.

Q. What is it?

A. What does it say? The Octoechos?

Q. Well, I'm asking you. Do you recognize what this document is? Take your time.

A. Looks like Octoechos, Third Tone. Second Tone. First Tone. First three tones.

Q. First three tones of The Octoechos. How many tones are there?

A. Eight.

Q. Eight. Do you know --

A. No. That's four Octoechos. There's four of them.

Q. Okay. So it's half of The Octoechos; is that right?

A. Um-hum.

Q. Do you recognize this as HTM's version?

A. No.

Q. Do you know if it is HTM's version?

136

A. No.

Q. Any reason to think it's someone else's?

A. Yes.

Q. How -- how is that?

A. There's no -- there's no indication that it's theirs. They usually copyright it.

Q. You mean, they usually put their name on it?

A. Um-hum.

Q. So if it doesn't have their name on it --

A. I wouldn't assume it's theirs.

Q. Do you -- can you read the writing at the top here?

A. See St. Nicodemus for inter -- no. Can you read it? I mean --

Q. I can't.

A. -- do you know where it's at? I mean, shouldn't ask you a question. See --

Q. It's okay if you can't read it. I just thought --

A. See St. Nicodemus for inter --

MR. INGOLD: Counsel, just trying to assist. I can put this in a very large size, okay?

MS. BROSIUS: No, that's all right. We'll go with the copy we have.

137

MR. INGOLD:  All right.

Q.  (BY MS. BROSIUS)  Thank you.  What about the other writing?  There's some handwriting, not just the editing notations, but actually handwriting in the middle here, that says, "He hath raised up Adam, suffered" --

A.  Um-hum.

Q.  Do you recognize that handwriting?

A.  No.

Q.  Is that yours?

A.  No.

Q.  What about down here at the end where it's in capitals, glory, dot, dot, dot, the 1st -- what does it say?  Do you see that writing?

A.  Yeah.

Q.  Is that a writing that you recognize?

A.  No.

Q.  Do you know where -- sorry to go back to the writing again.  Do you know where this came from?

A.  It -- it probably came from Father John.

Q.  Why -- why do you say that?

A.  Because he had all the services.  He gave us --

Q.  He gave you a lot of services?

A.  Um-hum.

138

Q.  Some were bound and some were loose like this one?

A.  No.

Q.  Were they all loose like this one?

A.  Yes.

Q.  Were all the -- did many -- did many of them have writing like this on them, editing, notations?

A.  I don't know.

Q.  You don't recall?

A.  No.

Q.  Okay.

A.  Like I said, he's the translator.  If he -- and I'm not a chanter, but I never used the --

Q.  Well, here's a question, then, before you pass it along.  You don't believe that Dormition Skete wrote this -- anyone at Dormition Skete wrote this, correct?

A.  I don't know.  I don't know for sure.

Q.  Does anyone at Dormition Skete translate?

A.  No.  Well, from -- if anything doesn't sound right, we change it, like --

Q.  Would anyone sit down and take a Greek language version of the first four tones and translate it into English, to your knowledge?  Anyone at

139

Dormition Skete?

A.  Would anyone take the Greek and translate it to English?  Mother Mariam.

Q.  Okay.  Anyone at -- okay.

A.  And when she is there, she would, if -- 'cause she has the Greek right next to the English.  If she doesn't like something, she'll cross it out and change it, and she'll put these marks in, too.

Q.  Is this something Mother Mariam would have created?

A.  Could be.

Q.  Wrote or edited?

A.  Wrote or edited.  Edited, maybe.

Q.  Let me break that up.  Edited?

A.  I don't think she typed it.

Q.  And you don't think she translated Greek to come up with this English?

A.  No.

Q.  Have this introduced as Exhibit 18.

(Deposition Exhibit 18 was marked.)

A.  But I did mention if we don't like something, we change it.  For instance, many times -- all the times, they -- Holy Transfiguration uses words that because of their -- well, forget it.  I won't say.

140

Q.  You know, let me just -- I don't want to -- given the time, let's just keep it.  Let me just show you --

A.  Four.

Q.  Whoops, I did this wrong.  Excuse me.  May I just have the document on that.  Thank you.  Here you go.  That's yours.

Again, I'll represent to you this was produced to us by you, no Bates numbers, but a file titled Part 2, 1980.  Do you recognize this document?

A.  Yes.

Q.  And what is it?

A.  Let's see.  I think this is The Octoechos.

Q.  Okay.  Is this the rest of The Octoechos compared to the first part we just looked at, the first four tones?

A.  By the first -- yes.

Q.  Is this 5th through 8th?

A.  Yes.

Q.  And do you again --

A.  Correct.

Q.  Thank you.  Do you recognize -- do you know where this document came from?

A.  If we sent it to you, it came from us.

141

Q. Oh, I'm sorry. Before that. Do you know how Dormition Skete obtained this -- this photocopy of this document?

A. Like the first half, probably from Father John.

Q. Can you just take a look again at some of the -- for instance on the third page --

A. Um-hum.

Q. -- there's some writing -- handwriting at the top. Do you recognize the handwriting?

A. When do first Kontakion. That?

Q. Um-hum.

A. No, I don't recognize -- it could be Father Peter. He writes very small. But I'm pretty sure he won't -- he didn't add anything to the text.

Q. Okay.

A. And it could be one time we had a novice, he had a -- he had a handwriting like this on page -- is it page 2? Father Yagos.

Q. Do you know if any -- do you know if a reproduction of this was put on your website?

A. No.

Q. What about the first document we looked at, the first four tones?

A. I don't know.

142

Q. You don't know?

A. No, but now that you've sued me -- I mean, I'm being sued, if it was up there, it was put up on my website. I mean, I don't know what was put up.

Q. Okay.

A. Until after, you know, I got sued.

Q. Just get through a few more, now. We'll have this marked as Exhibit 19.

(Deposition Exhibit 19 was marked.)

A. Okay.

Q. Again, a document produced to us by you under the title of Menaion, April 1980.

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Do you know who authored it?

A. Probably Father John. I mean, that's where it came from. Or it came from, you know --

Q. Do you recognize --

A. -- some of the Russian priests that were giving the services.

Q. So you really don't know where it came from?

A. No.

143

Q. Do you recognize this as an HTM work?

A. It could be. They did -- they did -- you showed me the book like this.

Q. Do you recognize any of the writing? I'm not sure there is any on here. Do you recognize, for instance, on page -- it's the page dated April 4 at the top. There's some handwriting. Do you recognize that writing?

A. (Shook head.)

Q. No. Okay.

A. It could be Bishop John. It could be.

Q. These all, again, seem to be three-hole punched. Have you ever seen these in binders or booklets?

A. Booklets, bound.

Q. No, I'm asking if you've ever seen these documents in a binder or a set of binders?

A. Yeah.

Q. Where are those kept?

A. At the monastery, in the chanting stand. Our chanting stand.

Q. Okay. So do you use these in the service?

A. Yes.

Q. How about the two -- the two prior to the

144

The Octoechos?

A. Which two?

Q. Exhibit 18, Exhibit 17, Exhibit 16, are those all the binders that are used on the -- on the chanting stands?

A. I believe so.

Q. Okay. Do you know if any of these are on your website -- were put on your website?

A. No.

Q. Do you remember having conversations about getting these loose bound service manuals -- service documents that you use on the website?

A. No.

Q. Telling Father Peter to do that?

A. No. Sorry.

Q. That's okay. Thank you. We're almost done. 20. Exhibit 20. Could you please mark that as the next in line? Thank you.

(Deposition Exhibit 20 was marked.)

Q. Again, this is another document photocopied, produced to us by you entitled November Menaion, 2005 HTM. Do you recognize this document?

A. November Menaion.

Q. Is this the HTM version of The Menaion?

A. Let me see. Where are -- where are their

145

names?  But it probably is.

Q.  Can you look at the last two pages.

A.  The last two pages.  Ah.  Did I -- their insignia.

Q.  And I think I asked you previously if you recall where you obtained The Menaion.

A.  From Mother Mariam.

Q.  And when that was?

A.  About a year ago.

Q.  Thank you.  And this is to be marked as Exhibit 21.

(Deposition Exhibit 21 was marked.)

Q.  So -- I'm -- again, I'm going to represent this was produced to us by you under title October Menaion, Part 1, 1980 HTM.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  The Menaion for October.

Q.  Okay.  And who -- do you recognize the author of this document?

MR. INGOLD:  Counsel, I hate to interrupt, but we need to clarify the record here.  HTM has been used for the monastery in Boston, but HTM is also an acronym for another monastery.  And --

146

Q.  (BY MS. BROSIUS)  In the beginning I said when I refer to HTM I meant the H -- Holy Transfiguration Monastery in Boston.

A.  Right.

Q.  Is there any confusion about my use of HTM in the past?

A.  In the past?

Q.  In the past of your day here.

A.  No.

Q.  So at any time you answered a question about HTM, you meant the plaintiff in the lawsuit?

A.  Yes.

MR. INGOLD:  My only question is now we're referring to an HTM document, and the face of this document creates the confusion that I'm raising.

A.  This is Holy Theotokus Monastery.

Q.  (BY MS. BROSIUS)  I understand.  So my question is, do you recognize this document?  You said it was Menaion?

A.  Right.

Q.  Do you know who is the author of this document?

A.  It says Theotokos Monastery.

Q.  Do you know how you came upon this document?

147

A.  No.  They probably gave it to us.

MS. BROSIUS:  So this is Exhibit 22 I'm going to have introduced.  And can you --

MR. INGOLD:  This is Exhibit 21; is that right?

MS. BROSIUS:  Correct.

(Deposition Exhibit 22 was marked.)

Q.  (BY MS. BROSIUS)  And again, this is a document produced to us by you in this lawsuit.  Can you tell me if you recognize that document?

A.  It is the Service of Matins.

Q.  Where would the Mat -- where would the Service of Matins -- what service book would that be in typically, or which one --

A.  Horologion.

Q.  -- or which ones?

A.  Horologion.

Q.  Horologion?

A.  Yes.

Q.  And this says Dormition Skete at the top?

A.  Um-hum.

Q.  And is that something to do with your books?

A.  Something, yeah.

Q.  Do you know --

148

A.  Of course, we put the stamp on there.

Q.  Did you put it on?

A.  No.  Sloppy.

Q.  Do you know who authored this Mat -- this Service of Matins document?

A.  Maybe we did.  I don't know.

Q.  If you look at the last -- the very last page.

A.  Okay.

Q.  Do you see --

A.  Yes.

Q.  -- where it -- can you read that?

A.  Yeah.

Q.  Does it say Holy Transfiguration Monastery, 1970 something?

A.  Yes.

Q.  Your understanding is this is only HTM's version of Service of Matins?

A.  Probably.

Q.  Do you have any knowledge of how you got this loose leaf bound?  Is this also part of the loose leaf bound books that are on your -- I just forgot the name you used.

A.  Chanting stand.

Q.  Chanting stand?

149

A. Um-hum.

Q. It is?

A. Yes.

Q. It's one you used during service?

A. Um-hum.

Q. Is there any reason --

A. I don't know if we use it.

Q. It's on the chanting stand?

A. I don't know if it's on the chanting stand, because -- I don't know. Could be. Could not be. Because the Service of Matins, it's in The Horologion and we have other sources for it. Maybe this was in the library. Did you ask for our books that we have from HTM? All right.

Q. Okay. So I think that's it for that one. Do you have any knowledge of how you came upon that?

A. No.

Q. No. Do you know if that was part of the books, loose-leaf books that were given to you by Father John?

A. If they were part? No, I don't know if they were part of it.

Q. What is St. Nectarios? Who is St. Nectarios?

A. St. Nectarios was a bishop ordained in

150

Egypt and retired to an island in Greece. And --

Q. In what service books are his writings typically found?

A. What service books --

Q. Um-hum.

A. -- are his writings found?

Q. Um-hum.

A. There are no service books that have his writings. When you say service books, that means in the Orthodox Church something you use in -- in the church.

Q. Understood. Okay. I'm going to show you a document. I just wanted to know if you recognize it. This was produced to us, again, by you, not Bates-stamped, in a file entitled St. Nectarios Service, 1980 HTM.

A. Okay. This was produced by us?

Q. Um-hum. Yes.

A. All right. So what is your question?

Q. Do you recognize -- what is that document?

A. Vespers for St. Nectarios.

Q. Is this a document authored by HTM?

A. Let me see. There's no marking on it. I don't know for sure if it says -- is there a

151

copyright? I don't know if it's theirs.

Q. So if you see --

A. For sure, you know.

Q. If you see a document with a copyright notice on a D, is it your understanding that the person or entity named in the copyright notice is the owner of that work?

A. (Nodded head.)

Q. If it doesn't have --

A. Correct.

Q. -- a copyright notice, what is your understanding?

A. It's up in the public domain.

Q. So if someone -- actually, let's just look at this document, for example, which is Exhibit 22.

A. Yeah.

Q. That's, you said, the Service of Matins, so that's marked with HTM's copyright notice. You understand that to be HTM's version, right?

A. Right.

Q. If someone had provided that to you and someone deleted the copyright notice, would that suddenly be in the public domain, to your understanding?

152

MR. INGOLD: Object to it calls for a legal conclusion.

Q. (BY MS. BROSIUS) You used the word public --

MR. INGOLD: Answer if you can.

Q. (BY MS. BROSIUS) You used the word public domain. Do you understand what that is? Or what is your understanding of public domain?

A. Public domain means that it's been reproduced -- it's out to be reproduced. It can be just like my icons. Everybody can copy my icons, even though I have them copyrighted, but everybody can copy them. We don't sue people over church things like this.

Q. Is it your understanding that work in the public domain is something that no one owns, anyone can use?

A. If it is in the public domain, is -- can anybody use it, are you saying?

Q. Let's start with the first question. Is it owned by anyone if it is in the public domain?

MR. INGOLD: And can I just have a standing objection to calls for a legal conclusion to this line of questions?

MS. BROSIUS: (Nodding.)

153

MR. INGOLD:  Thanks.

Q.  (BY MS. BROSIUS)  But you used public domain.  I just want to understand your -- I want to know what your understanding is of that word.  And if a work is, according to you, in the public domain, does that mean it's owned by anyone?

A.  I imagine it could be -- yeah, owned.  Okay.

Q.  So what if I ask you if a work -- if I told you that a work in the public domain means it's not owned by anyone.  Anyone can use it.  Is that -- does that help differentiate between something that's owned by one person versus something that's up for grabs, so to speak, owned by no one?

A.  I would --

Q.  Is that a differential you can appreciate?

A.  -- say that if something's in the public domain, I would say it's available for anybody.  I never thought of someone owning it.  It's available for everybody, for the general good use.

Q.  But you're not willing -- you don't understand that to necessarily mean that no one owns it, just that everyone can use it?

A.  I guess, yeah.

154

Q.  Okay.

A.  Someone can own it.  That last question, how -- what was the last question again?  I -- just you said it so quick.

Q.  I was differentiating between your understanding of owning -- if a work is in the public domain, my question was, do you understand that means no one owns it or that anyone can use it.

So how about this.  If you understand that a public -- a work in the public domain means anyone can use that work, copy it, publish it, put it on the website, do whatever they want with it, is that just because the owner doesn't object or because there is no owner, in your understanding?

A.  Doesn't object.  No, 'cause it's in the public domain.  I don't think any of those -- who -- how do we know who the owner is if it's, you know, not -- not labeled.  If it's out there with no identification.

Q.  So if someone stripped the identification from an otherwise copyrighted work, that would place it into the public domain, to your understanding?

A.  If someone strips the identification?  No.  I guess it's still copyrighted.

Q.  Okay.

155

MS. HAMILTON:  Wasn't marked.  You can keep a copy, but it wasn't marked.

MR. INGOLD:  You not --

MS. BROSIUS:  No, I don't think we did that one, 22.

MR. INGOLD:  This is -- okay.  So the next one will be 23.

MS. BROSIUS:  Can I have that marked as 23.

(Deposition Exhibit 23 was marked.)

Q.  (BY MS. BROSIUS)  And I'm going to again represent this was a document produced to us by you under the file title Supplicatory Canon, Second Edition, 1980, SNP HTM.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  The Supplicatory Service to the Mother of God.

Q.  Okay.  And what -- would this appear in a particular service book or service books?

A.  It would have its own.

Q.  It has its own?

A.  Or it could be in the -- maybe the Horologion.

156

Q.  Okay.

A.  No, on second thought, maybe it's just in the prayer book.

Q.  Maybe it's in the prayer book?

A.  Right.

Q.  Like the prayer book that we looked at?

A.  Yeah.

Q.  The HTM prayer book?

A.  Maybe it would be put there.

Q.  So it could be in Horologion or it could be on its own?

A.  Right.

Q.  Standing on its own, it could be in the prayer book?

A.  Right.

Q.  You're familiar with this work?

A.  Yes.

Q.  Do you recognize this as HTM's version of this work?

A.  Yes.

Q.  Okay.  And you know that because how?

A.  It's -- it's labeled.

Q.  Okay.

A.  That's for sure.

Q.  Okay.

157

A. And it has St. Nectarios Press on it.
Q. And who is St. Nectarios Press?
A. St. Nectarios Press is a -- is an entity from the parish of St. Nectarios in Seattle, Washington, which left with Father Panteleimon when he abandoned the Russian Church Abroad.
Q. So they're a press that publishes religious texts --
A. That's correct.
Q. -- is your understanding?
A. Correct.
Q. Do you know them to be a press that publishes Holy Transfiguration Monastery works?
A. Yes.
Q. Okay. That's been marked. Okay. Thank you. Going to have that marked as Exhibit 24.
(Deposition Exhibit 24 was marked.)
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. The Small Supplicatory Canon to the Virgin Mary. Same thing as the previous.
Q. This has the couple additional pages. Actually, let's go back to Exhibit 23, which -- that looks again as -- like it was in a loose-leaf. It has

158

three holes punched; do you see that?
A. Um-hum.
Q. Do you know where that was kept at Dormition Skete? Well --
A. On the chanting stand, probably.
Q. In a binder?
A. Probably.
Q. Okay. And this one does not appear to have the same three-hole punch?
A. No.
Q. If you look at the second page, it appears to have your stamp on it. Do you recognize this as a photocopy of an actual book -- bound book?
A. Yes, it has a spiral bound.
Q. Okay. And this also is Holy Transfiguration Monastery version; is that right?
A. Correct.
Q. All right. Do you know when you obtained these two versions?
A. We use them right now during the fast. Where have I seen them?
Q. Do you know how you obtained them?
A. No.
Q. Do you know when?
A. No. Let's see. When's the date on them?

159

There's no date. There's no copyright.
Q. Do you know if this -- either version was placed on your website?
A. No.
Q. You don't know?
A. No.
Q. Okay. All right. Thank you very much. We're -- well, we're over time. Yeah, we're ready to take a break. If we can go off the record. Great.
MR. INGOLD: Before we go off the record, just so that it's clear, anything dealing with financial income or expenses I will more likely than not designate as attorneys' eyes only. I know that under the protective order it's presumptively that until 14 days after the transcript, but I just wanted to give you a heads-up --
MS. BROSIUS: Okay.
MR. INGOLD: -- on that kind of income, financial stuff.
MS. BROSIUS: Okay. Chris, do you need to check the three sets, the three Bates-stamped HTM documents?
MR. INGOLD: Yeah, let me just tell you which those were. And so --
MS. HAMILTON: Was it 10, 11?

160

MR. INGOLD: It's Exhibit 11 --
MS. HAMILTON: Um-hum.
MR. INGOLD: -- and Exhibit 10. And it may only --
MS. HAMILTON: I just have the two, 10 and 11.
MR. INGOLD: There is one more, which is The Pentecostarion.
MS. BROSIUS: Yes.
MR. INGOLD: You, of course, have the version we gave you.
MS. BROSIUS: But what we produced -- what we should have produced was the copy of the copyright application --
MR. INGOLD: Which is Exhibit 6 stuff.
MS. BROSIUS: Correct.
MR. INGOLD: Okay. And that's what I don't have.
MS. BROSIUS: I'm sorry. It was labeled Exhibit 6.
MR. INGOLD: Yeah, and frankly, as I look at it, there are minor variations in the formatting and text, but I can't tell you if they're identical or not.
MS. BROSIUS: And our understanding is

161

because it went from the unpublished version to the
final printed version.

MR. INGOLD: Sure. So like, one example
is --

MS. BROSIUS: For -- for registration
purposes what you have -- what you should have been
produced is what you're holding.

MR. INGOLD: Yeah.

MS. BROSIUS: Which is the loose-leaf
copy.

MR. INGOLD: Yeah. And the only example
that I saw real quick is like a one ST version,
spelled out first, in the version that we have, so.

MS. BROSIUS: Okay.

MR. INGOLD: So I think they're probably
relatively minor and inconsequential differences.

MS. BROSIUS: Okay. I'm going to have
our associate look at that right now.

MR. INGOLD: All right. So reconvene in
an hour and a half, or an hour?

MS. HAMILTON: An hour.

MS. BROSIUS: I'd prefer -- well, it's 25
after now, so how about 1:30? Is that okay? We'll --

MR. INGOLD: Yeah, the one problem -- and
it maybe closer to 2, and I apologize. But there are

162

not real good sources of food that these gentlemen can
eat in this area.

MS. BROSIUS: Okay.

MR. INGOLD: And so I'm probably going to
go to a grocery store that has stuff close by. But
it's the closest one I know of.

MS. BROSIUS: Okay.

MS. HAMILTON: We can just make up the
half hour at the end if we need it, though.

MR. INGOLD: I don't have any problem
with that.

MS. HAMILTON: Okay. That would be
great.

(A lunch break was taken.)

MS. BROSIUS: So I'd like to introduce
this as Exhibit 25.

(Deposition Exhibits 25 and 26 were
marked.)

Q. (BY MS. BROSIUS) Actually, look at
these. So, Archbishop, can I just ask you once you've
had a chance to look at those, if you recognize those
documents.

A. Yes, we submitted to you these answers.

Q. Can you look at the one marked 25, the
second-to-last page, page 17. Is that your signature

163

at the top?

A. Yes.

Q. So you signed this document under the
pains and penalties of perjury. On page 16 there's a
paragraph there at the end before your signature.

A. Yes.

Q. Is that correct?

A. Yes.

Q. Can you turn to Exhibit 26, please. And
again, I just want to know if you -- once you've had a
chance to look at that.

A. Last page?

Q. No. It's going to be page -- I think
there's a third, actually, but --

A. Page 8?

Q. Correct. Is that your signature?

A. Yes.

Q. And you signed this document as well
under the penalties of perjury; is that correct?

A. Yes.

Q. I'm going to ask to be introduced as
Exhibit 27.

(Deposition Exhibit 27 was marked.)

Q. Do you recognize this document?

A. Yes. Response to requests for admission,

164

whatever that means.

Q. Did you write these answers?

MR. INGOLD: I'm going to -- I object. I
instruct you not to answer. How this was produced
is --

MS. BROSIUS: Okay, that's fine.

MR. INGOLD: All right.

Q. (BY MS. BROSIUS) Can you tell me if
you -- are these answers accurate and truthful?

A. Yes.

Q. And for the two exhibits, the two prior
exhibits, are your answers -- are the responses in the
interrogatories that you sent, 25 and 26, are those
accurate and truthful, as well?

A. Yes, as far as in my knowledge.

Q. Okay. I'm going to ask -- I want to talk
to you about the website. Are you familiar with the
website trueorthodoxy.info?

A. Yes, somewhat.

Q. Who owns that website?

A. I do.

Q. Can you -- do you recall when you
registered the domain?

A. When I registered?

Q. Um-hum.

165

A. No.

Q. Do you recall why you registered the trueorthodxy.info domain?

A. To propagate the faith.

Q. Did you discuss your plans for the website with anyone else at the time -- with anyone at the time?

A. Perhaps. I -- yeah, perhaps -- yeah, I don't know for sure.

Q. You don't have a specific recollection of discussing --

A. No, I just decided to -- you know, we should have something up there so people can have access to materials about the Orthodox Church.

Q. And which company hosts the website?

A. I think it's some kind of JJ something. I don't know the exact name.

Q. I'm going to actually introduce -- well, I'm going to show you a document and ask you if you recognize it before I ask for it to be introduced. Can you take a look at that and tell me if you know what that is.

A. No.

Q. You've never seen that before?

A. No.

166

Q. I'm going to take that back, then. Thank you.

MR. INGOLD: Counsel, can I take a look, please. Okay. Thank you.

MS. BROSIUS: Um-hum.

(Deposition Exhibit 28 was marked.)

Q. (BY MS. BROSIUS) I'm going to show you what is to be admitted as Exhibit 28. Do you recognize this document?

A. Affidavit by me.

Q. Which -- what's the date on this?

A. Well, it was -- oh, 2008, February.

Q. And this is an affidavit that was submitted in connection with this lawsuit; is that correct?

A. Yes.

Q. Is this your signature here on the third page?

A. Correct.

Q. And does it also say, "Signed under the pains and penalties of perjury?"

A. Where's -- I don't see that paragraph.

Q. It's directly above your signature.

A. Okay. Yes.

Q. Can you take a look at Exhibit 8 --

167

excuse me, paragraph 8 on page 2.

A. Okay.

Q. Where you say that the website trueorthodxy.info is registered to you.

A. Yes.

Q. That's accurate?

A. Yes.

Q. And also in paragraph 9 that you are responsible for the content of the website.

A. Yes.

Q. And that's accurate?

A. Yes.

Q. I'm going to have you look at another document, and I'm going to ask you about Exhibit 29.

(Deposition Exhibit 29 was marked.)

Q. I'm going to have the same questions on this one, Archbishop. Do you recognize this document?

A. Second affidavit.

Q. And this was also submitted in connection with this case; is that correct?

A. Correct.

Q. And is this also your signature on page 4?

A. Correct.

Q. Also signed under --

168

A. Under penalty of perjury.

Q. Thank you. Can you take a look at paragraph 17, where you say that you caused many files to be removed from our website; do you see that?

A. Yes.

Q. When you say our website, are you referring to trueorthodxy.info?

A. I was referring to trueorthodxy.info, and it should have been mine.

Q. Okay. Thank you.

A. My website.

Q. Who selects the content that appears on the website?

A. I, normally.

Q. Were you responsible for the content in August of 2007?

A. In what way?

Q. Well, you said --

A. Did I pick what goes up? Did I --

Q. You said you were responsible for the content --

A. Right.

Q. -- of the website. And so the question is, were you also responsible for it in August of 2007? Maybe the better question is have you been

169

responsible for the content of the website since the inception?

A. Yes.

Q. Okay. And you're still responsible for the content now?

A. Yes.

Q. Who else has ever been responsible or -- actually, strike that.

Who else has ever participated in selecting website -- the website's content besides you?

A. Participated in --

Q. Selecting content for the website besides you.

A. Let me see if I can under -- participated. Okay. I guess you could say that participated means anybody that chose to put up something. Is that what you're --

Q. That's -- that's fine, yes.

A. Okay. Father Peter.

Q. Father Peter. Anyone else?

A. No.

Q. So just you and Father Peter selected content that appeared on the website?

A. Um-hum. Well, yes.

170

Q. Did you -- did you yourself actually place content on the website?

A. No.

Q. Who did?

A. Father Peter.

Q. Did you supervise him in doing that?

A. To some extent, yes.

Q. How did you supervise him?

A. If there's something I liked, I had him put it up.

Q. So you brought things --

A. I chose what goes up.

Q. Okay. So you brought things to him and said, Put this up?

A. Um-hum.

Q. Did he come to you and say, Here are things I would like to put up. Do you agree?

A. Maybe at times he's done this. But in this --

Q. Did you --

A. -- particular case, he didn't. He said -- sorry.

Q. Which particular case are you talking about?

A. With your copyrighted works -- supposedly

171

copyrighted works.

Q. Okay. So as far as HTM works on your site, you're saying Father Peter, in that scenario -- in those scenarios, it was Father Peter who came to you and said, Put these up?

MR. BRUNO: Object to the form.

MS. BROSIUS: Thank you.

Q. (BY MS. BROSIUS) So can you clarify for me -- actually, before we get there, can you tell me, between you going to Father Peter with material that you wanted put up on the site versus material that he came to you and said, I think we should put this up on the site, how much content was split between those two --

A. How much content?

Q. How much content would be split between those two scenarios? 50 percent would be things you selected, 50 percent he selected?

A. No. The question is did I have any input on what he put up, is that what your -- do I have any responsibility since it's my website?

Q. Um-hum.

A. But can you rephrase the question.

Q. Sure. Yeah. My question -- well, let's -- you said specifically about HTM works

172

appearing on the website. Did you have any --

A. No, I said the -- the disputed works.

Q. Okay.

A. You know, we didn't go for -- we didn't put HTM work up on the websites.

Q. The disputed works and HTM works, I'm saying HTM works. You're saying --

A. The disputed works.

Q. The disputed works.

A. Um-hum.

Q. Okay. So in the -- for the disputed works, who made the decision to put those PDFs on the website?

A. Father Peter did.

Q. Father Peter. Did he show those to you before he put them on the website?

A. No.

Q. Did you have any discussion whatsoever with him about those files?

A. No.

Q. Did you know he was creating the PDFs?

A. I don't know what you mean by creating the PDFs.

Q. Well, how do the files actually appear on the website, or appeared on the website he created?

173

A.  Whatever way he had to do it, he did it.

Q.  Did you yourself ever use your computer to create text?

A.  Yes.

Q.  And that appeared on the website?

A.  Yes.

Q.  And can you give me an example of some of those?

A.  Well, probably letters or stuff that I gave to him to -- you said I created?  What --

Q.  That you created.

A.  Yes.  You know, letters that I'd written.

Q.  What format would you give those types of documents to him in?

A.  Probably e-mail or Word.

Q.  A Word document?

A.  Word documents.

Q.  Did you ever convert documents from Word to PDF format, you yourself?

A.  Probably no.

Q.  You don't have a recollection of doing that?

A.  No.

Q.  Do you know how Father Peter was actually getting content up on the site?

174

A.  How he was getting content up on the site?

Q.  Correct.

A.  How -- I don't know what that means.

Q.  Did he work with your web hosting company to place material on the site?  Do you know how it actually -- do you know how the Web pages were created?

A.  Other than, you know, being -- you know, computer work, no.

Q.  Is that something that you ever did?  Did you ever talk to the web hosting company about -- or give them material that you wanted up on the site?

A.  No.

Q.  Did you ever talk to the web hosting company about the website?

A.  No.

Q.  Okay.

A.  Well, that's -- you know, that they're going to put it up.  You know, I had to talk to them, you know, to say, Can you host my website.

Q.  Did you engage them?

A.  Yeah.

Q.  Did you pay?

A.  I did.

175

Q.  You were the one who initiated the communication with the web hosting company?

A.  I guess.

Q.  Set up the account; is that correct?

A.  Well, I don't know.  Maybe I had Father Peter do it.  I don't know.

Q.  You can't recall?

A.  No.

Q.  Do you know if Father Peter communicated to the web hosting company?

A.  Someone had to, right?

Q.  Is it your assumption that it was Father Peter?  Could it have been anyone else?

A.  I'm -- it's my assumption it's Father Peter.

Q.  Is there anyone else at Dormition Skete who was involved in the website in any way?

A.  All of us, to some extent, put things up that had right -- that had -- if they wrote anything or they found anything that was edifying, they would come to me and say, This is great.  Let's -- let's offer it to our people.

Q.  And then what did you do with it then?  Did you --

A.  Say put it up.

176

Q.  -- put it up?

A.  (Nodded head.)

Q.  Did you say, Give it to Father Peter to put it up?  Did you say, Here's the info on the web hosting company.  Give them a call?

A.  It was Father Peter.

Q.  So Father Peter was the one coordinating the efforts to get the website content up?

A.  Um-hum.

Q.  What kind of content is posted at the site?

MR. INGOLD:  Object to form, ambiguous.

Q.  (BY MS. BROSIUS)  Are religious service -- services text posted on the site?

A.  Are religious services?  Yes.

Q.  What other types of documents are posted at the site?

MR. INGOLD:  And just to clarify, can we get a time frame?

MS. BROSIUS:  We were 2:45, we're probably three hours on the record at this point; is that right?

MR. INGOLD:  No, I meant the context for your question.

MS. BROSIUS:  Oh, okay.

177

A. Can I look?

Q. Can you read back the last question.

(The last question was read back.)

MR. INGOLD: And my -- my inter --

MS. BROSIUS: Okay.

MR. INGOLD: My request is that we get a date.

MS. BROSIUS: Objection?

MR. INGOLD: Yeah, get a date that your question relates to.

Q. (BY MS. BROSIUS) So what about the site in August of 2007. What other kinds of documents were posted at the site other than religious services?

A. Writings from the church fathers, which are like homilies.

Will you permit me to look at the index?

Q. Actually, I have a document that we can look at. And why don't we --

A. Okay. That would be great.

Q. Why don't we look at that.

A. 'Cause, you know, my memory is --

Q. But so -- I just want to clarify one other thing. You were aware at the time in August of 2007 that Father Peter was putting religious services text on the site; is that correct?

178

A. I was aware in August -- he asked me, "Can I put up some services?"

Q. Okay. And --

A. And I said yes.

Q. Did he discuss with you which ones in particular he wanted to put up?

A. No, and you should be sure that the answer is no.

Q. Did he reference any particular religious text by name, such as --

A. No.

Q. -- The Psalter?

A. No.

Q. He just said religious texts?

A. Religious services.

Q. Excuse me, religious services. So that was the extent of the conversation --

A. Um-hum.

Q. -- as you recall it?

A. Um-hum.

Q. And you gave him your permission, correct?

A. Yes.

Q. When did you first -- did you look -- did you look at the site after he put the services --

179

A. No.

Q. -- up?

A. No. That's the last I heard of it until you sued me.

Q. So were any of the services -- actually, strike that.

You have -- you already testified you have Internet access and that you have a computer in your residence --

A. Um-hum.

Q. -- office.

A. Right.

Q. Is that right?

A. Right.

Q. Tell me how often you would visit your trueorthodoxy website.

A. Every day, because when I open it, the first page that comes up is the first page of the website.

Q. Okay.

A. Which tells me the reading -- the readings of the day, the gospel reading, the epistle reading, and from there I go off to whatever I, you know, want to see.

Q. Okay.

180

A. So every day.

Q. And yet you're telling me that you've never -- you never at that time viewed the page that contained the religious services?

A. Absolutely. Because this is the first time we put up any religious services, I think.

Q. Was August of 2007?

A. Yes.

Q. Do you know how long -- did he tell you they're all up, or to take a look at them?

A. No. Actually that's the last I heard of it. It was when I put up some services, you know, for the people in the Congo who can't get any services, and let them translate them into Swahili or whatever their native languages are. And I said, "Sure, go."

Q. So you don't remember anyone talking about that portion of the site after it was put up by Father?

A. No.

MR. INGOLD: Objection, asked and answered multiple times.

Q. (BY MS. BROSIUS) Actually, that question was if there were any communications with anyone else about that.

A. No.

181

MR. INGOLD: I don't mean to be picky.

Q. (BY MS. BROSIUS) You can just object, thank you.

MR. INGOLD: I was.

Q. (BY MS. BROSIUS) Yes. So is --

A. I never talked to anybody about it --

Q. Okay.

A. -- afterwards, until I was notified that you are disputing these as belonging to HTM.

Q. Would you recognize content from the site if you saw it?

A. Yes, I'm not that -- yes.

Q. Great. I'd like to introduce as Exhibit 20 --

THE REPORTER: 30.

MS. BROSIUS: 30. 30. Thank you.

(Deposition Exhibit 30 was marked.)

Q. (BY MS. BROSIUS) Looks like we got it. Take a look at this, please, Archbishop, and tell me if you recognize that document.

A. Isn't that the same as the one you already showed me?

Q. I believe what we looked at were the first and second, and this is the third.

A. Oh, so three times we made responses to

182

you?

Q. Correct. So can you take a look at page 34.

A. 34. My signature? My signature.

Q. And on page 33 that's that you signed these interrogatory responses under the penalty of perjury; is that right?

A. Yes.

Q. And you believe your answers are accurate and truthful, right?

A. Yes.

Q. Let me have an exhibit marked as 31.

(Deposition Exhibit 31 was marked.)

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. The welcome page of trueorthodoxy.info.

Q. Did you write the welcome message?

A. Yes.

Q. You can hold on to that, actually, for a moment. I'm going to have this introduced as Exhibit 32.

(Deposition Exhibit 32 was marked.)

Q. Do you recognize this document?

A. Yes.

183

Q. And what is it?

A. Looks like it's the Miscellaneous Index page.

Q. Is this the page that contains the religious services text that we were just discussing?

A. Yes.

Q. Who created this page?

A. Physically, I guess you could say Father Peter. Now, I'm -- then I stand corrected. Probably it wasn't the first time that services were put up.

Q. What do you mean by that?

A. I just said earlier this is the first time that services were put up, and now I see that I've had services up there before.

Q. So you've been to this website before August of 2007?

A. Yeah. Shows you how often I visited it.

Q. Did you create any of the text on this -- I'm going to call it a table of contents page?

A. This here? The first page?

Q. Any of this, under Miscellaneous Index, all the way down. Did you create any of the text here?

A. No.

Q. What about under Notes?

184

A. No.

Q. Did you write that?

A. No, I don't think so.

Q. Do you know who wrote that?

A. No, I'm not for sure. But it must be Father Peter.

Q. Can you tell me which service books reflected here were posted previous to August 2007?

A. Everything that you did not object to.

Q. Can you be a little more specific.

A. Well, if I could see. Let's see if there's anything here. Prayer book. Akathist. Divine Service Book For Home Use. All Night Vigil. Akathist. Mealtime Prayers. Did you object to Mealtime Prayers? If you didn't, those were up, 'cause I don't think he added anything else. Akathist to the Lord In Times of Trouble. That is -- that Akathist to St. Nicholas. Akathist to St. Peter and Paul.

Q. What about those works?

A. Those were probably after.

Q. Prior to August 2007?

A. August 2007 is when -- when the disputed works were uploaded; is that what you're saying?

Q. Oh, I'm asking you. You picked out

185

Akathist to the Lord in Times of Trouble, et cetera. Those are standing out to you as -- once again, that were posted previous to August 2007; is that what you mean?

A. Is August 2007 when the disputed things were uploaded? Is that why you're giving that date?

MR. INGOLD: Counsel, I -- I'd like to assist. I don't know if you're just simply testing his memory or if you need an answer.

Q. (BY MS. BROSIUS) I'm going to actually go to -- ask you to look at Exhibit 25.

A. Okay.

Q. And that should be first -- your responses to first set of interrogatories.

A. Yes.

Q. Is that the right one? Can you turn to page 6, please.

A. 6. Okay.

Q. Okay. So under the answer to your response to Interrogatory No. 5, is it correct that you said, "The alleged works of the monastery" --

A. Okay. August 2007. August 20, 2007.

Q. Okay. So that -- that's the date?

A. Okay. That's the date.

Q. You provided to us.

186

A. Okay. So before that. Probably these works. The Akathist to the Lord. The Prosphora Recipe. The Tonsure Service. Everything was put up before -- before August 2000 --

Q. Why don't we take a look -- actually, take a look at some of the PDFs.

MR. INGOLD: And Counsel, I really do mean to be of assistance if I can. There's actually three versions of the website that were provided to you. I don't know if that would assist you or not.

Q. (BY MS. BROSIUS) Why don't we just go through and see what we get the actual PDFs here. I'm going to ask to have introduced as Exhibit 31.

THE REPORTER: 33.

MS. BROSIUS: 33.

(Deposition Exhibit 33 was marked.)

Q. (BY MS. BROSIUS) And again, I'll just -- I'll represent that these are documents that were produced by you to us, but don't have a Bates stamp. But I'm going to have you take a look at those and tell me if you recognize that document.

A. These are Dismissal Hymns Kontakia, and Megalynaria. Hymns to the Saints For Every Day.

Q. What's the title of that document, in looking at the index here, under the miscellaneous

187

index? Is this under Troparia to the Saints January on page 2?

Um-hum. You're in the right place there.

A. Okay.

Q. In the middle of the page there, where it says Troparia.

A. Um-hum. Yeah.

Q. And that's January?

A. Yes.

Q. Do you know when that document was placed on the website?

A. No. But I'm assuming it's January 20 -- I mean August 20. Is that it, 2007? Yes. That was at the date when --

Q. Is that your recollection of when this document was put on the website?

A. I have no recollection when it was put on. It's just that since you've disputed that's when it was, I'm assuming --

Q. But in your interrogatory response, you identified August 20th, 2007, as when disputed text works were put up on the website. And now you're saying you don't know if that's accurate?

A. I don't know what was put on until you people sued me, so --

188

Q. So the August 20, 2007 date refers to what?

A. When Father Peter uploaded services.

Q. And you know this because you spoke to him at the time or subsequently?

A. I believe it's because someone had given us -- given me the date.

Q. Do you know who that is?

A. You.

Q. The date in your --

A. I --

Q. -- interrogatory response?

A. Oh, they -- you had to give us an -- we had to answer your -- so we -- I think we determined the date. We must have had it someplace. But you know, I don't -- I'm not in -- that involved with this, so --

Q. You're -- meaning you're --

A. I'm assuming that when Father Peter said he uploaded it, that's when it was uploaded.

Q. Okay. So I'm going to have this introduced as Exhibit 34.

(Deposition Exhibit 34 was marked.)

Q. Actually, I have a question about 33. Do you know if that's still on the website, that Troparia

189

to the Saints January?

A. I hope not.

Q. Do you know when it was taken down?

A. I don't know. It must have been taken down when we were sued.

Q. Do you know who instructed that it be taken down?

A. I told him.

Q. Do you know how you identified that as a work that should be taken down?

A. I told him put everything -- take everything down that they are disputing.

Q. And how did you know which works were in dispute? From this index?

A. From the index? No, I knew it from your complaint. If you had sent me a letter saying these were in dispute, I would have taken them down immediately. But you didn't give us any chance.

(Deposition Exhibit 35 was marked.)

Q. Thank you. I'm going to introduce the complaint as Exhibit 35. This is the complaint you're referring to, the complaint from this lawsuit.

A. Um-hum.

Q. Can you look through this complaint and tell me where you see Troparia to the Saints January

190

referenced?

A. On the 12th?

Q. You mean -- I'm sorry, paragraph 12 on page 2.

A. Yes.

Q. Is that what you referred to? And so that's a paragraph that says, "Among the tasks undertaken by the monastery in furtherance of the commission and purposeful creation of a work entitled, quote, Collective Dismissal Hymns, Kontakia, and Megalyn" --

A. "Megalynaria."

Q. "Megalynaria," thank you, "for the liturgical year, the Collective Dismissal Hymns work that comprises English translation of original church language."

Where does it say Troparia to the Saints January?

A. The word dismissal here, see the words dismissal hymn, which I -- it's a synonym for Troparia.

Q. Okay. Thank you. So you understand that all of the Troparia to the Saints January through December plus The Pentecostarion Period are encompassed in HTM's work --

191

MR. INGOLD: Object to form.

MS. BROSIUS: Okay. Let me finish the question. Then he can --

MR. INGOLD: Well, I wasn't sure because you paused.

Q. (BY MS. BROSIUS) Got it. Let me -- let me start again.

Can you confirm that Troparia to the Saints, January through December, plus The Pentecostarion Period, to your understanding, are all works that are encompassed in the works described here in paragraph 12?

MR. INGOLD: Objection to form.

A. Are you waiting for an answer from me?

Q. (BY MS. BROSIUS) Oh, yeah. Um-hum.

A. Say it again.

Q. Can you read the question back.

A. Read the question.

(The last question was read back.)

MR. INGOLD: Same objection. Go ahead and answer, if you can.

A. I must be getting -- is it to my understanding that they are -- that they are included in this work? Is it --

Q. (BY MS. BROSIUS) How did you take the

192

language of paragraph 12 of the complaint and understand that to include all of these works under Troparia, January through December plus Pentecostarion Period?

A. Because that's what it is.

Q. That's what it is? And your understanding is these two are the same?

A. Um-hum.

MR. INGOLD: Objection. And again, Counsel, I've raised this a couple of times in the deposition. I know that you're urgent, you're pressed for time, there's a lot of material. But you tend to cut off the deponent when he's in the middle of answering, which I think doesn't give us a good record.

MS. BROSIUS: What's next? Can you tell me what number we're on?

THE REPORTER: 36.

Q. (BY MS. BROSIUS) Okay. And so do you understand this work to be the February Troparia referenced here in the index?

A. It's the same hymns, so you know, you got to assume that it's the same, yes.

Q. If I show you the March through December and The Pentecostarion Period, would you -- would your

193

answer be the same?

A. The marks?

Q. If you saw you a copy of what's marked as March through December plus The Pentecostarion Period, would you understand these documents to be what's referenced here in the index?

A. Yes.

Q. I'm going to just get them all introduced, and if you can just bear with me while we do that.

MR. INGOLD: And Counsel, if you want to speed things up, we can probably stipulate to a lot of this. In other words, if it is in the website archive that we've produced you from December of 2007, I mean, and you can just click on it and you can see --

MS. BROSIUS: Chris, you know, we're dealing with a document that should have been stamped by your side so that they could have been referenced in some manner. We have to physically print them. We can't pass around the laptop and have a laptop introduced with an exhibit stamp. So I need to go through these paper copies, have your witness look at them, and tell me if these are actually the ones that appeared on the website.

MR. INGOLD: That's fine. I was just

194

trying to speed things up.

MS. BROSIUS: That's fine. However, of course if you're willing to stipulate to that, that these are actually -- everything we show you are the ones that are on the website under these titles as of August 2007, which were later removed from the website at your direction, I'm more than happy to do that.

MR. INGOLD: Right. And that's what I was suggesting to you.

MS. BROSIUS: But you need to look at them, because we're dealing with paper not computer produced files.

MR. INGOLD: That's fine. But what I'm telling you, Counsel, and trying to assist you to speed things up, is that you originally sent out a list of like, I don't know, 20 --

MS. BROSIUS: Can we go off the record?

(Discussion off the record.)

(Deposition Exhibits 36 through 70 were marked.)

MS. BROSIUS: So we're back on.

MR. INGOLD: Okay.

MS. BROSIUS: So Exhibit 32, which is the miscellaneous index that includes service books, we're -- defendant is stipulating that the following

195

exhibits -- exhibit numbers correspond to the documents on the miscellaneous index that were posted on the trueorthodoxy.info website.

MR. INGOLD: Yes, and just to be clear --

MS. BROSIUS: I'm sorry, let me just finish.

MR. INGOLD: I'm sorry.

MS. BROSIUS: In August of 2007.

MR. INGOLD: Right. And just to be clear, we have a copy of the website from December of 2007. And what I did is, as you handed me these items, I compared them and I can stipulate that they're the same. So that should ease things up for us.

MS. BROSIUS: Okay. So --

MR. INGOLD: And we were going to read through and you were going to give me the exhibit numbers you assigned everything.

MS. BROSIUS: Right. I just want to be clear that what we're stipulating to, is that these documents appeared on the website in August of 2007.

MR. INGOLD: Yes.

MS. BROSIUS: I don't know what you have, what electronic copy you're referring to. What I'm saying is these paper copies were on the website

196

corresponding to these titles in August 2007. Are we agreeing to that?

MR. INGOLD: Right. What I can stipulate to is there -- the website archive that I have for December of 2007 has the documents that were put on there August 20th of 2007. So what I'm looking at is what was put up there August 20th of 2007.

MS. BROSIUS: Okay. Great.

MR. INGOLD: Yeah.

Q. (BY MS. BROSIUS) Great. So let's start with The Home Prayer Rule, stipulating that is Exhibit -- reflected in Exhibit 48. Home Prayer Rule, No Jesus Prayer, Exhibit 47. Akathist to the Theotokos, 49. Divine Service Book for Home Use, 50. If these were in Polish, we'd have to translate. All Night Vigil for Cleros, 51. Then under Troparia to the Saints, we have January as Exhibit 33. February as Exhibit 34. March, 36. April 37. May, 38. June, 39. July, 40. August, 41. September 42. October 43. November 44. December 45.

The Pentecostarion Period is 46. The Octoechos is 52. The Supplicatory Canon to the Theotokus is 53. Palm Sunday is 54. Pascha is 55. Pentecost is 56. Nativity is 57. Exaltation of the Precious and Life-Giving Cross is 58. The Synodicon

197

of the Holy Orthodox Church is 59.

Under Service Books For Clergy, All Night Vigil For Clergy is 60. Divine Liturgy of St. John Chrysostom is 61. Divine Liturgy of St. John Without a Deaconess, 62. Divine Liturgy of Saint Basil is 63. Divine Liturgy of Basil Without a Deaconess, 64. Holy Baptism is 65. Proposal and Holy Matrimony is 66. Prayers For Purity, 67. After Communion Prayers, 68. Tonsure Service, 69. Prosphora Recipe is 70. I'd like to introduce an exhibit marked -- to be marked as Exhibit -- Exhibit 71.

(Deposition Exhibit 71 was marked.)

Q. Do you recognize that document, Archbishop?

A. Yes.

Q. What is it?

A. Homily on Faith, Repentance, Love, and Fear of God.

Q. Did this also appear on your website in August of 2007?

A. Looks like it, yes.

Q. Was it under Lives of the Saints, or do you know where it appeared?

A. It looks like it's homilies. Could be.

198

Q. Do you know where this document came from?

A. No, not -- no.

Q. Do you know if this is HTM's portion of St. Isaac the Syrian?

A. That's what I'm hearing, yes.

Q. Did you give this document -- did you give this text to Father Peter and ask him to post this on the website?

A. I -- I don't know. I -- no recollection.

Q. You have no recollection of asking him to post this document on the website?

A. No.

Q. Do you -- is it your understanding that he did post this document?

A. Probably, yes.

Q. Do you know where he would have gotten this document?

A. No.

Q. Can I ask you to look back at -- I believe it's Exhibit 27.

A. Okay.

Q. And this is your responses to HTM's first set of requests for admission, just so we're on the right document. Is that it?

199

A. Um-hum.

Q. And page 3, your response to question 9, request 9, which concerned the St. Isaac work.

A. Um-hum.

Q. You responded that you denied that you were the one who reproduced a translation of HTM's Isaac work for the website; is that correct?

A. Do I -- do I deny it? Is what you're saying?

Q. Is it correct, yes, that your answer is here that you weren't the one who authorized the translation, HTM translation, of the St. Isaac work on the website?

A. Yes, that's correct.

Q. But you're not disputing that it is HTM's work; is that correct?

A. I don't know if it's HTM's work.

Q. Okay.

A. I didn't read it, and I didn't read theirs.

Q. So with respect to the exhibits that we just stipulated to, which I believe started at 33 through 70, did you assist in any -- did you participate in any way in the selection of those works for your website -- for the website?

200

A. No.

Q. Did you participate in any way in creating those electronic copies that were posted on the website?

A. No.

Q. What about in editing them?

A. No.

Q. And you were not involved -- were you involved in posting them?

A. No.

Q. But you're responsible for the content that appears on the website?

A. Yes.

Q. Do you know if anyone at Dormition Skete authored any of those texts, the ones we just looked at, 33 through 70?

A. If anybody authored all of them? Or any --

Q. (BY MS. BROSIUS) Wrote any of them.

MR. BRUNO: Legal conclusion.

Q. (BY MS. BROSIUS) Wrote any of them.

MR. INGOLD: Object to legal conclusions.

Q. (BY MS. BROSIUS) You can -- you can answer.

A. Well, could be that the Prosphora

201

Recipe -- I mean that's a bread recipe. Could be that we authored it. Could be.

Q. What about any of the others?

A. It could. I don't know.

Q. Do you have any knowledge of any member of Dormition Skete writing service texts?

MR. INGOLD: Object to form.

A. Answer it? I --

MR. INGOLD: Yeah.

A. You know, I could have edited some of the -- some of the hymns.

Q. (BY MS. BROSIUS) Before they were posted on the website?

A. Yes. If I didn't like a word, I could have changed it and --

Q. So Father Peter, what, would have brought you the hymn, said, I want to post this on the website?

A. No, he didn't bring it to me. He took --

Q. So when would you have edited it?

A. When I heard it being chanted.

Q. How does that relate to what was posted on the website?

A. Well, he took whatever was in the church or whatever -- if he took something I edited, he would

202

have put it on the website.

Q. Okay. But beyond that, you're saying you did not participate in editing of the actual documents that were posted on the website?

A. Beyond that did I participate in any --

Q. In editing any of these documents that appeared on the website.

A. I don't think so, no.

Q. And it's your understanding that no one at Dormition Skete actually wrote any of these documents?

MR. INGOLD: Object to form, asked and answered, ambiguous, calls for legal conclusion.

A. Let's look at them again.

Q. (BY MS. BROSIUS) Do you understand what I mean when I say wrote them?

A. Wrote them.

MR. INGOLD: And Counsel, again you're cutting him off. He was looking at the index so that he could form an answer to your question that you had pending.

A. Would --

MR. INGOLD: I suppose you're entitled to withdraw your pending question, but it wreaks havoc, I think, when he's trying to form an answer and you cut

203

him off.

MS. BROSIUS: Chris, I appreciate that. You can object, but I don't think we need additional narrative. You can object to form.

MR. INGOLD: I only go beyond form and foundation objections when I find the questioning to verge on abusive or creating an inaccurate record. I will always go beyond at those points.

MS. BROSIUS: That's fine. You've stated your objection. Let's continue with the question.

A. Go ahead.

Q. (BY MS. BROSIUS) Do you understand what I mean when I say wrote the text?

A. Yes.

Q. Do you know if anyone at Dormition Skete wrote any of those texts --

MR. INGOLD: Object --

Q. (BY MS. BROSIUS) -- that appeared on your website?

MR. INGOLD: Object to form, ambiguous, calls for a legal conclusion.

A. Answer it?

MR. INGOLD: Yeah, go ahead.

A. Yes, I may have.

Q. (BY MS. BROSIUS) Which ones?

204

A. Let's go through them. Home Prayer Rule, I may have written --

Q. You may have written the Home Prayer Rule that appeared on your website?

A. Or compiled it from different sources.

Q. When would you have done that?

A. Many years ago.

Q. And so do you have a recollection of giving what you wrote to Father Peter and asking him to put that onto the website? How would Father Peter have gotten what you wrote?

A. Because we put it in a pamphlet and we use it. We use it for our prayers at night.

Q. And was your version of the Home Prayer Rule one of the documents that we looked at today?

A. Yes.

Q. Which one?

A. Home Prayer Rule, both of them. Both of them.

Q. So you're saying that the -- the document that appeared on your website, the Home Prayer Rule and the Home Prayer No Jesus Prayer, could have been ones that you wrote?

A. I wrote some of them. But I told you, I took pray -- I took prayers from vespers, prayers from

205

Compline, and put them together. Something to make a 15-minute duration time for some layperson to do their prayers.

Q. And what -- any other works that you or anyone else at Dormition Skete authored?

A. Let's see. Akathist to the Virgin Mary. Where is the Akathist? Oh, there it is. No. 49.

Q. You've written a version of the Akathist?

A. (Nodded head.)

Q. Have you translated that? Is that what you mean?

A. No. I don't know Greek enough to translate it.

Q. So it was not a translation when you say you could have written a version?

A. I took from four or five different Akathists and put them together to what I wanted to be the final outcome.

Q. So when -- okay. So when I'm asking you about writing something, you don't mean translating it from another language into English. What you mean is you compiled it from a variety of sources?

A. No. I -- yes and no. I compiled it, and if I wanted to change a word or so to make it rhyme, to make it more beautiful, I would change it.

206

Q. Do you under -- do you have an actual -- a precise recollection, sitting here today, of writing -- of doing that with the Akathist?

A. Yes, because it took a long time.

Q. And when did this happen?

A. Oh, let's see. How old am I? About -- maybe about 30 -- 30, 35 years ago.

Q. So did it happen while you were -- after you founded Dormition Skete?

A. It happened even until now.

Q. Akathist to the Theotokus.

A. Right.

Q. Was that compiled by you from various sources since you've been with Dormition Skete?

A. Yes.

Q. And what about the Home Prayer Rule --

A. Yes, only --

Q. -- since you've been with Dormition Skete?

A. Yes.

Q. So you would compile various sources --

A. Yes, I made --

Q. -- and come up with your own version?

A. Yes.

Q. And do you know that these are the

207

versions that Father Peter uploaded?

A. Do I know that they are the versions -- versions? Now that I see them, the only way he could have got them is from our -- our versions, yes.

Q. From your version?

A. Yes.

Q. Although you have testified already that you have numerous versions of various publications of the same type of book, for instance, you said that you have The Psalter by HTM, but you have other Psalters?

A. Um-hum.

Q. What other works you've -- are in a similar situation, The Horologion? Is that right?

A. Yeah, there are others. Every prayer book, everything here, there's many versions -- versions.

Q. So you can't say for sure that what appeared on the website here are versions that you offered; is that right?

MR. INGOLD: Object -- object to form.

Q. (BY MS. BROSIUS) Well, you tell me --

A. Yes, if it --

MR. INGOLD: Asked and answered, misstates prior testimony.

Q. (BY MS. BROSIUS) Go ahead.

208

A. Home Prayer Rule, it's the one that we did. If it's the Akathist, it's the one that we did. Why would he put up something that someone else did? We don't even use it.

Q. But it's possible you did, you just don't know about it?

MR. INGOLD: Counsel, let's not guess. Let's look at the exhibit, show it to him and ask whether it's the one he --

MS. BROSIUS: You know what, Chris, I'm going to --

MR. INGOLD: No --

MS. BROSIUS: Please don't --

MR. INGOLD: I'm going to object.

MS. BROSIUS: You can object, then -- state your objection for the record.

MR. INGOLD: My objection is you're doing a memory test. You have the document. You can show it to him and have him identify it or not. You're inviting error in the record. That's my objection.

MS. BROSIUS: Okay. Fine. So can you read back my prior question, please.

A. I know it. It's no. It's not possible that he would have put up someone else's.

Q. (BY MS. BROSIUS) But at the start of

209

this testimony, you were not sure that you had written any of these. Now you're telling me that it's impossible that he has posted anything but the ones you have authored; is that right?

A. No.

MR. INGOLD: Object to form. Counsel, I object. You're using writing, which is a defined legal term. He's never used that term. You're feeding back his testimony to him using that word. Now you're switching him to author, which is another legal jargon. I'm objecting --

MS. BROSIUS: You're leading -- you're testifying for your witness, Chris.

MR. INGOLD: No, no.

MS. BROSIUS: By using these types of speaking objections.

MR. INGOLD: No, I am not.

MS. BROSIUS: Yes, you are.

MR. INGOLD: I have not made speaking objections. I've been largely silent.

MS. BROSIUS: You are translating the words in my questions for him.

MR. INGOLD: I have been mostly silent this whole deposition. The record I'm making here is, what you're going down, this pathway, is designed to

210

create error in the record, and I object.

MS. BROSIUS: It is certainly not intended to create any record. I'm trying to understand the source of these documents.

Q. (BY MS. BROSIUS) You do understand the questions here are, do you understand where these documents came from, whether you authored them, whether you know that someone else authored them, and if so, who that person is. That's the MO here for my questions. Is that clear?

A. Okay.

Q. Okay. So --

MR. INGOLD: Object.

Q. (BY MS. BROSIUS) Okay. So --

MR. INGOLD: Object to the tone.

Q. (BY MS. BROSIUS) So my question -- my question here, again, is --

MR. INGOLD: Counsel, I object to the tone.

Q. (BY MS. BROSIUS) Noted. My question, again, is, do you know that these documents -- and I'm going to use as an example the one you referenced, which is Home Prayer Rule -- do you know, are you 100 percent certain, that the document that appeared on the website that we stipulated is Exhibit -- reflected

211

in Exhibit 48, that that is a document that you compiled from other sources --

A. Um-hum.

Q. -- gave to Father Peter and he posted on the website? Is that your testimony?

MR. INGOLD: I'm going to insist that if you're going to refer to an exhibit you show it to him.

Q. (BY MS. BROSIUS) Can you answer the question?

MR. INGOLD: I insist on you showing him the document you're referencing.

MS. BROSIUS: He is more than capable or you are more than capable of providing the document to him if he needs it. I have not heard that he needs to look at the document to answer that question. Of course, he is more than entitled to review the document.

MR. INGOLD: The exhibits are all sitting right by the court reporter. I'm asking that as you reference a document you show it to him.

Q. (BY MS. BROSIUS) Would you like to see the document?

A. Yeah, because I forgot the things I authored when you said, Did I do any of the services.

212

And when I saw the index that you're referring to, I remembered, yes.

Okay. Yes, this -- I authored some of this.

Q. What portions?

A. The last part.

Q. Can you point that out to me, please.

A. For sure. "Oh, Lord, I dedicate these" --

Q. Actually, I'm sorry. Could you point it out to me.

A. (Indicating).

Q. Okay. So from, "Oh, Lord," this last paragraph?

A. Yes.

Q. You authored that paragraph?

A. Yes.

Q. And where does it stop?

A. At the end.

Q. "Oh Lord, I dedicate these, Jesus, fresh to the service of God and for the souls of the departed service of God."

A. Yes.

Q. So I'm going to put a little bracket around it and put AB next to it, okay?

213

Where did the rest of this text come from?

A.   Came from various services of the Orthodox Church.

Q.   That Dormition Skete has in its possession?

A.   Yes.  Everybody.

Q.   Okay.

A.   Everybody has possession of.

Q.   Okay.  Thank you.

I'm going to get these all out of order. I apologize.  So 49, that is Home Prayer Rule, No Jesus Prayer?

A.   Yes.

Q.   Oh, I'm sorry.  47.  Just one second. Let me switch that with this one.  Let's look at this one first, if you don't mind.  Thank you.

And this is The Home Prayer Rule No Jesus Prayer.  We stipulated this is Exhibit 47.

A.   Yes.

Q.   Did you -- did you write that?

A.   No, I compiled it.

MR. INGOLD:  Object to the form.  Can you give me a standing objection to your use of the word "write," because I really don't mean to interrupt.

214

Okay.  Without the standing objection, I object to the use of the word form as ambiguous -- to "write," as ambiguous.

Q.   (BY MS. BROSIUS)  Do you know what the word "write" means?

A.   Yes, that I authored it.  Is that what you mean to say?

Q.   If that's a term you understand --

A.   Not the whole thing, just portions.  Just certain parts that I made towards our standards, so to speak.

Q.   Meaning this -- it was text that did not exist previously.  This came from your own mind and you wrote it into what existed already?

A.   No, I said I would change any parts that I -- that I felt were not up to our standards.

Q.   So does editing --

A.   That's editing.

Q.   -- characterize what you did?

A.   Yeah.  Yeah.

Q.   So compilation -- portions of which you edited --

A.   Yes.

Q.   -- by changing what, a word or --

A.   Word or two, yes.

215

Q.   -- two?  Anything else in there that is not something you edited, that's something you added?

A.   The -- as far as the text, no.  No.

Q.   Okay.

A.   Illustrations and maybe punc -- capitalization.

Q.   Okay.  So -- okay.  So the source --

A.   And --

Q.   -- whatever it is, which was compiled by you, had minor edits made by you?

A.   Let's see.

MR. BRUNO:  Object.

A.   Say that question again.  Do I --

Q.   (BY MS. BROSIUS)  I just want to be clear that apart from minor edits there was no other portion of that text that you yourself wrote down --

A.   Yeah.

Q.   -- that did not exist before.

A.   I'm looking to see if there's --

Q.   Okay.

A.   If there's anything that, you know, I added that's different.  Because I haven't seen this in a long time.

Q.   Okay.

A.   There's a -- what we call a rubric.

216

Kissing your Patron Saint, say, the dismissal hymn, and I prepared it.

Q.   Can I put a little bracket around that? So according to your recollection, this was not something you --

A.   Found someplace else?  No.

Q.   Okay.  So I'm going to put a bracket around it and put AB next to it.  Okay.  Anything else?

A.   Let's see.

(A pause occurred.)

A.   Let's see.  Any changes.  Should have changed this, okay.  The creed.

Q.   Why should you have changed it?

A.   Pardon me?

Q.   Why should you have changed that part?

A.   Because it's not, like I said, up to our -- you know, trying to do it as perfectly as possible.  And this one here, the creed, I didn't change.  Okay.  Nothing else.

Q.   Okay.  And can you say the same with Exhibit 49, which is the Akathist?

A.   Okay.  The Akathist.

Q.   Akathist.

A.   That's something different.  Okay.  So

217

what do you want to know?

Q. Oh, just what you did before with the other two. Any portion of that that you wrote, authored, whatever you want to define it, that did not exist before that you compiled.

A. Yeah, the first words of every -- like Kontakia, I changed them so it would match with the Greek alphabetical order. You notice how it --

Q. Yes. It's in alphabetical order, um-hum.

A. A, B, C, D, E, F, G.

Q. You inserted a work -- a new first word of each section?

A. Or phrase, or changed -- changed the phrasing or -- so that I would have the first letter of each paragraph in alphabetical order. That's better for a person to memorize.

Q. Okay. Anything else?

A. Yes. Throughout this -- if one Akathist had -- you see they're in -- they're in pairs down here in this section. If -- and we do it so they will rhyme and so that they would have a connection with each other. Those two verses, these two verses, these two verses, all of them would have a connection with each other.

So not only as far as meaning, but also

218

as far as the sound and also as far as the -- the amount of words even. So to like flower of incorruption, you had the next one should match it somehow, so you use crown of continent, it's not something overly big. It has to be the same -- the same length as far as the size of each. So in that respect, that's something we did over the years.

Q. Is that something you've seen before?

A. Pardon me?

Q. Is that something you've seen before, what you just described, in other --

A. It's in the Greek -- it's in the Greek that way.

Q. I mean, have you seen it in other English translations before?

A. No, some -- to translate the Greek, they may catch -- they may catch the beauty of it. But usually it's not -- but to do this, you know, I had to have someone help me with the Greek, and that's Mother Mariam or Father Ignacio or one of my Greek priests.

Q. You seem to recall this one in particular very well.

A. It's always an ongoing thing, and I changed it -- and I can't ask him. Maybe six months ago.

219

Q. Do you remember working with Mother Mariam on this?

A. Not only her, but Father Ignacio.

Q. And this is all since you've been at Dormition Skete?

A. Of course.

Q. Okay. Thank you.

A. No, no. This has been an ongoing thing. It's a --

Q. Can you explain that.

A. -- from the very beginning.

Q. Of?

A. My monastic life.

Q. You've worked on this work?

A. Yes.

Q. Okay. Thank you.

A. 'Cause there's no good translation.

Q. Can we look back at the service --

A. Um-hum.

Q. -- index. And so we've looked at the first three. Any others that you can tell me if you added text to as distinct from a work that you didn't?

A. I'd have to -- I'd have to look and see. Maybe the -- enough time -- prayers.

Q. That's not actually an exhibit that we're

220

interested in.

A. Oh, okay. The Prosphora recipe, now that's a bread recipe. Can I see it?

Q. Anything beyond that one?

MR. INGOLD: Well, the deponent has just asked to see something.

Q. (BY MS. BROSIUS) Yeah, and I will get that for you right now. Anything else as we're looking through the list?

A. Let's see. Communion prayers.

Q. Here you go.

A. I'd have to see the Tonsure service, because that's something I've edited in the past. Okay. This we probably did the whole thing.

Q. Here is Exhibit 65, which is Tonsure service -- whoop.

A. Okay.

Q. Nope, wrong. It's 69.

MS. HAMILTON: Exhibit 69.

MS. BROSIUS: Um-hum.

Q. (BY MS. BROSIUS) Okay. There you go.

A. Wow, I'm glad you showed me this.

Q. I don't think there's a pending question, but what I'd like you to do is take a look at 69, which is the one you just mentioned, Tonsure service,

221

and let me know if any part -- portion of that is something that you authored.

A.   See the rubrics.

MR. INGOLD:  Counsel, after this question, why don't we take a break.  'Cause we've been going about two hours.

MS. BROSIUS:  That sounds good.

MR. INGOLD:  Okay.

A.   Oh, yes, maybe there's something -- there's some words I deleted or replaced in this big prayer here in -- I recollect.

Q.   (BY MS. BROSIUS)  Okay.  So some edits like the Akathist?

A.   Yes.

Q.   Okay.

A.   No.  The Akathist was a lot.

Q.   Oh, I'm sorry.  I was referring to the --

A.   Home Prayer.

Q.   Home Prayer.  Thank you.

A.   Okay.

Q.   Okay.

A.   But the Prosphora recipe, that looks like it's all ours.

Q.   Okay.

A.   Maybe I took the first two words from

222

HTM's website.

Q.   So above all of these that we've --

A.   Prosphora recipe.

Q.   Can you tell me, do you recall Father Peter coming to you at any time to ask you ask for your permission on certain texts?  Or is it your recollection -- I think you testified before that he came to you and said, I want to put up service texts.  Is that okay?  And you said -- you gave him your permission?

MR. INGOLD:  Objection, asked and answered.

A.   May I tell you exactly what I remember him saying?

Q.   (BY MS. BROSIUS)  I -- yes.

A.   We had just come back from the Congo, and he asked me, "Can I put some services on the website?"

And I'm pretty sure he was referring so people in Africa can get these and translate them into their native language, which there have not -- they didn't have access.  That's what I'm imagining he wanted to do for them.  So I said, "Go put them up.  Put them up.  Put up some service books."

He didn't tell me which ones, he didn't tell me how many.  And that's it.

223

Q.   When did you return from the Congo?

A.   Pardon me?

Q.   When did you return from the Congo?

A.   2007 in our summertime when it's really cold down there, like 95 degrees.  I mean it's -- that was supposed to be funny.  95 degrees is their winter.

Q.   Got it.  When did Mother Mariam's father die?

A.   About -- oh, a little over a year ago.  Something like that.

Q.   And so you don't recall any other conversation?  That was it with Father Peter?

A.   That was it until --

Q.   All right.

A.   -- we were notified that we are sued in federal court.  Whereas previously if there was anything in dispute, they sent us a letter.

Q.   They being HTM?

A.   HTM sent us a letter.

Q.   Have you gotten letters from HTM before?

A.   Just one -- one.  I -- when you say HTM, you mean from the -- from their representatives, or from them?

Q.   Correct.  Either.

A.   Okay.  From them.  I've written them and

224

they've answered me after I left.

Q.   Okay.  So when -- let's talk about what happened after both -- after you were notified of the lawsuit.  Do you mind if I just ask two more questions and then we'll be done --

MR. INGOLD:  That's fine.

Q.   (BY MS. BROSIUS)  -- on this topic?  You said in January you removed text from the website; is that right?

A.   Yeah, that's according to -- according to this -- whenever I'm not -- I don't know exactly, but I'm assuming from what we -- what we answered -- those were the answers, yes.  Since I wrote that and signed it, I had determined that that's -- that's when we removed it.  When we were notified.

Q.   Did you tell Father Peter which ones to remove?

A.   Yes.

Q.   Father Peter didn't make that decision himself, did he?

A.   No.

Q.   You told him?

A.   Yes.

Q.   How did you know which ones were HTM texts?

225

A.  Because of the complaint.

Q.  Because you matched up the HTM works to these titles?

A.  No.

MR. INGOLD:  Object to form, ambiguous.

Q.  (BY MS. BROSIUS)  How did you know, then?

A.  Whatever you said -- whatever objection you had, we looked and found that document and took it off.

MS. BROSIUS:  We can -- we can break. About ten minutes would be good.

(A break was taken.)

MS. BROSIUS:  So can we go back on the record.  Thank you.

Q.  (BY MS. BROSIUS)  So, Archbishop, you testified previously that when -- after -- after Father Peter put services text on -- put the services text on the website, you didn't look at that page of the website?

A.  Not once.

Q.  Is that right?

A.  Not once.

Q.  Not once after that.  So you never -- after they were up, you never reviewed them to determine where they came from, or --

226

A.  No, I'm so busy that I don't even look at any of the pages unless I have a need.

Q.  I want to show -- ask you to look again at this Exhibit 32.  You know what?  Can I -- I can actually help you, because I don't need you to look at any of those.  I'm going to take them off of there.

A.  Want all of them?

Q.  I can take them all.

A.  This is all of them.

Q.  Yes, that's the index.  So where -- let me see.  On the third heading of the website under Service Books, it says, "Most of the services" -- let's see.  Under Service Books, it says, "Most of the following services are in Adobe PDF format."

A.  Where are you looking?

Q.  Oh, I'm sorry.  On the first -- very first page, under the title Service Books.

A.  Okay.

Q.  Do you see where it says, "Most of the following services?"

A.  Yes, I do.

Q.  And it says, "are in Adobe PDF format so that you may print very nice service books for your home or parish."

Did you write this paragraph?

227

A.  No.

Q.  Do you know who did?

A.  Probably Father Peter.

Q.  Okay.  And at the end, the very -- on the last page under the title Notes, where it says, "Items marked with a single asterisk are half-sheet booklets printed on letter sized paper unfolded in the middle."

Do you see where it says that?

A.  Yes.

Q.  Are these instructions on how to print these into booklet forms?

A.  Looks like it.

Q.  And did you write -- did you write this text?

A.  No.

Q.  Is it your understanding that Father Peter did?

A.  Not unless we have someone else sneaking in and -- yes.

Q.  So that's a yes, okay?

A.  That's a yes.

Q.  Okay.  And that's -- and these are -- I mean, your understanding that these are instructions on how to download and print service books?

A.  Yes.

228

Q.  So that you wouldn't have to -- no one would have to purchase them, they could just print them and use them?

A.  (Nodded head.)  I guess you could draw that conclusion.

Q.  Do you know if anyone downloaded copies of these PDFs?

A.  I don't know one person.

Q.  You don't track that information?

A.  No.

Q.  You don't keep records of visitors to the website?

A.  No.

Q.  Downloads?

A.  No.

Q.  Was the site ever restricted in any way?

A.  Was what?

Q.  Was the site ever restricted in any way, password-protected?

A.  What does that mean?

Q.  Meaning was it always open to the public?

A.  I imagine so.

Q.  You don't know that it was ever -- you -- whether a visitor to trueorthodoxy.info would ever need a password to be able to get in --

229

A. No.

Q. -- to print these -- to review these documents?

A. No.

Q. Have you ever been a party to a lawsuit before this one?

A. Yes. The other one that HTM sued me for.

Q. So nothing -- no other litigations?

A. No.

Q. Either defendant or plaintiff? What about, have any other legal claims been made against you by someone else?

A. No.

Q. By letter or in any other way?

A. I don't think so.

Q. Do you recall, is the suit you're referring to the suit from 2006?

A. 2006. Could be. If it's Saint Andrew, The Book For Christ's Sake.

Q. Were you -- do you recall where that suit was brought, what state?

A. I think Michigan.

Q. Were you the only defendant that HTM sued?

A. No.

230

Q. Who else did they sue?

A. The printers.

Q. Do you recall their -- their name?

A. Sheridan Books.

Q. Who -- who was Sheridan -- who is or was Sheridan Books?

A. They're a printing house in Michigan.

Q. And what was Dormition Skete's relationship with Sheridan Books at that time?

A. I gave them the check for $600 -- no. $600 to print the book.

Q. To print which book?

A. The same one we're referring to, Saint Andrew.

Q. To print the Saint Andrew work?

A. Yes.

Q. What was Sheridan going to do with the Saint Andrew book?

A. Print it and give it to me.

Q. Bind it. How many copies were they going to print for you?

A. Oh, I don't know.

Q. No recollection of what the first order amount was?

A. No. I could give a guess. Maybe 200,

231

400. I don't know.

Q. Were you planning on selling the books --

A. Of course.

Q. -- in your book shop?

A. Of course.

Q. And on-line?

A. Of course.

Q. What was the third place you said you've made sales of -- of your books?

A. Telephone.

Q. By telephone. So Sheridan charged about $600 for you to print?

A. I don't know for sure.

Q. Okay.

A. But it's a -- it's a book about this thick, (indicating), it's paper bound.

Q. Okay.

A. Half-inch thick.

Q. Did you enter into a written settlement agreement that ended that case?

A. Yes.

Q. Like to take a look at that with you. Ask that it be introduced as Exhibit 72.

(Discussion off the record.)

(Deposition Exhibit 72 was marked.)

232

MR. INGOLD: We're at Exhibit 72?

MS. BROSIUS: Um-hum.

MR. INGOLD: Is that right?

Q. (BY MS. BROSIUS) Want you to take your time, look over that and refresh your memory of that document.

(A pause occurred.)

A. And I was wrong. Probably the profit I made selling the book was 600.

Q. You're changing your -- your prior estimation --

A. Yeah.

Q. Of how much --

A. This.

Q. -- Sheridan charged you?

A. Yeah, does it say here how much they charged me? Oh, 600 copies. I bought 600 copies.

Q. Okay. So do you recognize this document as the settlement agreement?

A. I think.

Q. Settling the Sheridan Books case?

A. I suppose so, yes.

Q. Is it your signature here on page --

A. Yes.

Q. Second to the last page?

233

A.  Yes.

Q.  Were you represented -- were you represented by an attorney when you signed this, do you recall?

A.  I must have.  Sheridan had their attorney, so I was paying for his legal fees.  And yes, I had an attorney.

Q.  You and Sheridan shared an attorney?

A.  No, because I printed with them, I wanted -- the contract said if there's any dispute --

Q.  Oh.

A.  -- I have to pay for their attorney representing them.

Q.  Okay.  So you recall having your own attorney -- separate attorney at the time?

A.  Yes, but don't ask me his name.

Q.  Did you read the document before you signed it?

A.  Probably not.  Why?

Q.  Why do you say you didn't?

A.  Because I don't remember it.

Q.  Do you often -- do you often put your name on things that you don't read?

A.  If it's -- if it's so -- so voluminous that I can't sit down and read it.  This is --

234

Q.  This was a voluminous document?

A.  Well, the agreement with Sheridan, it's just a printing company, so you make an agreement with them.

Q.  Oh, no.  This is the settlement agreement.

A.  Oh.

Q.  This is the settlement agreement.

A.  You're talking about the settlement agreement?  Yes, I read this.

Q.  This is the case -- this is the -- do you recognize this document as the document where you settled the case that HTM brought against you and Sheridan?

A.  Yes.

Q.  It says at the top, "This settlement agreement by and between Society of the Holy Transfiguration Monastery, Archbishop Gregory of Denver and Sheridan Books, collectively referred to herein as the parties."

A.  Yes.

Q.  Okay.  So we know -- we're clear on what this document represents, and the fact that you signed it.  And my question before was, did you read it before you signed it?

235

A.  Yes.

Q.  And your answer, now that you know this is the settlement agreement is, is what?

MR. INGOLD:  Object to the form.

A.  It's the settlement agreement.

Q.  (BY MS. BROSIUS)  Do you recall reading this before you signed it?

A.  Yes.

Q.  Okay.  So -- and I just want to be clear that you weren't thinking of the agreement with Sheridan when I was asking you whether you were represented by an attorney at the time you signed this.  This is the settlement agreement.  Were you represented by an attorney when you signed this document?

A.  Yes.

Q.  You were?

A.  Yes.

Q.  Okay.  So the Saint Andrew work is mentioned in paragraph 1; is that right?  It's num -- numbered paragraph 1 here on page 1.

A.  Oh, numbered 1.  Oh, yes.  St. Isaac is mentioned.

Q.  No, I'm sorry.  Saint Andrew -- the Saint Andrew work is mentioned first; is that right?

236

A.  Saint Andrew is mentioned first.

Q.  All right.  And is it the Saint Andrew work that you said that was the work you had engaged Sheridan to print for you?

A.  Yes.

Q.  Okay.  But the settlement agreement also references the St. Isaac work; is that correct?

A.  Correct.

Q.  Okay.  And so do you see further down in numbered paragraph 1, the last sentence, which begins, "Archbishop Gregory and Sheridan Books?"

A.  Um-hum.

Q.  It says, "Further agreed that in consideration of the overall settlement of the dispute concerning the works."

Do you understand the settlement of the dispute concerning the works to be the lawsuit?

A.  Um-hum.

Q.  Is that -- is that a yes?

A.  Yes.

Q.  "That they will not challenge the validity of the monastery's copyright and/or the registrations in and to the works at any time in the future."

Do you see where it says that?

237

MR. INGOLD:  Object to -- object to form, foundation, and calls for legal conclusion.

Q.  (BY MS. BROSIUS)  Do you see where it says that?

A.  Yes.

Q.  Okay.  And when the works are referred to here, do you understand those as defined above here to be both Saint An -- the St. Isaac and Saint Andrew works?

A.  Correct.

Q.  Did you attempt to make this representation at the time you signed this agreement?

MR. INGOLD:  Object to form, foundation, and calls for a legal conclusion.

A.  That's my understanding when I -- when I signed it.

Q.  (BY MS. BROSIUS)  That in settlement of the -- settlement of the dispute concerning the works, meaning the lawsuit --

A.  Yes.

Q.  -- you would not challenge the validity of the -- of HTM's St. Isaac work; is that right?

MR. INGOLD:  Object to form, foundation, calls for a legal conclusion and asked and answered.

Q.  (BY MS. BROSIUS)  Is that right?

238

MR. INGOLD:  Same objections.

A.  Do I answer?

MR. INGOLD:  (Nodding.)

A.  Yes.

Q.  (BY MS. BROSIUS)  Okay.  And if you can turn -- actually, just look down a little further in section 2 there, paragraph 2, you -- it reads, "Archbishop Gregory, you warrant and represent that you, either personally or through your associates and agents, have not copied, duplicated, transcribed, reproduced, replicated or infringed in any manner the St. Isaac work, and that no copy, duplicate, transcript, reproduction or replica of any portion of the St. Isaac work has been or will be printed or published by or for Archbishop Gregory."

Do you see where it says that?

A.  Yes.

Q.  And further it says, "In that Archbishop Gregory asserts that he does not have any knowledge of the existence of any copy" --

A.  Right.

Q.  -- "duplicate, transcript, reproduction or replica of any portion of the St. Isaac work in any medium" --

A.  Right.

239

Q.  -- "and will not assist in the creation" -- I think that's a typo.

A.  Yes.

Q.  It says, "of copy, duplicate, transcript, reproduction or replica of the St. Isaac work in any medium at any time in the future."

Is that right?

A.  Yes.

Q.  And that was the representation you made when you signed the settlement agreement?

A.  Yes.

Q.  If you can turn to the next page, under paragraph 4, the first sentence, there do you see where it says, "Archbishop Gregory and Sheridan Books each agree to cease and desist from all alleged infringing activities, including without limitation copying, duplicating, transcribing, reproducing or replicating, printing or publishing in any manner any portion of the works."

Do you see where it says that?

A.  Yes.

Q.  And do you understand the works, again, to still be a reference to HTM's St. Isaac and St. Andrew works?

A.  Yes.

240

Q.  What did you get in exchange for making these representations and making this agreement?

MR. INGOLD:  Object to form, foundation.

Q.  (BY MS. BROSIUS)  Were you allowed to sell off the copies of the Saint Andrew work that Sheridan Books had already printed for you?

A.  Yes.  But your previous -- what did I get for signing this agreement?

Q.  Is that one of the things you got from signing that agreement?

A.  Yeah.  The other thing was not having to spend so much money on lawyers.

Q.  Because in paragraph 8, it says that upon execution of this agreement by you, that the monastery -- that HTM would agree to request that the court enter an order of dismissal of this lawsuit against you; is that right, with prejudice?

A.  Yeah, what does with prejudice mean?

Q.  That's good for you.

A.  What?

Q.  It's good for you.

A.  Oh, but what does it mean?

Q.  When something's dismissed with prejudice, it means -- what it means.  I guess we can talk about that some other time, or maybe your

241

attorney can explain that on a break.

In any case, the question that I posed was, in addition to the ability to sell off -- it looks like here at 390 copies of the Saint Andrew work that Sheridan printed for you -- HTM was also going to withdraw the suit against you; is that right?

A.  Yes.

Q.  Okay.  And did they, in fact, dismiss the suit against you once you signed the settlement agreement?

A.  I believe so.

Q.  Are you in possession now of a copy of HTM's St. Isaac work?

A.  Yes.

Q.  And you're now, I understand -- I'm asking whether now you're challenging the validity of HTM's ownership of the St. Isaac work; is that right? Let me --

A.  Correct.

Q.  Excuse me.  Of the version that they claim is there own.

A.  Right.

Q.  Is that right?

A.  Right.

Q.  After Father Peter posted the services,

242

did he ever come to you to ask whether he should -- did he ever have any questions for you on whether he should or should not post certain works, certain services?

A.  No.

Q.  So he -- or you never -- you never confirmed whether what he was posting --

A.  I never knew what he was posting until I got sued.

Q.  Okay.  Enough said.  Okay.

I want to talk to you about Holy Apostle's Convent, which we talked a little bit about this morning, I understand.  From what you said earlier, Holy Apostle Convent is a female monastic order; is that correct?

A.  Yes.

Q.  Do you know if it's also incorporated as Dormition Skete is?

A.  Yes.

Q.  Do you know if it's also a nonprofit --

A.  Yes.

Q.  -- 501 C corporation?

A.  Yes.

Q.  Is it incorporated in Colorado?

A.  Yes.

243

Q.  And where is it located?

A.  In Buena Vista.

Q.  So as you testified before, it's actually on the same property that's owned by Dormition Skete; is that right?

A.  I -- yes, it's right next to it.

Q.  And you actually testified that the buildings that -- or where the convent -- that that -- excuse me -- that comprised the convent are on land that Dormition Skete owns; is that right?

A.  I think I sold a portion to them for two bucks.  I think.  I sold --

Q.  So the land that was given to Dormition Skete at its founding --

A.  Not at its founding.  When she moved -- when she had -- when she moved -- when -- when she -- her original place was in the city.

Q.  Is she Mother Mariam?

A.  Right.  'Cause there's electricity there. And once we got electricity, she was able to come closer.

Q.  What year was that?

A.  '94.

Q.  So in 1994, you sold a portion of Dormition Skete land to the Holy Apostles Convent?

244

A.  I think so, yes.

Q.  What's the purpose of the convent?

A.  What's the purpose of the convent?  A place where a person can live a monastic life and propagate, you know, the orthodox faith.

Q.  Does -- I'm going to call it HAC for short, if that's okay with you.  Does HAC have officers of the corporation?

A.  Yes.

Q.  Who are they?

A.  I am, and I don't know if Bishop John is. But I am, and she is.

Q.  What is -- what is your officer title?

A.  Probably vice president.

Q.  And do you know what her -- Mother Mariam's title is?

A.  President.

Q.  Are any of the members of Dormition Skete common officers?

A.  Are there any --

Q.  Are any other members of Dormition Skete HAC officers?  Are you also a director of HAC?

A.  What's a director?  What do you mean?

Q.  Similarly, as you testified after we looked at -- after you looked at the articles of

245

incorporation of Dormition Skete, there were three directors and three officers; do you remember that?
A. Yes.
Q. Do you know if you're also a director of --
A. Probably, yeah.
Q. Is there a legal relationship between Holy Apostles Convent and Dormition Skete?
A. What do you mean by a legal --
Q. They're a corporation, you're a corporation. Are -- is one a subsidiary of the other?
A. No, no. They're both separate, different.
Q. Apart from a legal connection, what is the relationship between the two?
MR. INGOLD: Object to form.
A. She is a member of the church who is a monastic -- wants to live a monastic life.
Q. (BY MS. BROSIUS) What other members of HAC are there, apart from Mother Mariam?
A. She's the only one.
Q. She's the only member?
A. That's why --
Q. What is the -- can you describe the HAC, the convent, in terms of buildings similar to what you

246

did with the Dormition Skete? What are they? What does she own?
A. One building -- one building, three floors. She sleeps on the third floor, and has her office on the third floor. Second floor is the kitchen, church. Also a place to paint icons. A dining room. Living room. And the third -- the lower floor, we'd call it a basement. That's where she stores her books, it's where she packs her orders.
Q. Packs orders?
A. And there's a garage there.
Q. Packs orders for herself, or for Dormition Skete?
A. For herself.
Q. I'm going to have you look at a -- we'll have it introduced as Exhibit 73.
(Deposition Exhibit 73 was marked.)
Q. Do you recognize -- give you a second to look at that.
(A pause occurred.)
Q. Do you recognize this document?
A. Yes.
Q. Is this an article of amendment to Dormition Skete?
A. Yes.

247

Q. Is that your signature on the second page there?
A. Yes.
Q. Do you remember -- did you write this document?
A. I believe I did, yes.
Q. Okay.
(A pause occurred.)
Q. Did your -- did you write this document?
A. Yes.
Q. Did anyone else -- strike that.
Can you direct your attention to Article 2 on the first page there.
A. Just a second. Let me finish reading it.
Q. Oh, sure.
A. Okay.
Q. So --
A. I should read this close -- closer, but this is an amendment we made.
Q. In 2005; is that right?
A. Yes.
Q. Article 2, it says, "No one who is not an officer of the convent corporation has any authority over convent property."
A. Um-hum.

248

Q. This is an amendment to the Dormition Skete articles of incorporation, right?
A. What's that?
Q. This is an amendment to the Dormition Skete, Inc., articles of incorporation; is that right? Why don't we just --
A. Yes.
Q. Why don't we just read the top here. It says Articles of amendment --
A. Entity name, Dormition Skete, yes.
Q. All right. There you go. Okay. Jurisdiction Colorado. So again, Article 2, which references the convent corporation has any authority over convent property, when it says --
A. More in --
Q. Well, actually, so -- sorry.
The question I have for you is, does this article direct how the convent's property is to be disbursed?
MR. INGOLD: Object to form.
Q. (BY MS. BROSIUS) When it says property -- I'll withdraw the question.
When it says property, what do you understand that to include?
A. Everything there in the convent.

249

Q.  Meaning the land?
A.  The building.
Q.  Excuse me?
A.  Yeah, the land the building.
Q.  The land?
A.  Um-hum.
Q.  Contents of the building?
A.  Um-hum.
Q.  You have to say yes or no.
A.  Yes.  Sorry.
Q.  Books.  Is that right?
A.  Books.
Q.  And what do you understand authority to mean here?
A.  Authority.  Has a right.
Q.  Would that include the authority to purchase and dispose of property?
A.  I imagine.
Q.  Control how it's used?
A.  Yes.
Q.  Do you understand this to mean that -- well, first of all, let me ask you, you said that you are an officer of the convent corporation; is that right?
A.  Yes.

250

Q.  Do you understand this to mean that Dormition Skete has control over the convent's property?
A.  No.
MR. INGOLD:  Object to form.
Q.  (BY MS. BROSIUS)  No?
A.  No.
Q.  Is that your answer?  Is it true that you could amend Dormition Skete's articles of incorporation and change who controls the convent's property?
MR. INGOLD:  Object to form.
A.  Not without her.
Q.  (BY MS. BROSIUS)  If you -- if you were to amend Dormition Skete's articles of incorporation to get rid of Article 2, have you changed the manner in which the convent corporation's property is controlled?
MR. INGOLD:  Object to form, foundation, calls for a legal conclusion.
Q.  (BY MS. BROSIUS)  You don't understand it that way?
A.  I don't understand your question.
Q.  Do you know if Holy -- HAC makes any -- anything?

251

A.  Books.
Q.  They make books.  She -- she makes books; is that right?
A.  Um-hum.
Q.  It's just her; is that correct?
A.  Um-hum.
Q.  Sorry, you have to say yes or no.
A.  Yes, sorry.
Q.  What books does she make?
A.  She translates from the Greek all the lives of the saints.
Q.  The lives of the saints.  Anything else?
A.  That's mainly -- and sometimes the writings of the fathers.
Q.  Does she publish her books?
A.  Yes.
Q.  In bound form, hardbound, soft bound?
A.  Both.
Q.  Both.  Does she sell the books?
A.  Yes.
Q.  How does she sell them, through what channels?
A.  Internet, mail, phone.
Q.  Does she have her own website?
A.  Yes.

252

Q.  What is it, do you know?
A.  holyapostleconvent.org, I think.
Q.  And she sells her books on a website; is that right?
A.  Yeah.  Yes.
Q.  Does she make icons?
A.  Yes, at times.
Q.  For Dormition Skete?
A.  Well, yeah, she made one for us.  One, I think, that we used -- that we reproduced.  But mainly for herself.
Q.  And so she sells books -- she sells icons in addition to books?
A.  No.
Q.  She just makes icons?
A.  She just makes icons for herself.
Q.  For herself?
A.  She doesn't sell them.
Q.  What about -- does she provide any services?
MR. INGOLD:  Object to form.
Q.  (BY MS. BROSIUS)  The way when we were talking about Dormition Skete --
A.  Services for --
Q.  -- offering its services of custom

253

painting of icons on canvas for building. I guess I would call that a service, but maybe not.

A. What do you mean?

Q. Does she do anything else to -- strike that.

Does she sell anything else other than books and icons? Actually, you said that she doesn't sell icons. Does she sell anything else other than books?

A. I think that's it. Her customers may ask to buy icons from Dormition Skete. She may -- she may take orders from -- from our catalog, 'cause it's like a joint effort. She -- she advertises with us sometimes.

Q. Does she help you run the sales side of Dormition Skete?

MR. INGOLD: Object to form.

A. If she gets orders, we allow her to fill them and take a cut.

Q. (BY MS. BROSIUS) Okay.

A. So just -- like, she sells us books, we sell her icons.

Q. Got it. Is she allowed to advertise your icons in her publications or on her website?

A. The only way she -- she advertises is by

254

using our icons in her books.

Q. The source of money that comes into HAC, one, I assume, then, is the sale of her books, right?

A. Yes.

Q. One would be a portion of profits she might receive from selling your icons, Dormition Skete's icons; is that right?

A. Say that again. One should be --

Q. One other manner of income that she receives is a -- you said a portion of sales from icons that she facilitates the sale of --

A. Um-hum.

Q. -- the Dormition Skete icons.

A. Um-hum.

Q. Is that right? And does she receive donations?

A. She must. I don't know. Yes, I know she receives donations, but I don't know how much. She has her own private situation.

Q. What is your role as vice president? Did you say you were vice president of HAC?

A. Yes.

Q. What is your -- what are your responsibilities as vice president of HAC?

A. Where -- as a corporate officer, I

255

imagine whenever she meets to file papers or anything like this.

Q. Do you have regular meetings with her about HAC --

A. Yes.

Q. -- issues, corporate issues?

A. Yes. And maybe she has to fill out forms that we have to report to the state.

Q. Just like she sits in -- I think you said she sits in on your meetings?

A. Yeah.

Q. Does she translate from any -- or any other language other than Greek?

A. No.

Q. Is a portion of her property dedicated to a library the way Dormition Skete's is?

A. Yes.

Q. Where is that library, in her --

A. On the third floor. Actually, it's the second floor if the basement is considered a basement. On the second floor.

Q. Do you understand that to be where she keeps books that she owns? Books not for sale, but her own books?

A. Correct.

256

Q. Do you have access to her library?

A. What does that mean?

Q. Are you --

A. Allowed to go in and take her books?

Q. Yes.

A. No, that's a no. No.

Q. Have you ever asked if she has a particular book that you wanted to look at?

A. Have I ever asked her?

Q. Um-hum.

A. Yes.

Q. Did she have it?

A. Yeah. She has a bigger library than I do.

Q. So she will share when -- when she's asked she will let you borrow books from her?

A. Not necessarily, because one time we borrowed a book and it came back soiled. And that was the last time.

Q. When was that?

A. Oh, it must have been years ago.

Q. So you don't know any recent share -- let's say book sharing between HAC and Dormition Skete?

A. Yeah. She bought a book about a month

257

ago, and she let me look at it for about a day.

Q. And what book was that?

A. The Homilies of St. Gertrude Thomas.

Q. Do you remember borrowing any -- do you remember borrowing any books in particular that you were -- from her that you were, you know, happy that she had that you were looking for?

A. I don't remember.

Q. Nothing stands out?

A. No, nothing stands out like --

Q. Do you recall looking at any of her -- any HTM texts that she has?

A. I don't know if she has or -- well, she must. Maybe -- she must have HTM texts, I imagine, but I don't look at -- I don't look at their work. I'm not a chanter.

Q. Would she -- have you ever looked at her library?

A. Yes.

Q. Been invited to come in and look and see what kind of texts she has?

A. Yes.

Q. Even if you haven't walked out with any?

A. Yes.

Q. Has she done the same with Dormition

258

Skete books?

A. No, the library is -- she's just been in the library maybe two times.

Q. She has more books than Dormition Skete; is that right?

A. Probably.

Q. By a fair amount?

A. Oh, no. But her books -- well, what can I say? She -- she'll easily buy a book when she -- when it looks like it's in -- very interesting.

Q. Okay.

A. She's a book buyer. And if I see something that she's bought, I will say, Yeah, I want that. And I'll probably buy it, too.

Q. You might buy it or you might borrow it or you might look at it?

A. Borrowing is no more.

Q. Okay.

A. No, can't borrow. But --

Q. Can look at?

A. Can look at. It stays in the convent. And then if I want it, I have to buy it.

Q. Have you ever asked her to purchase books for you?

A. Yes.

259

Q. And she's done that, right?

A. Yes.

Q. And some of those were HTM books, right?

A. Maybe -- perhaps, yeah.

Q. Do you know if anyone else in Dormition Skete has asked her to purchase books for Dormition Skete?

A. Do I know if anybody --

Q. Else in Dormition Skete --

A. Yeah.

Q. -- has asked her, Mother Mariam, to purchase books for them?

A. No, I wouldn't imagine. But we wouldn't buy them from HTM. We'd buy them from St. Nectarios bookstore.

Q. I understand the difference. We've spoken about that. Thank you. How would she use the service books?

A. Just like any other chanter.

Q. Is she a chanter?

A. No.

Q. Does she attend services with Dormition -- at Dormition Skete?

A. At times. But mainly she doesn't use HTM service books, 'cause she does everything in Greek.

260

So she may have them because they were printed and she likes to have them. Or -- yeah. Yeah.

Q. Okay.

A. Anybody prints something new, maybe Mother Mariam will be one of the first customers.

Q. She's an early adopter, we would call her?

A. Right.

Q. Okay.

A. She loves books.

Q. Show you some documents.

(Deposition Exhibit 74 was marked.)

Q. Just take a look at that document.

A. Um-hum.

Q. And is this the St. Nectarios you were referring to earlier?

A. Yes.

Q. Who sells HTM books, right?

A. Right.

Q. And do you recognize this document?

A. Yes.

Q. What is this?

A. It says it's a sales receipt.

Q. From St. Nectarios to Dormition Skete; is that right?

261

A.  Yes.

Q.  For The Psalter?

A.  Right.

Q.  You understand that's the HTM Psalter?

A.  Absolutely.  They wouldn't sell anything else.

Q.  Okay.  And what is the date of the invoice up there in that first black box?  Upper left?

A.  Upper left?

Q.  Right there.

A.  Oh.  2004.

Q.  April 2004.  And I'll have this marked as Exhibit 75.

(Deposition Exhibit 75 was marked.)

Q.  And, sir, do you recognize this document?

A.  Do I recognize it?

Q.  Um-hum.

A.  It is an invoice.

Q.  From Holy Transfiguration Monastery; is that right?

A.  Correct.  Correct.

Q.  To Dormition Skete; is that right?

A.  To Dormition Skete.

Q.  And it's dated -- the order date -- ship date, is October of 1996; is that right?

262

A.  October 1996.  Where is that?

Q.  The middle boxes.

A.  Yes.

Q.  And so the first work listed here is The Psalter; is that right?

A.  Right.

Q.  So this is an invoice showing orders made by Dormition Skete of Holy Transfiguration Monastery texts; is that right?

A.  Correct.  Who is Peter Noblum?

Q.  Do you know who Peter Noblum is?

A.  Must have been a guest or someone that's staying at the monastery.  Peter Noblum.

Q.  Do you have a lot of guests?

A.  Yes.

Q.  And do you remember one named Peter in 1996?

A.  No.  Can I give this to him and see if Father John knows him?

Q.  Unfortunately, no.

A.  Okay.

Q.  But thank you.

A.  Peter Noblum.

Q.  So -- okay.

A.  Sorry.

263

Q.  And Exhibit 7 --

A.  It's probably because he wanted a Psalter, and I told him you have to buy it yourself.

(Deposition Exhibit 76 was marked.)

Q.  76.  Thank you.  Here we go.

A.  Thank you.

Q.  And do you recognize this document?

A.  It is an invoice.

Q.  Again, from St. Nectarios Press, right?

A.  Right.

Q.  You see --

A.  Dated 2007.

Q.  And this is referencing books sold to Mother Mariam at HAC; is that right?

A.  Correct.

Q.  The third one down is The Great Horologion.

A.  Yes.

Q.  Is that right?

A.  Yes.

Q.  And you understand that would have been HTM's Great Horologion; is that right?

A.  Yes, $120 per book.  Now you know why we don't buy their works.

Q.  And I'm sorry, I'd like to have this

264

introduced as Exhibit 77.

(Deposition Exhibit 77 was marked.)

Q.  And can you take a look at this.  Do you recognize this document?

A.  Invoice.

Q.  From Holy Transfiguration Monastery, right?

A.  Right.

Q.  To Mother Mariam at HAC?

A.  In 2005.

Q.  In 2005.  And is the first work listed here The Great Horologion?

A.  Yes.

Q.  Do you have any understanding of why Mother Mariam would have needed two copies of The Great Horologion?

A.  Not unless she's going to give them to someone, no.  Maybe she needs them for both sides of her church.  You buy usually two for both choirs.

Q.  One in 2005 and one in 2007?

A.  Correct.  If you can't -- if you can't afford it one year, you try and get it the next year.

MR. INGOLD:  Counsel, just so the record's clear, she bought three in the prior order.

MS. BROSIUS:  Oh, I'm sorry.

265

MR. INGOLD:  So she bought a total of four copies.

MS. BROSIUS:  7 -- like to have this introduced as Exhibit 78.

(Deposition Exhibit 78 was marked.)

Q.  (BY MS. BROSIUS)  And do you recognize this document?

A.  Invoice.

Q.  From Holy Transfiguration Monastery to Mother Mariam?

A.  Yes.

Q.  And August -- also August of 2005, correct?

A.  August of 2005.

Q.  And also reflecting an order of HTM Great Horologion, right?

A.  Yes.

Q.  I'm just going to have these marked sequentially, if it's okay.  79.

(Deposition Exhibits 79 through 81 were marked.)

A.  $1,000 for this.

Q.  (BY MS. BROSIUS)  So 79, 80, and 81 all are Holy Transfiguration Monastery invoices; is that right?

266

A.  When you say 79, 80, 81 --

Q.  I'm so sorry.

A.  Oh, the exhibits.

Q.  Yeah.

A.  Yes.  Correct.

Q.  Who are -- who was the "shipped to" on each of these?

A.  Holy Apostles.

Q.  Mother Mariam, right?

A.  Correct.

Q.  And do all of these together reflect orders that she placed of The Menaion?

A.  Apparently.

Q.  That's pretty expensive.

A.  Yes, isn't it?

Q.  What years -- okay.  Let's look at 79. 79, the order date was in September of 2005; is that right?

A.  Yes.

Q.  And then April of 2007, she ordered two sets?

A.  Correct.

Q.  At a thousand dollars a piece?

A.  Correct.

Q.  And then in September, she ordered

267

another set for September 2007.  Another single set of Menaion; is that right?

A.  Correct.

Q.  Do you have any idea why she would have needed $4,000 worth of sets of The Menaion?

A.  3,000.

Q.  Four, actually.  She has one here, two here and one here.

A.  Oh.  She was going to give me two, and probably keep two for herself for both sides of the chanter stand.

Q.  You recall getting a copy -- two sets of The Menaion from her?

A.  Absolutely.

Q.  Okay.

A.  When her father died, she got donations in his memory from her family.

Q.  And that was in 2007?

A.  Probably.

Q.  Or -- well, one is 2005, it could have been earlier?

A.  Um-hum.

MR. INGOLD:  Just as a housekeeping matter, are you meaning any of this to be confidential, attorneys' eyes only?  Because it's not

268

stamped that.  But it seems to me that some of these correspond to documents previously disclosed in that fashion.  So I'm just raising it as a housekeeping issue so everything is on the up and up.

MS. HAMILTON:  Well, give us the 14 days and let us just --

MR. INGOLD:  Sure.

MS. HAMILTON:  Okay.

MR. INGOLD:  Okay.  That's fine.

MS. HAMILTON:  Thanks.

Q.  (BY MS. BROSIUS)  Are you familiar with the Russian Orthodox Church outside of Russia?

A.  Yes.

Q.  Is that entity also known by the acronym ROCOR?

A.  Yes.

Q.  Is that the same as the Russian Orthodox Church Abroad?

A.  Yes.

Q.  Also known as ROCA?

A.  Yes.

Q.  So the relationship between ROCOR and ROCA are they're the same; is that right?

A.  Yes.

Q.  What's the relationship between Dormition

269

Skete and -- I'll just say ROCA -- right now?

A. The relationship between them? There is no relation -- there is no relationship other than I came from their church.

Q. Do you currently commemorate the bishops of ROCA?

A. No.

Q. What bishops are commemorated by Dormition Skete?

A. Bishop John and Archbishop Gregory and the Greek Orthodox Church.

Q. I'm sorry, what?

A. Well, commemorated in communion.

Q. In communion?

A. In communion, really. Yeah.

Q. When you say commemorated, is that the same as being in communion with?

A. No. Commemorate is that you are under them or they are part of your church per se. Like there's the church of America, it's not like the same church in Greek -- in Greece. Because it's a different country, it's a different church.

Q. Okay. And to give blessing to the bishops or to be under the blessing of a bishop means something different?

270

A. It means that -- that you're a bishop. Like if he gives you a blessing to start a monastery, that's your bishop.

Q. So a monastery can be -- can commemorate bishops of a particular church?

A. Provided that's their -- they're in their territory.

Q. Okay. So you would only commemorate the bishop of a church located in the United States?

A. Part of my church, or in communion with me.

Q. And is it -- does it follow that you would only receive a blessing from a bishop of a church located also in the United States?

A. Only in communion with me.

Q. Who is also in communion with you?

A. Yeah.

Q. So it's one and the same?

A. Yes.

Q. Was Dormition Skete ever in communion with the bishops of ROCA?

A. Yes.

Q. When did it begin -- that communion begin?

A. When it was founded. When Dormition

271

Skete was founded.

Q. In 1979?

A. Correct.

Q. And when did that -- when did that communion end?

A. 1994.

Q. 1994. And why did Dormition Skete -- well, did Dormition Skete end that relationship?

A. Why did Dormition Skete Skeet --

Q. I'm sorry. Let me rephrase that. Did Dormition Skete --

A. Yes, they did.

Q. -- cease commemorating --

A. Correct.

Q. -- the bishops of ROCA?

A. Correct.

Q. Why did that happen?

A. Because they went into communion the first time with a group in Greece whom they earlier condemned.

Q. What group?

A. And --

Q. I'm sorry.

A. As well.

Q. Okay. And what group was that?

272

A. The group of all calendars known as Cyprian Apheli.

Q. Can you spell Cyprian?

A. C-y-p-r-i-a-n.

Q. And is it Apheli?

A. Apheli.

Q. Apheli.

A. It's a city or area in Greece.

Q. So when they began to do that, you -- you ceased being in communion with them; is that right?

A. Correct.

Q. Is that when you became -- when did you become a bishop?

A. 2001.

Q. Between 1994 and 2001 did you -- were you in communion -- was Dormition Skete in communion with any other bishop -- group of bishops -- bishop?

A. At that time I was a priest, and I had to be under a bishop. So I went to Greece with -- to join bishops whom the ROCA was in communion with up until that time.

Q. Who also split away from --

A. Who also broke away from the ROCA.

Q. Okay.

A. Correct.

273

Q.   And then you became a bishop in 2001?
A.   Yes.
Q.   Did you cease being in communion with those bishops at that time in Greece?
A.   No.
Q.   That's continued?
A.   That continued, yes.  I consider myself in communion with them, but it's a completely different church in that they govern their own territory and I govern my own territory.
Q.   When you were a novice -- you were a novice at HTM, correct?
A.   Correct.
Q.   Did you do any translation work when you were at HTM?
A.   No.
Q.   Did you create icons when you were at HTM?
A.   Yes.
Q.   And since you founded Dormition Skete, you create religious icons now, correct?
A.   Correct.
Q.   After that.  Did -- when you want to sell the icons, do you need to go to someone outside of Dormition Skete to do that, to get permission to sell

274

the icons?
A.   No.
Q.   Did anything happen in 1994 when you left ROCA, in terms of --
A.   Now, it could -- this is 1994, December.  But it probably went --
Q.   Into 1995?
A.   Right.
Q.   Okay.
A.   It's not, you know, bang, you know.  I mean, it takes time to move from one jurisdiction to another.
Q.   What happened when Dormition Skete left ROCA?  How did that process play out?  Did you notify them by letter?
A.   No.  I called the bishop and I told him that because they -- they went into communion with this group, and I had notified them with three or four open letters that this was a drastic mistake, they knew my position, and then they just went ahead and did it.  So they were kind of like expecting me to do that.
Q.   Okay.  So it was not a surprise to them, you presume?
A.   No, it wasn't a surprise.  And so I got

275

permission from the bishop.
Q.   To leave them?
A.   To leave them.
Q.   Was it a -- was it a formality, or was it something of an agreement?
A.   It was an agreement by word.  Their word is yea, nay, yea, nay.
Q.   Were there any other formalities that needed to be taken care of when you left them?
A.   No.  No.
Q.   You didn't have to send them anything or give them anything or give them back anything?
A.   No, I didn't have to give them -- no.
Q.   Did they have to return anything to you or send you anything to make it final?
A.   No.  They just took my name off their list.
Q.   And you did the same?
A.   Um-hum.
Q.   All right.  Just have a few other documents here.  82.
     (Deposition Exhibit 82 was marked.)
Q.   And I just need to make the representation that this is a document also produced by you to HTM, although not Bates-stamped.  I believe

276

it was titled under the file named 1959 Monastic Statutes.
A.   Yes.
Q.   Do you recognize this document?
A.   Yes.
Q.   When did you first see this document?
A.   First see it?  I don't know how many years ago.  I can't tell you.
Q.   Can you make a guess?
A.   I could make a guess.
Q.   What is that guess?
A.   Say --
Q.   Was it more than two years ago?
A.   Oh, yeah.
Q.   More than five years ago?
A.   Let me make a guess.
Q.   Okay.
A.   Say, 1980.
Q.   1980, okay.
A.   '80s.
Q.   Do you remember seeing this document when you were at HTM?
A.   No.
Q.   Can you take a look at Article 15.  There it is.  Page 4 at the top, there.  Where it says, "The

277

possessions of a monastery, convent or community are its property and registered in its name, which is why each monastery, convent and community must take steps to become incorporated as an entity."

Do you see where it says that?

A.  Yes.

Q.  Is that why you incorporated Dormition Skete as a nonprofit of Colorado?

A.  It would have to be incorporated.  The -- the convents had to be or the monasteries have to be incorporated, yes.

Q.  And then do you see where it further says, "The possessions of the" -- is it synod?

A.  Um-hum.

Q.  "Diocese or monastery are correspondingly the property of the synod, Diocese or monastery." What is the -- it continues and says, "Just as the possessions of the Stavropigial"?

A.  Stavropigial.

Q.  What does that mean?

A.  How do I -- let me see if I understand, as well.  Monastery started by -- I think monastery started by the bishop as an independent -- I don't know.

Q.  Not a monastery that later affiliated

278

with a particular bishop.  Is that a difference?

A.  I don't know for sure.  I'd have to look it up.

Q.  What do you understand this paragraph to mean, in terms of the possessions of the monastery versus the possessions of the synod?

A.  Possessions of the monastery are their automobiles, you know, whatever physical things I believe are in the monastery.

Q.  That's how you interpret possessions?

A.  I would imagine so.

Q.  And then the possessions of the synod, their automobiles are owned by them correspondingly? Is that how you understand it?

A.  "And possessions of the synod, Diocese or monastery are correspondingly the property of the synod."

Q.  Diocese or monastery.

A.  A property of the synod.  I have to think about it.  Property of the synod is probably the myrrh that they received to function, the entimos that they received when they became -- when they came under the -- beneath the bishop of the synod.  And if they were requested or --

Q.  I'm sorry.  You said synod, but did you

279

mean monastery?

A.  No.  Synod is a group of bishops.

Q.  Okay.  And then you said they were something that they received from the synod?

A.  Right.

Q.  So they received something from themselves?

A.  Oh, the monastery?

Q.  Sorry.  I was confused by that.

A.  Oh, the property of the monastery.  The possessions of the synod belong to them, like the entimos and like the myrrh, the holy oil.

Q.  Um-hum.

A.  They give that to the monastery to function --

Q.  Okay.

A.  -- as a church, as a monastery.  They can't hold services unless they have these symbols that they belong to the synod.

Q.  What does Dormition Skete get from its bishops?

A.  Entimos and myrrh.

Q.  Is that symbolic?  Are you the bishop you're referring to when you say from or some other --

A.  No.  The bishop who founded us.

280

Q.  And who -- remind me who.

A.  Archbishop Seraphim of Chicago.

Q.  He -- one of the founders?

A.  Yes.  The one who gave us permission to start our monastery.  You have to have the permission of a bishop that's in -- that you live in, his Diocese.  If you're in there, you have to have permission from him to start a church or monastery, a chapel or anything.  You can't just go ahead and build it.

Q.  I think earlier when we talked about the founder, I thought you said the founders were the three individuals listed on the original articles of incorporation.

A.  He became --

MR. INGOLD:  Object to form.

A.  He became -- he signed as one of the founders, also.

Q.  (BY MS. BROSIUS)  Okay.

A.  He gave permission and signed as one of the founders.

MS. BROSIUS:  All right.  Can we just take a five-minute break.  Thank you.  We can go off the record, please.

(A break was taken.)

281

Q.  Can I -- I just have a couple of questions left that just relate to one document that we've already introduced, and it's the RFAs, which I think are Exhibit's 20 something.

(Discussion off the record.)

Q.  So these are your requests -- your responses to HTM's requests for admissions, right?

A.  Yes.

Q.  Which we looked at before.  Can you take a look at your answers to Request No. 7, which is on page 30.

A.  Yes.

Q.  The request for admission was, "Archbishop Gregory reproduced portions of the Psalter work on the website."  Do you see where it says that?

A.  Yes.

Q.  Do you understand that the Psalter work means HTM's version of The Psalter work?

MR. INGOLD:  Object to form.

Q.  (BY MS. BROSIUS)  Do you understand that?

MR. INGOLD:  Same objection.

Q.  (BY MS. BROSIUS)  Do you not understand the question?

A.  Well, The Psalter work, yes.  I understand the question.

282

Q.  That for purposes of this question, Psalter work here means HTM's version of The Psalter work?

A.  Okay.

MR. INGOLD:  Object to form.

Q.  (BY MS. BROSIUS)  And so under your response, you say, "The Archbishop admits only that he reproduced a translation of The Psalter work which the plaintiff claims copyright."  Do you see where it says that?

A.  Yes.

Q.  Do you mean to question the plaintiffs' claim of the copyright in the Psalter work?

A.  Yes.

Q.  But you're otherwise admitting that the HTM Psalter was produced on your website.

MR. INGOLD:  Object to form.

Q.  (BY MS. BROSIUS)  Is that correct?

MR. INGOLD:  Same objection.

A.  I -- say it clearer.  I --

Q.  (BY MS. BROSIUS)  Okay.  When you say that you admit that you reproduced a translation of The Psalter work which the plaintiff claims copyright, are you admitting that you've reproduced the HTM Psalter on your website?

283

MR. INGOLD:  Object to form.

A.  I reproduced.  I admitted that -- he only --

MR. BRUNO:  This witness has knowledge of that particular response because the testimony's already been that -- well, Chris, you really need to do this, so --

MR. INGOLD:  Yeah, I -- you're asking him to answer questions about responses that clearly were crafted by an attorney on his behalf.  How could he possibly exposit those responses?  I mean, I think you can ask him facts in questions but you can't ask him, By this response what did he mean?  Because an attorney's signature is on this document.

MS. BROSIUS:  Did you -- did you create this document?

MR. INGOLD:  I wouldn't get into work product with you.  You should know that by now.

MS. BROSIUS:  But you're telling me that your client didn't create this document.

MR. INGOLD:  No, what I'm telling you is that all attorneys do in virtually every jurisdiction in the United States including federal jurisdictions that I'm aware of, the attorneys sign the requests for admission.  And how those documents come about is a

284

work product issue, which you're not entitled to inquire into.

MS. BROSIUS:  And I agree with that.

MR. INGOLD:  Yeah.

MS. BROSIUS:  I'm not entitled to know how these answers were formulated.  What I am entitled to know is whether they're accurate according to the Archbishop.

MR. INGOLD:  And --

MS. BROSIUS:  Are these answers accurate.

MR. INGOLD:  And prior testimony earlier in the day has been yes, he affirms that these are true and accurate to the best of his knowledge.

MS. BROSIUS:  Great.  So what I want to do is better understand what these answers mean, because they're a little confusing.  So I'm trying to ask you, maybe you can rephrase the language that appears here.

Not interested in knowing whose hand penned this response.  What I'm interested in hearing from you is whether you can explain this response in a way that clarifies it, clarifies the ambiguity that exists in it.

MR. BRUNO:  Well, my point is that Father Peter -- that he's already testified that it's Father

285

Peter who put the items on the website. So I don't know if he's the right witness to be asking this question.

MS. BROSIUS: Right. But that's for me to figure out.

MR. INGOLD: Yeah. But here's the other issues, as far as I'm, concerned, Ms. Brosius. And I do hope I'm saying your name correctly.

MS. BROSIUS: You are.

MR. INGOLD: Because it's easy to mess names up. The point I'm saying is that these are finally executed and signed by an attorney. If you want supplemental answers, they're likewise going to be finalized and executed by an attorney. So having him try to exposit this response, I don't think it's appropriate under the rules.

MS. BROSIUS: Okay. So you're -- okay. But you're not instructing him not to answer these questions; is that right?

MR. INGOLD: No, I think that --

MS. BROSIUS: You're trying to give me some advice that what I think would be beneficial to me in questioning your witness, what might be most helpful for me, which I appreciate, Chris. But that's --

286

MR. INGOLD: No, really, I'm actually not trying to do that. I'm trying to make an objection that's clear.

MS. BROSIUS: Okay. You need to state it and -- because we need to move on.

MR. INGOLD: Okay.

MS. BROSIUS: So I have questions I need to ask about this document, and I want to ask them. So make your objection and I'll move on.

MR. INGOLD: My objection is that under the rules, the attorney signs requests for admission. So it would be inappropriate to have this deponent exposit a response he did not sign for. That's my objection.

MS. BROSIUS: They're admissions from Archbishop Gregory. From this party, this individual. These are his admissions.

MR. INGOLD: Right. And they're made on his behalf by his attorney, and any supplemental responses likewise would be formulated the same way.

Q. (BY MS. BROSIUS) Okay. So let's -- Archbishop Gregory, if you wouldn't mind, let's get back to your response here to No. 7, which -- that again asks whether you reproduced portions of The Psalter work on the website. Do you understand what

287

that question is asking?

A. Which the plaintiff claims --

Q. No. No, it doesn't say that.

MR. INGOLD: Objection.

Q. (BY MS. BROSIUS) Excuse me.

MR. INGOLD: Objection. That's not a question. It is a --

MS. BROSIUS: It's a request for admission.

MR. INGOLD: Right.

Q. (BY MS. BROSIUS) So you were requested to admit or deny whether you reproduced portions of The Psalter work, the HTM Psalter work, on the website. What was your -- did you admit that or did you deny that?

MR. INGOLD: Objection, the document speaks for itself. Under the rules, this individual does not respond to requests for admissions directly.

MS. HAMILTON: But he responds to questions at depositions, and I think that's what we're doing now.

Q. (BY MS. BROSIUS) Okay. So the answer -- can you answer the question? Did you admit or deny No. 7 -- what No. 7 is asking you to admit or deny?

MR. INGOLD: Same objections.

288

A. Did I put up on the website The Psalter work, HTM. I put up -- well, again, I did not put it up. But since I'm responsible for it, in that way, I put it up. But The Psalter work is probably -- I would say yes, something that they claim copyright. But it's also something that we found in other books, too.

Q. (BY MS. BROSIUS) Okay. Similarly with -- with No. 9, that asks -- a request for admission that asks you whether you reproduced portions of the St. Isaac work. And again, I want to understand from you whether you understand that to mean the HTM Isaac work; do you understand that?

MR. INGOLD: Object to form.

A. Now, with this, I don't know where he obtained this. I don't know where he obtained this -- this homily, these two paragraphs.

Q. (BY MS. BROSIUS) This being Exhibit 71, which is the St. Isaac work that we looked at earlier?

A. Correct. Because --

Q. And he being Father Peter?

A. Right.

Q. Okay.

A. Yes.

Q. I'm sorry. Go ahead.

289

A.  Yes.

Q.  So you're -- you were saying?

A.  I don't know where he got it from, because there are other translations that are identical.

Q.  So your answer to this -- you're -- are you admitting or denying that you reproduced portions of the HTM St. Isaac work on the website?

MR. INGOLD:  Objection, the document speaks for itself.  The same objections I made previously.  Go ahead and answer, if you can.

A.  I don't know how to answer it.  If there's -- I don't know where he got it, and he could have gotten the other translation and put it up and it could have been identical to HTM's.

Q.  (BY MS. BROSIUS)  What about request for admission No. 11 here on the bottom of 3.  That is the same format.  It again asks you to admit or deny whether you produced HTM's Akathist Hymn work on the website.

Do you know, what is your -- what is your admission?  Do you admit or deny that in your answer?

A.  I deny that.

Q.  You deny that in your answer.  Okay. What about -- what about 12 on page 4?  The same

290

question, but related to The Service of Preparation For Holy Communion With Akathist For Our Savior and the Theotokos work.  HTM's, of course.

A.  What about it?

Q.  Do you admit or deny -- sorry, you know what?  I'm asking you about 12 and that's not -- let me strike that.  13.  14.

The same question as it relates to HTM's Great Horologion work.  Do you admit or deny what's being requested of you in 14?

MR. INGOLD:  Object to form and also the prior objections made.

A.  Do I admit that I put up?  Say it again, please.

Q.  (BY MS. BROSIUS)  That you reproduced portions of HTM's Great Horologion work on your website.

A.  I have to say I deny it.

Q.  Same with 16.  As it relates to your reproduction of portions of HTM's Collected Dismissal Hymns.

MR. INGOLD:  Object to form and the prior objections.

A.  Did I put them up?  I deny it.

Q.  (BY MS. BROSIUS)  And the same question

291

for 18, which asks you to admit or deny reproducing portions of The Octoechos work on the website.

MR. INGOLD:  Object to form and the same prior objections.

A.  I deny it.

Q.  (BY MS. BROSIUS)  I'm going to direct your attention to page 2, No. 5.  That's the same request for admission as it relates to HTM's prayer book.

MR. INGOLD:  Object to form and the same prior objections.

Q.  (BY MS. BROSIUS)  The question is whether you admit or deny that.

MR. INGOLD:  Same objections.

A.  Deny.

Q.  (BY MS. BROSIUS)  And at the top of page 2, No. 3 is request to HTM's Pentecostarion work.

MR. INGOLD:  Object to form and the same prior objections.

A.  Denied.

Q.  (BY MS. BROSIUS)  What about Father Peter?

A.  What about him?

Q.  Did he reproduce portions of the HTM Pentecostarion work on the website?

292

A.  No.

Q.  You know that for -- you know that, you believe that, you think that?

A.  I know it.  He would never take anything that belongs to them.

Q.  Okay.

A.  He's a former policeman.

MS. BROSIUS:  I'm done.  I'm finished. Thank you.

MR. INGOLD:  I do have questions, but given that it's almost 6 o'clock and you're not going to take a full day tomorrow, do you want to reserve those for the morning?

MS. HAMILTON:  Do you know we're not going to take a full day tomorrow?

MS. BROSIUS:  How long do you think you need?

MR. INGOLD:  Let me take a quick look. It's just, you know, basic cleanup stuff.  I imagine half an hourish.

293

WHEREUPON, the within proceedings were recessed at the approximate hour of 5:52 p.m. on August 25, 2009.

I do hereby certify that I have read the foregoing deposition and that the same is a true and accurate transcript of my testimony, except for attached amendments, if any.

_____
ARCHBISHOP GREGORY

( ) No changes      ( ) Amendments attached

SUBSCRIBED AND SWORN TO before me this _____ day of _____, 2009.

_____
NOTARY PUBLIC
Address _____
_____
My Commission Expires _____

295

STATE OF COLORADO
COUNTY OF DENVER

Before me, this day, personally appeared ARCHBISHOP GREGORY, who, being duly affirmed, states that the foregoing transcript of his/her deposition, taken in the matter on the date and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_____
ARCHBISHOP GREGORY

SUBSCRIBED and SWORN to before me this _____ day of _____, 2009, in the jurisdiction aforesaid.

_____   _____
My Commission Expires    Notary Public

294

CERTIFICATE

I, Diane K. Scholl, Registered Professional Reporter, appointed to take the deposition of ARCHBISHOP GREGORY - VOLUME I, certify that before the deposition the deponent duly affirmed to testify to the truth; that the deposition was taken by me on August 25, 2009; then reduced to typewritten form, by means of computer-aided transcription; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on September 2, 2009.

_____
Diane K. Scholl
Registered Professional Reporter

Proofread by:  S. Barrette

296

DEPOSITION ERRATA SHEET

RE:  Esquire Deposition Solutions
File No. 36640
Case Caption: HTM vs. Gregory

Deponent: ARCHBISHOP GREGORY
Deposition Date: August 25, 2009
To the Reporter:
I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the errata sheet and the appropriate certificate and authorize you to attach both to the original transcript.

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

297

Deposition of: ARCHBISHOP GREGORY - VOLUME I
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

## 298

74940ADS
IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:07-12387-RGS
_____
SOCIETY OF THE HOLY TRANSFIGURATION MONASTERY,
INCORPORATED,

Plaintiff,

vs.

ARCHBISHOP GREGORY OF DENVER, COLORADO,

Defendant.
_____

DEPOSITION OF ARCHBISHOP GREGORY - VOLUME II
August 26, 2009
Pursuant to Notice taken on behalf of the Plaintiff at
303 East 17th Avenue, Suite 565, Denver, Colorado
80203, at 8:38 a.m., before Diane K. Scholl,
Registered Professional Reporter and Notary Public
within Colorado.

## 299

APPEARANCES:

AMY L. BROSIUS and MARIA HAMILTON, Attorneys at Law, from the Law Firm of Fish & Richardson P.C., 225 Franklin Street, Boston, Massachusetts 02110, appearing on behalf of the Plaintiff.

CHRIS L. INGOLD, Attorney at Law, from the Law Firm of Irwin & Boesen, 4100 East Mississippi Avenue, 19th Floor, Denver, Colorado 80246, appearing on behalf of the Defendant.

Also Present: Bishop John.

## 300

I N D E X

EXAMINATION:                        PAGE
By Mr. Ingold                      301, 343
By Ms. Brosius                        326

INITIAL
REFERENCE

DEPOSITION EXHIBITS:
7  The Great Horologin or Book of Hours,
   Copyright 1997                    301

   (Enclosed with Volume I, with no copies
   to counsel.)

83  Canons XXXVI through XLI          349

   (Enclosed, with no copies to counsel.)

## 301

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure:

ARCHBISHOP GREGORY - VOLUME II, having previously duly affirmed to state the whole truth, testified as follows:

EXAMINATION

BY MR. INGOLD:

Q. Good morning, Vladika.

A. Um-hum.

Q. I have a few questions for you. If I call you Vladika, do you understand what I'm referring to?

A. Me.

Q. And is that just another word that's used for bishop?

A. Yes, in the Russian church.

Q. Yesterday, if I recall, we were talking about The Horologion, which is Exhibit 7, and I believe you said that it was published in 1979. If you could look at that, is that correct?

A. It's 1997.

Q. So that was just a slip of the tongue or what?

A. Yes. I'm dyslexic, or whatever you call

302

it.

Q. Okay.

A. A little bit.

Q. Nonetheless, yesterday, did you attempt to answer all the questions that were asked of you fully and to the best of your ability?

A. Yeah.

Q. Okay.

A. Yes.

Q. Do you think your memory yesterday was perfect?

A. My memory's never perfect.

Q. I recall also when you were being asked about whether any complaints other than those from HTM had ever been made against you or lawsuits filed against you; do you recall that?

A. Yes.

Q. I also recall that a question was made about whether apart from a lawsuit being filed, anyone had ever threatened to sue you; do you recall that?

A. No.

Q. Well, do you recall a person by the name of Milton Capner?

A. Yes.

Q. Who is that person?

303

A. He was a disturbed person that came to the monastery for help.

Q. And at any point in time did he threaten to file suit against you?

A. I think so, yes.

Q. And what was the resolution of that? Did he ever sue you?

A. No.

Q. Apart from Milton Capner and HTM, has anyone ever sued you or threatened to sue you --

A. No.

Q. -- that you can recall?

A. No.

Q. What is the Genuine Orthodox Church of America and what is the relationship of the Dormition Skete Monastery to the Genuine Orthodox Church of America?

A. The Genuine Orthodox Church of America is the Orthodox Church. Dormition Skete is a member of the Orthodox Church. Therefore, it's a member of the Genuine Orthodox Church of America.

Q. Okay. And what is a Skete?

A. A Skete is a small monastery.

Q. And what is the relationship between a monastery and the church as a whole?

304

A. Monastery -- what's the relationship between a monastery and what?

Q. And the church as a whole, the Genuine Orthodox Church.

A. Well, a monastery is supposed to be probably the holiest place, and where people are -- dedicate their whole lives to the church. What is the relationship between the monastery and the church?

Q. Does one have authority over the other, or how does that work?

A. Yes. The bishop has authority over the monastery.

Q. And what is the role of the bishop in the church? I mean, how is it set up?

A. He is just by the -- I think the word means overseer.

Q. Okay.

A. So he oversees everything in his diocese.

Q. Let me kind of give you a background for the kind of question I'm asking here. There are Christian churches where the members of the congregation vote, and they elect people and they make decisions for the church as a whole, and sometimes those are called congregational churches.

A. Yeah.

305

Q. There are other churches where there are persons within the church who exercise responsibility for those -- for the others within the church, and those are usually called hierarchical churches.

A. Yes.

Q. Do you understand the distinction that I'm making?

A. Yes.

MS. BROSIUS: I'm going to object -- excuse me. Just give me a minute. I'm going to object to the extent you're testifying and asking a leading question.

MR. INGOLD: That's fine.

Q. (BY MR. INGOLD) Do you understand the distinction I'm making between hierarchical and congregational churches?

A. Yes.

Q. What kind of a church is the Orthodox Church?

A. Hierarchical.

Q. And in terms of the hierarchy within the Orthodox Church, what are the different ranks of the clergy, the hierarchical clergy?

A. There are three ranks: The bishop, the priest and the deacon in the higher clergy.

306

Q.   And in terms of the authority that's exercised by the bishops, is there any grouping of bishops or any one bishop that's over the other bishops?

A.   Bishops, yes, are together and form a synod, what is called a synod.  And they're over each individual -- each individual bishop, I guess you could say, would have to answer to the whole of all -- all the bishops gathered together.

Q.   Okay.  And is there a distinction between a bishop and an archbishop?

A.   There's a distinction only in as far as title.  A bishop can be a roving bishop and he can be a vicar bishop.  An archbishop is a roving bishop, usually.

Q.   And is there such a thing as a patriarch in the Orthodox Church?

A.   Yes.

Q.   And what is the role of a patriarch, and how does that relate to the clergy you've already described?

A.   Okay.  The patriarch is the bishop of a capital city.  Whereas like the bishop of Denver and the bishop of San Diego and all the other bishops of every city, they would be all equal as far as their

307

diocese.  But when they gather together, one would preside over all of them, and that would be the bishop of the capital city.

Q.   Okay.

A.   And normally he is called the patriarch of that church of that country.

Q.   Okay.  And --

A.   But in places where there are no patriarchs, then the higher authority is the metropolitan, and he could be elected as the head of the group of the synod.

Q.   Now, what --

A.   It's not like a pope.

Q.   In terms of the bishops and the authority that they exercise over the church, are they free to decide whatever they want to decide?  Or is there any guidance, law or authority that they refer to?

A.   They have to obey the canon law, because they take -- when they become a bishop, they have to vow that they're going to uphold the canons of the church.  You have to do that three times, just to be sure that they do -- they understand.

Q.   Now, what is the relation of the canons or the canon law to the ecumenical councils of the church over the centuries?

308

A.   The ecumenical councils wrote the canons of the church.

Q.   And how many ecumenical councils are recognized by the Orthodox Church?

A.   There's normally called seven, we're the church of the seven ecumenical councils.  But in reality, there are -- there have been more councils that are not labeled as one of the seven.  But any valid council that is brought together can make canons, and they're accepted in the church -- the conscience of the church.

Q.   Now, is it correct that pretty much all the Christian churches, Protestant, Catholic, Orthodox, they all accept the seven ecumenical council canons, but the Catholic church and the Protestant church went further with other councils?

A.   Right.

MS. BROSIUS:  I'm going to object.  You can answer.

Q.   (BY MR. INGOLD)  You can answer.  Can you explain that.

A.   Well, the original church is the Orthodox Church.  Everybody's has -- if they're called Christians, look to their root.  So even the scriptures were all determined by what bishops of the

309

Orthodox Church gathered together and determined they'd be part of the scriptures.  So they, like the Roman Catholics, have always accepted the ecumenical councils up until the time that they were in communion with the Orthodox Church.  The Protestants like to look at those early church councils, and some of them accept the canons, yes.

Q.   So pretty much all churches that call themselves Christian would accept the seven ecumenical council canons?

MS. BROSIUS:  Objection.

Q.   (BY MR. INGOLD)  Is that correct?

A.   I think so.

Q.   And everyone who calls themselves a part of the Orthodox Church must accept those canons?

A.   Without a doubt.

Q.   And they can't accept any other higher law apart from those seven canons; is that correct?

MS. BROSIUS:  Objection.

A.   Correct.

Q.   (BY MR. INGOLD)  Why is that so?

A.   There's no higher law than the -- than the laws of the church.  I mean, they're expected -- they -- the canons are an expression of the scriptures and the teachings and the dogmas of the Orthodox

## 310

Church.

Q.   Under the canon law, what does it mean to be anathematized?

A.   It means to be cut off from the church completely.

Q.   So if someone who calls himself a member of the Orthodox Church is in violation of a canon law, what do the canons say must happen with that person?

A.   Depending on what he did, what violation he did.  If he, for example, did something which would merit to be deposed, which means if he's a clergyman, he's no longer a clergyman, he -- he is punished by being deposed.  He's -- the -- his clerical office would be taken away from him.  If he does something more severe, he could be cut off from the church completely.

Q.   Okay.

A.   Which is anathematized.

Q.   And in the Orthodox Church, is there a distinction between excommunication and anathematizing?

A.   Yes, anathematizing is if you've done something very bad.

Q.   And that person is outside the church entirely?

## 311

A.   Yes.

Q.   But someone who's excommunicated may still be in the church, they're just not communing?

A.   Right.  They're still part of the church. They're just excommunicated for a certain length of time.

Q.   Was there a time in your personal knowledge of the members of HTM where you became aware of conduct that violated the canon laws?

MS. BROSIUS:  I'm going to object.  This is outside the basis of his prior testimony and irrelevant.

MR. INGOLD:  This is a deposition, and it's --

MS. BROSIUS:  I lodged my objection.  You can continue.

Q.   (BY MR. INGOLD) Okay.  Go ahead.

A.   What is it, again?

MR. INGOLD:  Can you read back my question.

(The last question was read back.)

MS. BROSIUS:  I'm going to object.

A.   Yes.

Q.   (BY MR. INGOLD) Okay.  Let me get into that a little bit.  Are there canons that address

## 312

sexual activity within monasteries?

MS. BROSIUS:  Objection.

A.   Yes.

Q.   (BY MR. INGOLD)  Is it permitted to have sexual activity within a monastery?

A.   No.

MS. BROSIUS:  Objection.  Give me a moment to object, and then lodge an objection for each question.

MR. INGOLD:  Sure.

Q.   (BY MR. INGOLD)  Let's just get a clean record, so I'll ask the question, and she'll object, and you'll answer.

A.   But when she objects, I just --

Q.   You can answer anyway.

A.   But what's the use of objecting?

Q.   It's like a bookmark in the record, and it lets the Judge later see that somebody had a concern.

A.   Oh, okay.

Q.   So it's for later, okay?

A.   Oh.

Q.   Are there canons that address whether sexual activity is permitted in monasteries?

MS. BROSIUS:  Objection.

## 313

A.   Yes.

Q.   (BY MR. INGOLD)  Is sexual activity permitted in monasteries?

MS. BROSIUS:  Objection.

A.   No.

Q.   (BY MR. INGOLD)  In a monastery -- is there still a hierarchical order within the monastery?

A.   Yes.

Q.   So there's a higher person, as it were, who has responsibility over people with less responsibility?

A.   Absolutely.

Q.   In a monastery -- who has the least authority in the monastery?

A.   I imagine the person that's last in the pecking order.

Q.   So would that be --

A.   The last in seniority, I should say.

Q.   Would that be a novice?

A.   Yes.

Q.   Okay.  And the person with the most authority and responsibility?

A.   Would be the abbot.

Q.   Okay.  And under the canon law, what kind of obedience should a novice show the abbot?

314

A. Complete.

Q. Are you saying they virtually surrender themselves to the keeping of the abbot?

A. Yes.

MS. BROSIUS: Objection.

A. Yes.

Q. (BY MR. INGOLD) Why do you say that?

A. Because that's what obedience is.

Q. Okay.

A. But there's limits.

Q. Is sexual activity between the abbot and a novice permitted?

A. That's --

MS. BROSIUS: Objection.

A. That's the limit.

Q. (BY MR. INGOLD) Okay.

A. That and one other thing.

Q. What is the other thing?

MS. BROSIUS: Objection.

A. When the abbot takes the monastery outside the church.

Q. (BY MR. INGOLD) Okay. Did your concerns about sexual activity at HTM have anything to do with those limits?

MS. BROSIUS: Objection.

315

A. Did my what?

Q. (BY MR. INGOLD) Your concerns about what was going on at HTM, the members of HTM that may have violated canon law, did it have anything to do with those two limits you just described?

MS. BROSIUS: Objection.

A. Correct.

Q. (BY MR. INGOLD) How so?

MS. BROSIUS: Objection.

A. Well, when I first realized that they were -- they had a lifestyle that was not permitted, I had to report it to the bishops according to the canon law.

Q. (BY MR. INGOLD) Okay. Let me just ask you directly, was the abbot engaging in sexual activity with novices?

MS. BROSIUS: Objection.

A. Not only -- not only -- well, I don't know about novices, but with the monks.

Q. (BY MR. INGOLD) Okay. And how were the monks in relation to obedience to the abbot?

A. Absolute.

Q. Okay.

A. I wish you'd warned me about this. Okay.

Q. How is the relationship between the

316

abbots and the monks?

MS. BROSIUS: Objection, vague.

A. How is what?

Q. (BY MR. INGOLD) What kind of relationship hierarchically is there between the abbot and the monks in a monastery?

A. It's -- one is under obedience to the other.

Q. And are there higher ranks than a monk between the monk and the abbot?

A. There -- it -- only if they go into the clergy.

Q. There are clergy members within the ranks of the monastery?

A. Yes.

Q. Or there can be?

A. Yes, there could be deacons and priests, subdeacons.

Q. And there were at HTM; is that correct?

A. Of course.

Q. You reported sexual activity between the abbot and the monks to a higher authority outside the monastery; is that correct?

A. Yes, to --

MS. BROSIUS: Objection.

317

A. Yes, to the -- to the bishops who are overseeing -- you know, were the overseers of the monastery which I -- the bishops of their diocese.

Q. (BY MR. INGOLD) What was the conclusion of that matter?

MS. BROSIUS: Objection.

A. They were going to make an investigation. And they asked me to meet with other monks who had left the monastery to see if there was a pattern with them.

Q. (BY MR. INGOLD) And --

A. And I did.

Q. -- does the Orthodox Church have any courts or prosecutors or whatever, like the civil authorities do?

A. Yes.

Q. And this report to the bishops about what was going on at HTM, did it result -- did it interact in any way with the orthodox court system?

MS. BROSIUS: Objection.

A. Yes.

Q. (BY MR. INGOLD) How so?

A. They made an investigation and determined that because there were so many witnesses that they should proceed with a trial, spiritual court.

318

Q.  What was the outcome of that trial?

MS. BROSIUS:  Objection.

A.  What was the outcome of the trial?  There was no trial.

Q.  (BY MR. INGOLD)  Why?

A.  Because the abbot took the monastery out of the church.

Q.  That kind of sexual activity between a superior at HTM and his subordinates, why didn't that get handled by the criminal authorities?

MS. BROSIUS:  Objection.

Q.  (BY MR. INGOLD)  I mean, why didn't you make your report to the police instead of to bishops?

MS. BROSIUS:  Objection.

A.  I had no -- no inclination to do such a thing.  I would report to my own bishops.  Of course, at that time I was a priest, so long as you understand, I had to -- I'm subject to the bishop as a priest, just like they were priests and as priests were subject to the bishop.

Q.  (BY MR. INGOLD)  Does the canon law express any preference about how disputes within the church should be handled, whether it should be handled within the church or by civil authorities?

MS. BROSIUS:  Objection.

319

A.  Yes.  If someone has a complaint against another person, that should be brought before the church authorities, not before the civil authorities.

Q.  (BY MR. INGOLD)  Okay.  Would that include claims that one orthodox person had taken the intellectual property of another person?

MS. BROSIUS:  Objection.

A.  Of course, if it's between two people in the church and if it's a church matter.

Q.  (BY MR. INGOLD)  Yesterday you were asked some questions about what kinds of things were sold through Dormition Skete.  Do you recall those questions?

A.  Yes.

Q.  Do you think you exhausted the universe -- the total picture of what was sold in that store?

A.  When I saw our -- what do you call them?  Sales list, and then I remembered that we sold buckles.

Q.  Okay.

A.  And we sold another book or something like that.

Q.  Well, let's go through the list, here.  You sell icons, correct?

320

A.  Correct.

Q.  Through the store?  Is that the primary item that's sold through the store?

A.  Probably.

Q.  Crucifixion crosses, do you sell those?

A.  No.

Q.  Did you used to sell them at any time that you're -- that you can recall?

A.  Well, crucifixes out of wood, we do now.

Q.  Okay.  Incense?

A.  We used to.

Q.  Okay.

A.  We still -- we still have a little bit left, and we sell some.

Q.  Prayer ropes?

A.  Yeah, prayer ropes.

Q.  Belt buckles?

A.  Belt buckles.

Q.  There's one book you're still selling?

A.  There's one book we're still selling.

Q.  Calendars?

A.  Calendars we still sell.

Q.  Catalogues?

A.  Catalogues we sell, yes.

Q.  How about software?

321

A.  Yes, Mother Mariam's Orthodox New Testament, we sell that, too.

Q.  As a computer program?

A.  Yes.

Q.  What is your familiarity with computers?  Can you write any computer programming languages like Fortran, C-Plus?

A.  No.

Q.  Can you fix problems on a Mac or PC that crop up?

A.  No.

Q.  What's the extent of your familiarity with computers?

A.  What's my extent of familiarity?

Q.  Yeah.

A.  Well, I could --

Q.  I mean --

A.  -- open it, get on the -- get on the Internet, do e-mail.

Q.  Do you know how to --

A.  That.

Q.  -- load a new program onto a computer?

A.  Possibly.

Q.  Okay.

A.  But not absolutely.

322

Q.   So would you say you just have familiarity of being a user --

A.   Yes.

Q.   -- of a computer?

A.   Any problems, I call Father Peter.

Q.   Do you know how to upload documents to the Internet?

A.   I would say.

Q.   Do you know how to upload documents even to your own website?

A.   No.

Q.   We discussed just a little bit earlier the distinction between Dormition Skete Monastery and the Genuine Orthodox Church.  Is there also a distinction between Dormition Skete, the corporation, and the Dormition Skete Monastery?

A.   Yeah, the corporation has members on it that are not necessarily part of the monastery that they -- which deal with governmental papers that have to be signed and stuff.  But the monastery is the brotherhood, and those are people coming to live a quiet life, to repent past life or whatever, and to lead a virtue -- a virtuous life in the monastery.  To come for prayer.

Q.   The property up in Buena Vista, who owns

323

the property, the Dormition Skete Brotherhood or Monastery or the Dormition Skete Corporation?

A.   The corporation.

Q.   What does the brotherhood own separate and apart from the corporation?

A.   Nothing.  Other than clothes, maybe.  Even their clothes, I don't know.  Nothing.

Q.   Is there a distinction between you as an individual and yourself as an archbishop of the church?

A.   I don't know what -- I don't know what --

Q.   Well, in the canon laws, is a bishop allowed to own personal property?

A.   Yes.

Q.   And in the canons, is there a --

A.   There's no prohibited.

Q.   All right.

A.   There's no prohibited.

Q.   And in the canons, is there a difference between the bishop's personal property and the property of the church that he safeguards and takes care of?

A.   Yes.  He can't put the church's property in his own name.

Q.   And if a bishop were to take the property

324

of the church for his own use, his personal use, what do the canon laws say should happen?

A.   Should be punished.

Q.   Okay.  How so?

A.   Whichever way the canons prescribe.  Either he is -- probably deposed.  He probably would be deposed.  I have to look at the canon.

Q.   Sure.  But if the bishop takes his personal property and uses it however he wants for the glorification of the church or for some other use or to give to a family member, is there anything in the canons that prohibits the bishop disposing of his own property as he wishes?

A.   His?

Q.   His own property.

A.   Yeah, his own property.  Giving it to the family members I don't think is permissible, I mean.

Q.   But to otherwise dispose of it?

A.   Yes.

Q.   And there's no prohibition that he does whatever he wants with that?

A.   Yes, there is.  He could only give it to people in the church, I think.  I have to look at the canon.

Q.   Okay.  But there's a distinction between

325

what he does with his property and what he does with the property of the church?

A.   Oh, absolutely.  The church -- it's not his property.  The church's property is not his property.

Q.   Now --

A.   It -- he just oversees it.  It has to remain in the church.

Q.   trueorthodoxy.info, that website, is that your personal property, or is that the property of the church?

A.   It's my -- my own.  I -- I wanted to make this.

Q.   Has any synod in the Genuine Orthodox Church or any gathering of the clergy of the Genuine Orthodox Church ever been convened to initiate, create or maintain trueorthodoxy.info?

A.   No.

Q.   Now, yesterday when you were asked questions about Dormition Skete, were those questions about Dormition Skete the corporation, Dormition Skete the brotherhood, or did you even know?

A.   I didn't know, yes.

Q.   Did you nonetheless do your very best to answer the questions that were asked?

326

A. Yes. Although some of the questions were asked quick, I wanted to appear that I understood them, maybe. But I -- you know. You said we had a chance to review them and correct any mistakes.

Q. Will you exercise that opportunity with due diligence and faithfulness?

A. Yes.

MR. INGOLD: I have no questions at this -- further questions at this point.

MS. BROSIUS: I just have a few on redirect.

EXAMINATION

BY MS. BROSIUS:

Q. You said that Dormition Skete is in communion with GOCA; is that right? Is that Genuine Orthodox Church of America?

A. Um-hum.

Q. Is that an autocephalous Orthodox Church?

A. It's independent.

Q. It's independent. Does that mean it's a hierarchical church?

A. Yes.

Q. And to which autocephalous church would it be aligned or consider itself aligned?

A. It's aligned with the churches that have

327

kept the teachings of the church.

Q. So --

A. And there's only -- go ahead.

Q. Sorry. Finish your answer. I'm sorry for interrupting you.

A. Okay. It's aligned with those who have kept -- kept the faith.

Q. But you said it's independent?

A. Yes.

Q. Does that mean it's not in communion with one of the autocephalous Orthodox churches?

A. In this country, no.

Q. Or any country?

A. Yes.

Q. Which autocephalous church would it --

A. Now, when you say autocephalous church, what do you mean by that?

Q. Autocephalous church meaning one of the -- is it seven main churches?

A. No. No. It's --

Q. What is your understanding of an autocephalous Orthodox Church?

A. An independently governed church. So every country has their own independently governed church.

328

Q. And which autocephalous church is GOCA affiliated with here in the United States?

A. We are an entity unto ourselves.

Q. When you said that an abbot who takes a monastery outside the church would be going against canon law -- did I understand that's what you said?

A. Um-hum.

Q. What does -- what does it mean to take -- take a monastery outside the church?

A. To take it away from the bishops.

Q. The bishops to whom the monastery is presently in communion?

A. Right. They have --

Q. And if --

A. -- to do it within the laws of -- within the canon.

Q. Okay. So --

A. Canons.

Q. -- a monastery who is presently in communion with a particular synod of bishops, if they cease to be in communion with that synod and they then elect to be in communion with another synod of bishops, is that considered taking the monastery outside the church?

A. If they do it against the canon law.

329

Q. How would you do it -- how would it be done against the canon law?

A. By not obeying the canons. First of all, if you want to take your monastery outside, you have to get a release from the bishops.

Q. Okay.

A. This is what I did when I left the Russian church. I telephoned the bishop, as I told you yesterday, and I told -- I told him we cannot stay any longer. He said -- his words were, "I understand."

"And I'm going to go to the Greek Old Calendar Church," I told him, "whom we are in communion with."

He said, "Okay," and that was a verbal release.

Q. So you should -- it has to be done with the blessing of the bishop to whom you are presently in communion?

A. Absolutely. Absolutely.

Q. I mean, it has --

A. And it has to have a proper reason.

Q. A proper reason to be accepted by the bishop?

A. Acceptable to the bishops, right.

330

Q.  Okay.  And when you said that canon law -- that -- I think you said that there is no higher law than canon law.  Is that what you --

A.  Well, canon law is the expression of -- of all the rules and dogmas of the church.

Q.  So is it correct that canon law would deal -- does deal with the doctrine of --

A.  And --

Q.  -- the Orthodox Church?

A.  And conduct of the clergy.

Q.  And conduct of the clergy?

A.  Absolutely.

Q.  So I think you were asked, though, whether ecclesiastical court would deal with issues regarding the violation of a canon.

A.  Yes.

Q.  Is that correct?

A.  Correct.

Q.  And that's your understanding of how ecclesiastical church --

A.  Yes.

Q.  -- operates?

A.  Yes.

Q.  So anything outside issues about doctrine, interpretation of doctrine, that would not

331

necessarily be an issue for ecclesiastical court; is that right?

MR. INGOLD:  Object to form.

A.  Doctrine -- what was -- say it again.

Q.  (BY MS. BROSIUS)  You just said that the canon law deals with the doctrine.  Is dogma a better word?  Doctrine, dogma?

A.  Yes.  Yes.  It's an expression.

Q.  Of the orthodox faith?

A.  Like --

Q.  It says to its members what is the correct interpretation or belief that --

A.  Yes, you cannot do this because we believe this and this.

Q.  Okay.

A.  Okay.

Q.  And so any issues, any confusion or misunderstanding about an interpretation of a canon, would be a proper subject for ecclesiastical court to decide who's correct, what the correct interpretation is; is that right?

A.  Yes, that's possible.

Q.  Okay.  And also with the conduct of clergy.

A.  Yes.

332

Q.  That would also be a subject for an ecclesiastical court?

A.  Without a doubt, yes.

Q.  Okay.  But I believe you said it is your understanding that is -- an intellectual property dispute would be subject to an ecclesiastical court determination; is that right?

A.  A dispute over property within the church?  Is that what you said?

Q.  Intellectual property is what I said.

A.  Oh, intellectual property.  Why not?  If it's -- if it's done by people of the church with the blessing of the bishops, that -- that product of that should belong -- should belong to the church, and that's how it's -- that's how it's always been.  You know, church people don't sue each other.

Q.  So when you left the church, were the belongings of Dormition Skete at that time then surrendered to the synod of bishops to whom you were breaking your communion?

A.  Say that again.

Q.  At the time you left the --

A.  Yes.

Q.  Is it ROCA?  Right?

A.  Right.

333

Q.  Were the possessions, the property of Dormition Skete at that time, were they surrendered to ROCA?

A.  No, because --

Q.  Why not?

A.  Because I had a blessing.  I had permission to leave.  I didn't have to return the antimony, I didn't have to return the myrrh, because I was going to a synod of bishops who were already in communion with the -- with the church I was in, and they knew -- the ROCA knew why I was leaving.

Q.  So GOCA's in communion with ROCA?

A.  Yes.  GOCA means the church I went to.

Q.  That's my understanding, that you left -- you broke with ROCA to become in communion with GOCA; is that right?

A.  No, I think you -- you don't understand it.  I left ROCA.  I was just a priest.  So I had to get another -- I had to be under a bishop.  I had -- a priest can't just be by himself.  He has to be under a bishop.

So the only bishops that were of the same faith and holding the same dogmas and everything unchanged were the Greek Old Calendar Church, and they are situated in Greece.  And they are called the GOC

334

of Greece.

Q. Okay.

A. So they were in communion with the Russian Church Abroad. In fact, they -- as I told you yesterday, they broke communion with the Russian Church Abroad when the Russian Church Abroad went into communion with a group called Cyprian Apheli. So they broke approximately the same time I did, for the same reasons.

Q. So you were a priest when you left ROCA?

A. Right.

Q. You were a priest when you were with HTM; is that correct?

A. No.

Q. What were you?

A. A monk.

Q. A monk. Did you yet -- did you or did you not receive the blessing from a bishop when you left HTM?

A. Yes.

Q. You did?

A. Yes.

Q. Which bishop was that?

A. Constantine.

Q. You testified a moment ago that you were

335

not sure if you understood all of the questions that were asked of you yesterday, you may have misunderstood some of them; is that right?

A. Well, sometimes you spoke a little fast, and I thought I -- well, I'm -- you know, I -- and you said do you understand the question, I -- and I --

Q. You understand that in the beginning when I asked you if there were any questions that you did not understand, you could ask me to repeat them or rephrase them, right?

A. Okay. Yes.

Q. And you said you would do that?

A. Yes.

Q. Is that right?

A. I think I answered everything, and I think I understood everything pretty well.

Q. Okay. That's fine. Can you just give me a moment.

(A pause occurred.)

Q. And I just want to clarify --

A. I --

Q. -- you said you do have --

A. If I may say, when you talk quick, it gives me a little -- I need a little bit more time to, you know, get all the words.

336

Q. I understand.

A. If you talk a little slower, then I would focus better.

Q. You said -- I believe you testified yesterday that you personally own nothing; is that right? That the monastery owns -- that you own no possessions?

A. Yes, I -- I don't think there's anything we own.

Q. But didn't you just a moment ago say that you do own a website?

A. Yes. Okay, I own a website.

Q. Are there any other things that you own beyond the website, or is that the only exception?

A. Let me think.

I don't -- I don't know of anything I own. I mean, my clothes, but, like, they're not in my name. I mean, how can I -- I own the clothes. When I die, there's nothing to disburse. I don't have my own bank account. There's no need for a will because I have nothing.

Q. Why is there a distinction between your ownership of the website and your ownership of anything else at Dormition Skete?

A. Because I started it. Because I wanted

337

to use my efforts to edify the people -- the people of the church, to have people have access to the teachings of the church, to edify people.

Q. Isn't that your role? Isn't that your mandate as Abbott of the monastery in general?

A. No, as -- no. The abbot is to direct the monks to help them and hear confession and to direct them into living a virtuous life, which is a full-time job. That's why --

Q. Would you say that the icons that you create are also owned by you in the same manner as the website?

A. I was under the impression that if a person creates them, he owns them. So they are copyrighted. They are copyrighted because I created them, right? So in that way, yes, you could say I own -- I own those. But everybody uses them at their own desire, 'cause we don't -- they're expressions of the gospel and that's why --

Q. But that's your choice, right? To allow others to use what you created in a way that you approve; is that right? Let me put it to you this way. If someone wanted to use one of your icons that you own the copyright in for a purpose that you did not approve of, would you object to that?

338

MR. INGOLD:  Object to form and foundation.

A.  Yes, I would object if they want to desecrate something, yes.

Q.  (BY MS. BROSIUS)  Use it in a way that you don't approve of?

A.  Yes, if they wanted to use it as target practice for -- someone wrote me I want to use your icon of Christ so I could shoot at it, I would say, Well, go find something else.  Yes.

Q.  So that would be a way that you would be able -- you as the owner of that icon would be able to control the use -- the use of it?

A.  Yes, but it's --

Q.  The --

A.  To sue someone for that, you could voice your -- you could say that's not right.  But to go ahead and sue someone, that's -- that's --

Q.  Maybe that wouldn't be your choice; is that what you're saying?

A.  Yeah.

MR. INGOLD:  Object to form.

A.  And -- yes, I wouldn't go that far to sue someone, because it's against the gospel.  Orthodox people do not sue each other, if you're an orthodox

339

person, in the civil courts.  And that's in the Scriptures.  And it's in the canons being -- as I said, being -- being the expression of the Scriptures.

Q.  (BY MS. BROSIUS)  Can I ask you one question about the canons.  Is there any -- can you point to or do you recall any particular canon that deals with intellectual property?

A.  Do I know of any canon to deal with intellectual property?  Not unless I look specifically for that.  They talk about the property.  I don't know if they make a distinction about intellectual property.

But from the tradition of the church, people who have created intellectual property, I'm assuming, like homilies, writings, teachings, they don't copyright them.  Because if they did them in the church they are for the church.

Q.  But a moment ago, you just said you do own the copyright in the icons you create; is that right?

A.  Yes.

Q.  So what's the difference between writing a homily and creating an icon?

A.  Okay.  If a person in the church wants an icon, okay, the copyright -- I mean, big deal, I have

340

a copyright.  But if an atheist wants an icon, like I said, to desecrate it, then you could say perhaps because -- you could write him and say, Hey, I have a copyright to this, you know, cease and desist is the expression you people use, or else I'm going to sue you.

So in that respect, if you have a copyright, you can try and protect something from being desecrated, I would think.

Q.  Okay.  And so my question that I -- I believe was you testified that you believe you have a copyright in the icons you create; is that correct?

A.  So I'm told, yes.

Q.  And do you believe that someone similarly who writes a homily has a copyright in the text of that homily that they wrote -- that they write?

A.  Do they have a copyright because they created it?

Q.  Yes.

A.  I imagine.

MS. BROSIUS:  All right.  Can you just give me a moment.  Yeah, actually can we take a very quick break.  Thank you.

(A break was taken.)

MS. BROSIUS:  Back on.  I just have a

341

couple more questions.

Q.  (BY MS. BROSIUS)  Archbishop, does the civil law of a country where clergy reside apply to the behavior of clergy?

A.  Does the civil law of the church --

Q.  Does the civil law of the country --

A.  Yes.

Q.  -- where clergy reside apply to the behavior of the clergy?

A.  Could you read back --

Q.  Does it govern their behavior?

A.  Does the civil law of the -- of the country --

Q.  (Nodding.)

A.  -- what?

Q.  Where the clergy resides.

A.  Yes.

Q.  For instance, you're a clergy, you're in the United States.

A.  Yes.

Q.  Does the United States law apply to the clergy who live in the United States?

A.  Yes.

Q.  What about the criminal law?

A.  Yes.

342

Q.   So when you signed a settlement agreement, that was governed by civil law?  You did that, right?

MR. INGOLD:  Objection to form, foundation, calls for a legal conclusion.

Q.   (BY MS. BROSIUS)  Did you sign a settlement agreement with HTM in 2006?

A.   Yes.

MR. INGOLD:  Object to form, foundation, calls for a legal conclusion.

A.   Yes.

MR. INGOLD:  So, Vladika, again, you're going to have to -- just like with her, I'm going to object.

A.   Yeah.

MR. INGOLD:  So pause after the question so I can get my objection in so we can keep the record clean.

Q.   (BY MS. BROSIUS)  Do you understand that the settlement agreement you signed was governed by civil law?

MR. INGOLD:  Object to form, foundation, calls for a legal conclusion.

A.   Yes.

Q.   (BY MS. BROSIUS)  You understand it

343

wasn't governed by ecclesiastical law; is that right?

A.   Yes.

Q.   Did it govern your actions when you signed it?

A.   Yes.

MS. BROSIUS:  Okay.  I'm all set.  We're done.  Are we off the record?

(Discussion off the record.)

MR. INGOLD:  Okay.  I just have one very brief follow-up with the archbishop.

EXAMINATION

BY MR. INGOLD:

Q.   Okay.  Vladika --

MS. BROSIUS:  You know what, before you start, I'm just going to note for the record, I'm going to lodge an objection to the fact that the witness was just conferring with counsel and looking at documents on counsel's computer prior to beginning this reredirect.

MR. INGOLD:  Well, that's fine.  That's actually what we're going to read in is the one canon we were looking at, and that's fine.  I just --

Q.   (BY MR. INGOLD)  The Apostolic Canons, what are those, Vladika?

MS. BROSIUS:  I'm going to object that

344

the witness is being asked to testify from a refreshed memory by conversation with counsel a moment ago.

Q.   (BY MR. INGOLD)  Do you need your memory refreshed?  Or did I refresh it this morning as to what the Apostolic Canons are?

A.   No.

Q.   What are the Apostolic Canons?

A.   Apostolic Canons are 85 canons that were written by the Apostles and accepted in the church as valid canons from the first century.

Q.   And were those Apostolic Canons accepted by the seven ecumenical councils?

A.   Absolutely.

Q.   I'm going to read to you Canon XXXX.

A.   Okay.

Q.   Which you were just looking at on my computer.  "Let the private" --

MS. BROSIUS:  I'm going to -- excuse me.  I'm going to object to the fact that we're not being provided with a copy of the document that's being read here today, and I have no idea what the source is.  So I'm going to object to foundation.

MR. INGOLD:  That's actually -- it was previously provided to you in a request for production.

345

MS. BROSIUS:  What's the Bates number, Chris?

MR. INGOLD:  It is in the book called The Seven Ecumenical Councils, and it is page number 844.

MS. BROSIUS:  What's the Bates number of that document that you provided to us?

MR. INGOLD:  It is entitled The Seven Ecumenical Councils, and it is page number 844 of those seven ecumenical councils.

MS. BROSIUS:  So it's not Bates numbered; is that what you're saying?

MR. INGOLD:  It is in the disk that was produced to you back in November of last year.  Under folder --

MS. BROSIUS:  Do you have a copy of the document?

MR. INGOLD:  -- 15, Other Things, there is a file called The Seven Ecumenical Councils that was referred to liberally in the responses to interrogatories that were provided to you at the same time.  And in the seven ecumenical councils, at page 844, is Canon XXXX of the Apostolic Canon.  And I don't have a paper copy, much like yesterday you didn't have paper copies of a number of things.

MS. HAMILTON:  Well, we did for exhibits,

346

though.  I mean, you're not going to --

MR. INGOLD:  Well, actually there are whole exhibits that were accepted that I saw for the first time yesterday and you didn't have a copy for me, depository materials that I'd requested exemplars and I wasn't provided.

MS. BROSIUS:  Okay.  We discussed already that to the extent those were mistakenly not produced, although we believe they were, those three documents --

MR. INGOLD:  Right.

MS. BROSIUS:  -- we will be producing them.  To the extent the books, however, of course were provided to you, you have copies of those books.

MR. INGOLD:  I'm not -- well, we'll see.

MS. BROSIUS:  The books were produced to you, Chris.  I'm just -- I just want to state for the record that none of the documents that you produced were produced to us in paper form, according to the Court's order, electronically to be printed or Bates stamped.  I just want to note that, okay?  So -- and I also want to lodge, again, an objection to the fact that your witness is being shown a document on your computer that we have not been produced and we don't have it here today.

347

MR. INGOLD:  You want to look at it?  It's right here.

MS. BROSIUS:  No.

MR. INGOLD:  You can look at it.

MS. BROSIUS:  I -- no.

MR. INGOLD:  This is the Canon XXXX.

MS. BROSIUS:  Thanks for noting where you apparently produced it on a disk, but --

MR. INGOLD:  If you want to take a moment, I bet that this deposition service where you're holding the deposition would print us copies.  Would you like that?

MS. BROSIUS:  Chris, if you want to do that, you should do what you feel you need to do to take the deposition.

MR. INGOLD:  Well, it seems to be a major concern for you, so that's what I'm going to do, is we'll take a break, like you were suggesting just a moment ago, since we've been going a little over an hour.  And during the break I will get a copy of this one page and we'll go from there.  How's that?

And then we -- I guess I will be marking an exhibit.

(A break was taken.)

MS. BROSIUS:  Are we back on?

348

THE REPORTER:  Yeah.

MS. BROSIUS:  Just before we start, I'm going to lodge my continuing objection to the fact that counsel for defendant showed defendant -- showed the witness, excuse me, a document on his computer.  They had a conversation about it, and that is now the document that the witness will be testifying about.

MR. INGOLD:  So that the record is clear, in response to the questions asked by opposing counsel, I thought I identified a canon that was applicable.  I spent a couple minutes verifying with the archbishop that that was indeed the canon I was thinking, and now we're here.

MS. BROSIUS:  Are you waiving your objection to privilege based on the communication you just had?

MR. INGOLD:  Sure, you can ask him, if it's a limited -- if we construe it as a limited waiver as to what I showed him on the computer and how we came to this document that is now going to be an exhibit, I would make a limited waiver as to that exchange if you want --

MS. BROSIUS:  That's fine.

MR. INGOLD:  -- to ask him questions about that.

349

MS. BROSIUS:  That's fine.  We can get started.

MR. INGOLD:  All right.  Which exhibit number are we up to?

THE REPORTER:  83.

MR. INGOLD:  83.

Q.  (BY MR. INGOLD)  Vladika, I'm going to show you what's being marked as Deposition Exhibit 83.

(Deposition Exhibit 83 was marked.)

Q.  Do you recognize these canons as a translation of the Apostolic Canons?

A.  Yes.

Q.  And what authority do the Apostolic Canons have in church life?

A.  They're the first group of canons that were written in the Orthodox Church.

Q.  And they're accepted by the ecumenical councils, correct?

A.  Correct.

Q.  Can you read Canon No. XXXX.

A.  "Let the private goods of the bishop, if he have any such, and those of the Lord, be clearly distinguished.  That the bishop may have power of leaving his own goods when he dies to whom he will and how he will.  And that the bishop's own property may

350

not be lost on the pretence its being the property of the church. So it may be that he has a wife or children or relations or servants and it is just before God and man that neither should the church suffer any loss through ignorance of the bishop's own, nor the bishop or his relations be injured under the pretext of the church, nor that those who belong to him should be involved in contests and cast reproaches upon his death."

Q. Does that canon inform you as to whether the bishop can hold property separate from the property of the church that he takes care of?

A. Yes.

Q. Okay. And he then can dispose of that property in a godly manner however he wishes; is that correct?

A. Correct.

Q. Okay. The trueorthodoxy.info website, is that registered in the name of the church or in your personal name?

A. My personal name.

MR. INGOLD: I have no further questions at this time.

MS. BROSIUS: Just a moment.

We're all set. Thank you.

351

WHEREUPON, the within proceedings were concluded at the approximate hour of 9:52 a.m. on August 26, 2009.

I do hereby certify that I have read the foregoing deposition and that the same is a true and accurate transcript of my testimony, except for attached amendments, if any.

352

C E R T I F I C A T E

I, Diane K. Scholl, Registered Professional Reporter, appointed to take the deposition of

ARCHBISHOP GREGORY - VOLUME II, certify that before the deposition the deponent duly affirmed to testify to the truth; that the deposition was taken by me on August 26, 2009; then reduced to typewritten form, by means of computer-aided transcription; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on September 4, 2009.

_____

Diane K. Scholl
Registered Professional Reporter

Proofread by: S. Barrette

353

STATE OF COLORADO
COUNTY OF DENVER

Before me, this day, personally appeared ARCHBISHOP GREGORY, who, being duly affirmed, states that the foregoing transcript of his/her deposition, taken in the matter on the date and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_____

ARCHBISHOP GREGORY - VOLUME II

SUBSCRIBED and SWORN to before me this _____ day of _____, 2009, in the jurisdiction aforesaid.

_____    _____
My Commission Expires    Notary Public

### 354

CAPTION

The Deposition of ARCHBISHOP GREGORY, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

### 356

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

Deposition of: ARCHBISHOP GREGORY - VOLUME II
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

### 355

DEPOSITION ERRATA SHEET

RE:  Esquire Deposition Solutions
File No. 36640
Case Caption: HTM vs. Gregory

Deponent: ARCHBISHOP GREGORY - VOLUME II
Deposition Date: August 26, 2009
To the Reporter:
I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the errata sheet and the appropriate certificate and authorize you to attach both to the original transcript.
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____

### 357

Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____
Page No. _____ Line No. _____
Change to:_____
_____
Reason for change:_____