UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12387-RGS

SOCIETY OF THE HOLY
TRANSFIGURATION MONASTERY,
INCORPORATED

v.

ARCHBISHOP GREGORY
OF DENVER, COLORADO

MEMORANDUM AND ORDER ON
CROSS-MOTIONS  FOR PARTIAL
SUMMARY JUDGMENT

February 18, 2010

STEARNS, D.J.

This case involves a dispute over the copyrights to English language translations of seven ancient Greek religious texts.  Society of the Holy Transfiguration Monastery, Inc. (the Monastery), alleges that Archbishop Gregory of Denver, Colorado (the Archbishop) has infringed the copyrights that it owns in the disputed religious texts.  The Monastery also accuses the Archbishop of breaching a Settlement Agreement reached in a prior lawsuit involving one of the disputed copyrights.  The Monastery moves for partial summary judgment on the breach of contract claim and the claim of infringement of the copyright to the Ascetical Homilies of St. Isaac the Syrian[1] (the St. Isaac Work).  The Archbishop by way of a cross-motion seeks partial summary judgment on the Monastery's infringement claims regarding four works: the St. Isaac Work, the  Pentecostarion, the

_____

[1]Also known as Isaac of Nineveh.  The St. Isaac Work is a compilation of seventy-seven Homilies.

Octoechos, and the Psalter (collectively, the Works).  He also contests the enforceability of the Settlement Agreement, and alleges that the true owner of the copyrights to the Works is the Russian Orthodox Church Outside Russia (ROCOR).[2]

BACKGROUND

The Monastery was founded in Massachusetts in the early 1960's by adherents of the Eastern Orthodox faith.  As part of their vocation, the monks translated the Works from the original Greek into English.  The Monastery published and/or registered the Works with the Patent and Trade Office (PTO) on the following dates: (1) the St. Isaac Work was published on November 25, 1985, and registered on January 3, 1986; (2) the Pentecostarion was published on May 23, 1990, and registered on June 24, 1986; (3) the Octoechos was never published, but was registered on June 24, 1986; and (4) the Psalter was published on May 17, 1974, and registered either in 1975 or 1986.[3]

On January 23, 2006, the Monastery filed a lawsuit in the United States District Court for the Eastern District of Michigan (the Michigan lawsuit) against the Archbishop and his then publisher, Sheridan Books, Inc. (Sheridan).  The suit alleged infringement of the Monastery's copyright to the St. Andrew Work (a Work not at issue here).  In July of 2006, the Monastery, the Archbishop, and Sheridan entered into the Settlement Agreement.[4]  Under the terms of the Agreement, the Michigan lawsuit was dismissed with

---

[2]ROCOR is not a party to this lawsuit.

[3]The Monastery has variously asserted that it registered the Psalter on February 24, 1986, and sometime in 1975.  See Comp. ¶ 31; and the Monastery's Stmt. of Material Facts ¶ 20.

[4]All parties to the Agreement were represented by counsel.

prejudice.[5]  The Archbishop pledged that "in consideration of the overall settlement of the dispute concerning [the St. Isaac and the St. Andrew Works], [he] will not challenge the validity of the Monastery's copyright and/or the registrations in and to [the St. Isaac and St. Andrew works] at any time in the future."[6]  Agreement ¶ 1.  The Agreement further provided that

> Archbishop Gregory warrants and represents that he, either personally or through his associates and agents, has not copied, duplicated, transcribed, reproduced, replicated, or infringed in any manner the St. Isaac Work, and that no copy, duplicate, transcript, reproduction or replica, of any portion of the St. Isaac Work has been or will be printed or published by or for Archbishop Gregory and that Archbishop Gregory asserts that he does not have any knowledge of the existence of any copy, duplicate, transcript, reproduction, or replica of any portion of the St. Isaac Work in any medium, and will not assist in the creation of copy [sic], duplicate, transcript reproduction or replica of the St. Isaac Work in any medium, at any time in the future.

Id. at ¶ 2.  Finally, the Agreement specified that "[n]o one has made any promise except as expressly set forth in this Agreement to induce any other party to enter into this Agreement."  Id. at ¶ 11.

The Archbishop owns the website *www.trueorthodoxy.info*.  No later than August of 2007, the Archbishop posted (or caused to be posted), Homily 46 from the St. Isaac Work on the website.[7]  The Archbishop does not charge the public a fee for access to his website.

---

[5]The Agreement also allowed Sheridan to sell off its remaining inventory of the Archbishop's infringing religious books.

[6]The Michigan lawsuit alleged actual infringement of only the St. Andrew Work.

[7]The Archbishop does not deny the fact of publication.

The Monastery filed this Complaint on December 28, 2007.  The Archbishop responded with a motion to dismiss on February 18, 2008, followed by an answer on April 24, 2008.  The motion to dismiss was denied by the court, and after the close of discovery, the parties filed the instant cross-motions for partial summary judgment.

## DISCUSSION

Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[I]f a party resists summary judgment by pointing to a factual dispute on which it bears the burden of proof at trial [e.g., an affirmative defense], that party must point to evidence affirmatively tending to prove the fact in its favor." Fed. Deposit Ins. Corp. v. Elder Care Servs., Inc., 82 F.3d 524, 526 (1st Cir. 1996) (citation omitted).

### The Monastery's Claims

### Breach of Contract

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted).[8] To establish a breach, plaintiff has the burden of proving the failure of the defaulting party

---

[8]The Settlement Agreement does not contain a choice-of-law clause.  The parties, however, acknowledge that Massachusetts and Michigan contract laws are identical in all material respects and have cited only Massachusetts contract cases in their briefs.

to conform to one or more of the contract's material terms.   A term is material when it involves "an essential and inducing feature" of the contract.  Buchholz v. Green Bros., 272 Mass. 49, 52 (1930).  Here, the Agreement required the Monastery to dismiss the Michigan lawsuit with prejudice, in exchange for which the Archbishop agreed that he would not contest the Monastery's copyright in the St. Isaac Work.  In this lawsuit, the Archbishop is doing exactly what he promised in the Settlement Agreement that he would never do.

> Though questions of materiality are usually to be determined by the trier of fact, . . . the rule is not universal.  As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law.

Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994) (discussing cognate Rhode Island law).

Bowing to the inevitable, the Archbishop does not deny that he is in breach of the Agreement.  Rather, he argues on four grounds that the Agreement should be voided.  The grounds are mutual mistake, material misrepresentation, economic duress, and restraint of trade.  As will be shown, these defenses fail as a matter of law.[9]

"If the language of a written instrument does not reflect the true intent of both parties, the mutual mistake is reformable.  The mistake must either be mutual . . . or be made by one party and known to the other party . . . ."  Polaroid Corp. v. Travelers Indem. Co., 414

---

[9]As each of the grounds is an affirmative defense, the Archbishop bears the burden of proof on their applicability.  See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226-1227 (1st Cir. 1994).  Mistake must be shown by clear and convincing evidence.  Covich v. Chambers, 8 Mass. App. Ct. 740, 747 (1979).

Mass. 747, 756 (1993) (internal citations omitted).  A contract will not be reformed in cases of unilateral as opposed to mutual mistake.  <u>See</u> <u>Berman v. Sandler</u>, 379 Mass. 506, 509-510 (1980) ("In contract law, reformation will not be granted unless the parties' mistake is mutual.").  Moreover, as the Archbishop acknowledges, in cases of mutual mistake, the contract is voidable only at the election of the party adversely affected.[10] <u>LaFleur v. C.C. Pierce Co., Inc.</u>, 398 Mass. 254, 257-258 (1986).

The Archbishop identifies as a "mutual mistake" his representation in the Agreement that he had not infringed the Monastery's copyright in the St. Isaac Work.  He contends that when he signed the Agreement, he did not know – nor did the Monastery – that the St. Isaac Homily 46 had already been posted to his website.  Even accepting this as true, it is evident that it is the Monastery, and not the Archbishop, that is disadvantaged by his representation.  The Monastery fully performed its promise under the Settlement Agreement.  It would be neither just nor reasonable to now allow the Archbishop to escape his contractual obligations while depriving the Monastery of the benefits of its bargain.

The Archbishop next argues that the Agreement is voidable because he entered it in reliance on the Monastery's "material misrepresentation" that it owned the copyright to the St. Isaac Work.  The Archbishop, however, has failed to plead or offer proof of two necessary elements of this claim: that the Monastery *knowingly* misrepresented its

---

[10]<u>See</u> Restatement (Second) of Contracts § 152 (1981) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.").

ownership of the copyright or that it in fact did not own the copyright.  See Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997); Zimmerman v. Kent, 31 Mass. App. Ct. 72, 77 (1991).  The Monastery's proffered evidence, including the uncontested copyright registration certificate, clearly and convincingly indicates the opposite.[11]

The Archbishop next claims that he signed the Agreement under the duress caused by the Monastery's threat of legal action against which, as an impoverished prelate, he did not have the means to defend.  While a contract entered into under duress is voidable, Cabot Corp. v. AVX Corp., 448 Mass. 629, 637 (2007), the Archbishop's claim of economic duress is not one recognized by the law.

> Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion. Thus in order to substantiate the allegation of economic duress or business compulsion there must be a showing of acts on the part of the defendant which produced the financial embarrassment. The assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.

Int'l Underwater Contractors, Inc. v. New England Tel. & Tel. Co., 8 Mass. App. Ct. 340, 342 (1979) (internal quotation marks omitted).  Release of a party from its contractual obligations on a claim of economic duress is "reserved for extreme and extraordinary cases."  Cabot, 448 Mass. at 639.  A party may ratify an agreement entered under duress by accepting its benefits, by remaining silent for a period of time after having the

---

[11]See 17 U.S.C. § 410(c) ("[A] certificate of [copyright] registration made before or within five years after first publication of [a] work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.").

opportunity to avoid it, or by acting on it.  Id. at 643.  Ratification describes precisely what happened here.

Finally, the Archbishop claims that the Agreement is voidable on public policy grounds as an unreasonable restraint of trade or vocation.  A contract in violation of public policy will not be enforced.  Frishman v. Maginn, 75 Mass. App. Ct. 103, 115-116 (2009), citing Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996). The factors to be examined when determining whether a contract violating public policy should be enforced are the following:

> what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract . . . ; what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall.

Town Planning & Eng'g Assocs. v. Amesbury Specialty Co., 369 Mass. 737, 745-746 (1976) (footnotes omitted).  See also Frishman, 75 Mass. App. Ct. at 116-117.

None of these factors militate in the Archbishop's favor.  Nothing in the Agreement restricts his right to engage in his chosen vocation, nor attempts to prevent him from competing with the Monastery.   The Agreement does not bar the Archbishop from producing his own original translation of the St. Isaac Work and posting it to his heart's content.  Nor is there any smack of illegality about the Agreement.  It simply binds the Archbishop to do what the law requires him to do – to respect the intellectual property of others.  To work a forfeiture under the circumstances would confer an undeserved windfall on the Archbishop at the Monastery's expense.

8

Because the Archbishop has no valid defense to the enforcement of the Agreement, summary judgment will be <u>GRANTED</u> to the Monastery on its breach of contract claim.

<u>Copyright Infringement</u>

To establish copyright infringement, a plaintiff must show:  (1) ownership of a valid copyright in a work; and (2) a copying of constituent elements of the work that are original. <u>Lotus Dev. Corp. v. Borland, Int'l., Inc.</u>, 49 F.3d 807, 813 (1st Cir. 1995), citing <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).  A plaintiff bears the burden of proving that the work, as a whole, is original and that it has "complied with the applicable statutory formalities."  <u>Id</u>.  "'In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid.'"  <u>Id</u>., quoting <u>Bibbero Sys., Inc. v. Colwell Sys., Inc.</u>, 893 F.2d 1104, 1106 (9th Cir. 1990).  Where a work is made for hire, the Copyright Act provides that the employer is the author and owns the copyright, "unless the parties have expressly agreed otherwise in a written instrument signed by them."  <u>Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.</u>, 119 F.3d 55, 59 (1st Cir. 1997), quoting 17 U.S.C. § 201(b).

To prove copying, a plaintiff must show that the defendant copied the work, and that the copying was so extensive that it rendered the infringing and copyrighted works "substantially similar."  <u>Johnson v. Gordon</u>, 409 F.3d 12, 17-18 (1st Cir. 2005).  Copying may be inferred from a showing that a defendant had access to a plaintiff's work prior to publishing his own, and that there is a substantial similarity between the two works.  <u>See Grubb v. KMS Patriots, L.P.</u>, 88 F.3d 1, 3 (1st Cir. 1996).  Even if both showings are made,

9

a defendant may still prevail by showing independent creation.  Id.

The Archbishop's defense against the copyright infringement claim is a repetition of his contract argument denying the Monastery's ownership of the copyright to the St. Isaac Work.  The heart of the argument – ignoring for the moment the estoppel effect of the Settlement Agreement – is that the copyright to the St. Isaac Work should as a matter of church law be transferred to ROCOR.  The argument is a by-product of a long-simmering dispute over the ownership and disposition of ROCOR property in the U.S.  See, e.g., Primate and Bishops' Synod of the Russian Orthodox Church Outside Russia v. Russian Orthodox Church of the Holy Resurrection, Inc., 418 Mass. 1001 (1994).  The court need not, however, accept the Archbishop's invitation to delve into the intricacies of the doctrine of neutral principles as it applies to ecclesiastical disputes.  The Copyright Act provides a simpler statutory answer.[12]  After 1978, a transfer of copyright, other than by operation of law, "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  The Archbishop does not allege the existence of any writing signed by the Monastery evincing an intent to transfer ownership of the copyrights to ROCOR (or anyone else).  The Archbishop rather alleges that the Monastery holds the copyright in "trust" for ROCOR.  This claim is unsupported by a properly authenticated evidentiary record, as is discussed below.  Moreover, the source of the law

---

[12]As a rule, property disputes that arise among members of churches of both a congregational and a hierarchical nature are justiciable.  See General Convention of the New Jerusalem in the U.S.A., Inc. v. MacKenzie, 449 Mass. 832, 835 n.4 (2007).

of trusts that the Archbishop means to invoke is not clear.  If church law, this court doubts

its authority to interpret it.  See Maffei v. Roman Catholic Archbishop of Boston, 449 Mass.

235, 243 (2007).  If Massachusetts law, there is no allegation that the Monastery has ever

"unequivocally" manifested an intent to settle a trust for the benefit of ROCOR.  See State

St. Bank and Trust v. United States, 634 F.2d 5, 10 (1st Cir. 1980); Ventura v. Ventura, 407

Mass. 724, 726 (1990).

The Archbishop does not dispute that nearly an exact copy of a portion of the St.

Isaac Work appeared on his website and that he had copies of the Monastery's St. Isaac

Work in his possession prior to the posting.  Although minuscule differences exist between

the two versions, these are insufficient as a matter of law to render the website copy of

Homily 46 not "substantially similar" to the version copyrighted in the St. Isaac Work.[13]  The

Monastery therefore has made out a prima facie case of copyright infringement.

Fair Use

"Fair use is an affirmative defense," and the burden of proof is on the accused

infringer rather than the copyright holder.  See Campbell v. Acuff-Rose Music, Inc., 510

U.S. 569, 590 (1994).  In determining whether use of a copyrighted work is fair, a court is

to evaluate and weigh together the four factors set out in 17 U.S.C. § 107 (the purpose and

character of the use, the nature of the copied work, the extent of the copying, and its effect

on the market value of the work).  See Núñez v. Caribbean Int'l News Corp., 235 F.3d 18,

---

[13]The Archbishop's copying omitted footnotes and a total of three words, added a
question mark, and changed the spelling of six words.  It also added six quotation marks,
and changed some headings.

21-26 (1st Cir. 2000).

Fair use is a mixed question of law and fact. See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985).  "If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work."  Los Angeles News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1120 (9th Cir. 1997), quoting Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1150 (9th Cir. 1986).  See also Blanch v. Koons, 467 F.3d 244, 249 (2d Cir. 2006) (upholding district court's grant of summary judgment on the fair use defense); Núñez, 235 F.3d at 21 ("When the district court, as here, has found sufficient facts to evaluate each of the statutory factors, we need not remand but may determine fair use as a matter of law.").

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1). The Archbishop contends that his use of the St. Isaac Work is strictly for devotional purposes.  The Monastery does not dispute that the Archbishop does not seek commercial gain from his use of the St. Isaac Work, but that does not end the inquiry.

> [T]he central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

Campbell, 510 U.S. at 579 (internal citations omitted). See also Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 478 (1984) (Blackmun, J., dissenting) (the key

12

question is whether defendant's use "is a *productive* use, resulting in some added benefit to the public beyond that produced by the first author's work."). The more transformative the new work, the less significant are the factors that weigh against fair use, such as commercial gain. Campbell, 510 U.S. at 579. The Archbishop claims that his use of Homily 46 is transformative because he has placed a portion of the St. Isaac Work in a new media context (the Internet) for the instruction of Orthodox believers. A simple repackaging of a work in a new format, whether on the Internet or on a CD-ROM or on a flash drive, is not transformative when the result is simply a mirror image reflected on a new mirror. This factor weighs in favor of the Monastery.

The second factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2). Two aspects are particularly relevant: first, the extent to which the copyrighted work is a creative work of fiction as opposed to a factual work, such as a glossary of maps or a biography. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." Harper & Row, 471 U.S. at 563. The second critical aspect is whether the work has been published. "Our prior discussion establishes that the scope of fair use is narrower with respect to unpublished works. . . . The right of first publication encompasses not only the choice of whether to publish at all, but also the choices of when, where, and in what form first to publish a work." Id. at 564. As to the first aspect, the Archbishop maintains that "[t]he St. Isaac Work as a whole and Homily 46 on its own, are to their readers factual works that are part of their religion." As a theological precept, this may ring true to a believer, but from an objective legal perspective, a religious contemplation in the form of a Homily (an admonitory sermon or discourse) falls more

13

appropriately within the category of a work of imagination and creativity.   While a translation is by definition derivative, some translations – the King James Version of the Bible comes to mind – are nonetheless thought to be "original in their own right."   This factor, on the whole, weighs in favor of the Monastery.[14]

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," are reasonable in relation to the purpose of the copying.   17 U.S.C. § 107(3).   See Campbell, 510 U.S. at 586.   The parties do not dispute the actual amount copied, rather they dispute how it should be weighed against the whole.   The Archbishop points out that Homily 46 is only one of seventy-seven Homilies in the St. Isaac Work, covering approximately 3 of some 383 pages of text.   This factor nonetheless weighs in favor of the Monastery.   While the Archbishop's copying does not span a large portion of the St. Isaac Work, he incorporated the entirety of the Monastery's version of Homily 46 on his website for no apparent purpose other than avoiding the trouble and expense of creating a version of his own.   "As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'" Harper & Row, 471 U.S. at 565, quoting Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936).

The final factor, the effect of the use upon the potential market for or value of the copyrighted work, is the single most important element of the fair use doctrine.   See id. at 566.   "[This factor] requires courts to consider not only the extent of market harm caused

---

[14]There is no dispute that the Monastery published its version of the St. Isaac Work in 1985, hence the second aspect, the right of first publication, is neutral.

by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  <u>Campbell</u>, 510 U.S. at 590 (internal quotation marks omitted).  The Archbishop admits that the St. Isaac Work, as published by the Monastery, is an expensive undertaking, but points out that the Monastery has not alleged any specific lost sales or profits as a result of the infringement.  This is true, but as the Monastery fairly notes, it has had to expend time and resources to enforce its rights in the St. Isaac Work.  (At a minimum, the Monastery is entitled under the Settlement Agreement to the attorney's fees it expended in defending the market for the Works from the prospective effects of the Archbishop's plagiarism).[15]  Given <u>Campbell</u>'s emphasis on the deterrence of injurious conduct by others as a consideration separate and apart from a showing of actual market harm, this factor too weighs in favor of the Monastery.[16]

Because a weighing of the four fair use factors favors the Monastery in all respects, its motion for partial summary judgment on this claim will also be <u>ALLOWED</u>.

<u>The Archbishop's Claim</u>

The Archbishop moves for summary judgment on the Monastery's claims of

---

[15]The parties specifically addressed legal fees in paragraph ten of the Agreement: "Each party to this Agreement agrees to bear its own costs and attorneys' fees; provided, however, a) any party found by a Court of proper jurisdiction to be in breach of the Agreement shall pay any other necessary party's reasonable attorney's fees, plus costs . . . ."  The Monastery is also entitled to statutory damages under the Copyright Act on its infringement claim.  <u>See</u> 17 U.S.C. § 504.

[16]A rule that would require a victim of infringement to delay taking action to defend its copyright until actual (and perhaps irreparable) harm had accrued would run contrary to the very purpose of the Copyright Act.

infringement of the copyrights to four works (the St. Isaac Work, the Pentecostarion, the Octoechos, and the Psalter).  As to these works, the Archbishop repeats his earlier claim that the Monastery is not the true owner as it holds the copyrights in trust for ROCOR.  He relies on two purported ROCOR documents, the Statutes for Monasteries of the Russian Orthodox Church Outside Russia (Monastic Statutes) and the Regulations of the Russian Orthodox Church Outside Russia (Regulations).

> Documents supporting or opposing summary judgment must be properly authenticated.  To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).  Rule 56(e) requires that the affidavit be made on personal knowledge, set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein.

Carmona v. Toledo, 215 F.3d 124, 131 (1st. Cir. 2000) (internal citations omitted).  The Archbishop has failed to authenticate either the Monastic Statutes or the Regulations.  Thus, this court does not give any credence to these purported documents.  As a result, it must deny the Archbishop's cross-motion for partial summary judgment.[17]

## ORDER

For the foregoing reasons, the Monastery's motion for partial summary judgment is ALLOWED as to the breach of contract claim.  It is also ALLOWED as to the copyright infringement claim regarding the St. Isaac Work.  The Archbishop's cross-motion for partial summary judgment is DENIED.  Within twenty-one days, the parties will file a status report

---

[17]Even had the Archbishop complied with the authentication requirement, the result would be the same as he has shown no grounds under which he would have standing to raise an ownership claim in the copyrights on behalf of ROCOR.

with a view to expediting a disposition of the Monastery's remaining claims.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE