UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12387-RGS

SOCIETY OF THE HOLY
TRANSFIGURATION MONASTERY,
INCORPORATED

v.

ARCHBISHOP GREGORY
OF DENVER, COLORADO

MEMORANDUM AND ORDER ON
PLANTIFF'S MOTION FOR
SUMMARY JUDGMENT

December 3, 2010

STEARNS, D.J.

This case involves the alleged infringement of the copyrights to English language translations of ancient Greek religious texts. Society of the Holy Transfiguration Monastery, Inc. (Monastery), alleges that Archbishop Gregory of Denver, Colorado (Archbishop) has infringed its copyrights in the disputed texts. On July 23, 2010, the Monastery moved for summary judgment on the remaining claim in this case, the infringement by the Archbishop of the copyright on six of the Monastery's works: the Psalter Work, the Prayer Book Work, the Great Horologion Work, the Pentecostarion Work, the Collected Dismissal Hymns Work, and the Octoechos Work (collectively, the Works).[1] The court heard oral argument on the motion on November 18, 2010.

---

[1] On February 18, 2010, the court entered a Memorandum and Order on Cross-Motions for Summary Judgment (Feb. 18, 2010 Mem. and Order) granting judgment to the Monastery on its breach of contract claim and a claim of copyright infringement as to a seventh disputed text, the St. Isaac Work.

BACKGROUND

The bulk of the underlying facts are set forth in the court's February 18, 2010 Memorandum and Order and need not be repeated here. Additional pertinent facts are as follows. The Monastery published and/or registered the individual works with the U.S. Copyright Office on the following dates: (1) the Psalter Work was published in March of 1975, and registered in 1975, and again in 1986; (2) the Prayer Book Work was published in July of 1988, and registered in November of 1988; (3) the Horologion Work was published in October of 1997, and registered in December of 1997; (4) the Pentecostarion Work was published in 1990, and registered in June of 1986; (5) the Dismissal Hymns Work was never published, but was registered in December of 1987; (6) the Octoechos Work was never published, but was registered in June of 1986. Members of the Monastery collaborated on the creation of the Works, and their sale is a source of income sustaining the Monastery. Corr. Jt. Stmt. Mat. Undisp. Facts ¶¶ 1-19, 92. In August of 2007, the Archbishop caused or permitted versions of the Works to be posted on his website, www.trueorthodoxy.info.[2] The Monastery alleges that some of the posted Works infringed its copyrights. Corr. Jt. Stmt. Mat. Undisp. Facts ¶¶ 22-59, 108.

On December 28, 2007, the Monastery filed a Complaint against the Archbishop in the U.S. District Court. The Archbishop responded with a motion to dismiss on February 18, 2008, followed by an Answer on April 24, 2008. The motion to dismiss was denied by

---

[2]The Archbishop admits that he bears responsibility for and has authority over the content of the website. However, he claims that he did not personally post the allegedly infringing material, and that he was unaware of the details of the actual material being posted. Corr. Jt. Stmt. Mat. Undisp. Facts ¶ 23, 137.

the court on April 14, 2008. After the close of discovery, the parties filed cross-motions for partial summary judgment. On February 18, 2010, the court granted the Monastery's motion for partial summary judgment on its breach of contract claim and on the infringement claim regarding the St. Isaac Work. The court also denied the Archbishop's cross-motion for partial summary judgment. The Monastery now moves for summary judgment on the remaining claims of copyright infringement.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986). "[I]f a party resists summary judgment by pointing to a factual dispute on which it bears the burden at trial [e.g., an affirmative defense], that party must point to evidence affirmatively tending to prove the fact in its favor." FDIC v. Elder Care Servs., Inc., 82 F.3d 524, 526 (1st Cir. 1996).

To establish copyright infringement, a plaintiff must show: (1) ownership of a valid copyright in a work; and (2) copying of constituent elements of the work that are original. Lotus Dev. Corp. v. Borland, Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995), citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). "'In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability

3

and shifts the burden to the defendant to demonstrate why the copyright is not valid.'" Id., quoting Bibbero Sys., Inc. v. Colwell Sys., Inc., 893 F.2d 1104, 1106 (9th Cir. 1990). Where a work is made for hire, the Copyright Act provides that the employer is the author and owns the copyright, "'unless the parties have expressly agreed otherwise in a written instrument signed by them.'" Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc., 119 F.3d 55, 59 (1st Cir. 1997), quoting 17 U.S.C. § 201(b).

I. Validity of the Copyrights

The Archbishop argues that the Monastery does not own valid copyrights in the Works for three reasons: (1) the Monastery is not the rightful owner of the copyrights; (2) the Monastery allowed its works to pass into the public domain by publishing them without copyright notice; and (3) the Monastery's translations lack the originality necessary to be copyrightable. See Def.'s Opp'n Mem.

1. Ownership of the Copyrights

In his opposition to the Monastery's motion for summary judgment, the Archbishop reiterates his allegation that the Monastery is not the owner of the copyrights at issue because they belong to the Russian Orthodox Church Outside Russia (ROCOR).[3] This argument has been previously considered and rejected by the court. Feb. 18, 2010 Mem. and Order at 10-11, 15-16. Notwithstanding the rejection, the Archbishop again invites the court to delve into the byzantine intricacies of the doctrine of neutral principles as it applies to ecclesiastical disputes.

As the court stated in its February 18, 2010 Memorandum and Order, the Copyright

---

[3]ROCOR is not a party to this lawsuit.

Act provides a statutory answer to the copyright issue that makes it unnecessary to consult the canonical traditions of the Orthodox Church. After 1978, a transfer of copyright, other than by operation of law, "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). The Archbishop does not allege the existence of any writing by the Monastery evincing an intent to transfer ownership of the copyrights to ROCOR (or to anyone else). Instead, he argues that the Monastery's copyrights were transferred to ROCOR by operation of law because of the Monastery's decision to disaffiliate itself from ROCOR. Def.'s Opp'n Mem. at 6-20.

In support of this argument, the Archbishop cites cases in which courts have found copyrights to be transferred by operation of law without the necessity of a writing. See id. at 18-20. These cases arose in fairly predictable contexts, such as a bankruptcy proceeding, a foreclosure, a merger, or the transfer of assets from a dissolved corporation to its shareholders. See, e.g., Brooks v. Bates, 781 F. Supp. 202 (S.D.N.Y. 1991). See also U.S. Home Corp. v. R.A. Kot Homes, Inc., 563 F. Supp. 2d 971, 976 (D. Minn. 2008) ("Courts have interpreted a transfer by 'operation of law' to include mergers and any other transaction that 'establish[es] the author's express or implied consent' to transfer the copyright."). The Monastery's spiritual secession from ROCOR has no analogy to a corporate transaction involving the express or implied agreement to transfer ownership of assets or to a court-ordered transfer of property from a debtor to a creditor. The court is simply not persuaded by the Archbishop's complinic operation of law argument.

    2. Publication without Notice

5

The Archbishop next argues that some of the Works were published without copyright notice and are therefore in the public domain. See Def.'s Am. Answer at 11; Def.'s Proposed Facts at ¶¶ 30-38. "The common law recognizes three ways of exposing a work to the public: exhibition or performance, limited publication, and general publication. Of these, only general publication results in loss of the common law copyright by the creator." Burke v. Nat'l Broad. Co., Inc., 598 F.2d 688, 691 (1st Cir. 1979). A general publication occurs "when a work is made available to members of the public at large without regard to who they are or what they propose to do with it." Id. In contrast, a limited publication occurs "when tangible copies of the work are distributed, but to a limited class of persons and for a limited purpose." Id. at 692. A limited publication does not extinguish a copyright. Id. at 691. See also John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 35-36 (1st Cir. 2003) (finding that a limited publication or display of a work does not constitute a "distribution" for copyright purposes). Not unexpectedly, the unauthorized distribution of a work by a third party also does not extinguish copyright protection. See Cipes v. Mikasa, Inc., 346 F. Supp. 2d 371, 375 (D. Mass. 2004) ("[A]n unauthorized user lacks not only the right, but also the ability to 'publish' an author's work and any attempt to do so is ineffective.").

The Archbishop alleges that the Monastery published its Dismissal Hymns and Pentecostarion Works, and portions of the Horologion Work and Prayer Book Work, without copyright notice. See Def.'s Proposed Facts ¶¶ 27-35. The evidence that the Archbishop provides to support this allegation is neither clear nor persuasive. See Def.'s Opp'n Mem. at 4-5. The Monastery admits that on occasion over the years, it has provided

6

portions of the translations-in-progress for parish use and for the solicitation of religious and literary critiques. Corr. Jt. Stmt. Mat. Undisp. Facts ¶ 93. The distribution by the Monastery of the Works to a select group of co-religionists for restricted purposes constitutes a limited publication as a matter of law. See Burke, 598 F.2d at 692 ("At common law the creator of a literary or artistic work has the right to copy and profit from it, and can distribute or show it to a limited class of persons for a limited purpose without losing that right."). See also Patterson v. Century Prods., Inc., 93 F.2d 489, 492-493 (2d Cir. 1937) (finding that exhibitions of a film to religious, educational, and social organizations without charge did not constitute a general publication that would invalidate the copyright). To the extent that third parties may have disseminated the Works without the Monastery's authorization (there is no evidence in the record that this occurred), no publication in a legally meaningful sense took place.

### 3. Originality

The Archbishop finally disputes the validity of the Monastery's copyrights on the grounds that the Works lack originality. See Def. Mot. Amend Answer; Def.'s Opp'n Mem. at 22. In a copyright infringement action, the plaintiff bears the burden of proving that the work, as a whole, is original and that it has complied with the statutory formalities. Lotus Dev. Corp., 49 F.3d at 813. Original does not mean novel – "the requisite level of creativity is extremely low; even a slight amount will suffice." Feist, 499 U.S. at 345. Whether or not a work is original is a question that the court can determine as a matter of law. See CMM Cable Rep, Inc. v. Ocean Coast Prop., Inc., 97 F.3d 1504, 1517 (1st Cir. 1996) (affirming summary judgment on the originality of a promotional contest theme,

7

stating "[w]hile we do not dispute that the question of originality can be a question of fact for the jury, it is not necessarily so."); see also Feist, 499 U.S. at 341 (1991) (deciding a question of originality as a matter of law).

The Copyright Act protects translations of preexisting works, including religious texts, as "original works of authorship." See 17 U.S.C. § 102; see also Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 97 (2d Cir. 2002) (concluding that an English translation of a Hebrew prayerbook reflected sufficient originality to be a copyrightable work). The Monastery claims that all six Works are "unique translations of preexisting public domain works originally authored in foreign languages; i.e., derivative works." Corr. Jt. Stmt. Mat. Undisp. Facts ¶ 101. The Archbishop alleges that the Works lack originality because they duplicate portions of preexisting third-party translations. However, he does not provide any evidence to support this allegation, see Def.'s Opp'n Mem. at 20-22, while the Monastery provides detailed side-by-side comparisons, illustrating the significant differences between the Monastery's Works and those cited by the Archbishop. See Pl.'s Reply Mem., App.

Because the Archbishop has failed to raise any genuine dispute regarding ownership of the copyrights, the prior publication of the Works without copyright notice, or their originality, the Monastery's copyrights are presumptively valid. See 17 U.S.C. § 410(c).

II. Copying

To establish copyright infringement, the Monastery must also show "copying of constituent elements of the work [by the defendant] that are original." See Lotus Dev.

8

Corp., 49 F.3d at 813, citing Feist, 499 U.S. at 361. To prove copying, a plaintiff must show that the defendant copied the work, and that the copying was so extensive that it rendered the infringing and copyrighted works "substantially similar." Johnson v. Gordon, 409 F.3d 12, 17-18 (1st Cir. 2005). Copying may be inferred from a showing that a defendant had access to a plaintiff's work prior to publishing his own, and that there is a substantial similarity between the two works. See Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996). "Substantial similarity exists if a reasonable, ordinary observer, upon examination of the two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." Situation Mgmt. Sys., Inc. v. ASP Consulting LLC, 560 F.3d 53, 58 (1st Cir. 2009) (internal quotations omitted). "Case law supports the 'ordinary observer' test and the disregard of minor differences in favor of major similarity." Matthews v. Freedman, 157 F.3d 25, 28 (1st Cir. 1998).

The Archbishop is a former member of the Monastery. While at the Monastery, he participated in the creation of many of the Works. He does not dispute that he possesses copies of all seven Works at issue in this case. See Corr. Jt. Stmt. Mat. Undisp. Facts ¶¶ 65-84, 98, 102; Def.'s Opp'n Mem. at 23-24. The evidence compels a finding that the Archbishop had access to the Works prior to August of 2007, when the allegedly infringing material was posted on his website.

The Monastery does not claim that the Archbishop made wholesale reproductions of the six Works; rather, the Monastery alleges that the Archbishop reproduced portions of the Works interspersed with filler material. Pl.'s Summ. J. Mem. at 21. The Monastery again provides side-by-side comparisons, which show identical and near-identical

9

similarities between portions of all six Works and the Archbishop's website postings.[4] Applying the ordinary observer test, the slight textual differences between the two are insufficient as a matter of law to render the Archbishop's versions not "substantially similar" to the infringed portions of the Works copyrighted by the Monastery.[5] See Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 66 (1st Cir. 2000) (affirming the district court's findings that two of defendant's sweater designs were, as a matter of law, substantially similar to plaintiff's copyrighted design, where the designs differed in but a few details).

III. Fair Use Defense

The court previously found that the Archbishop's reproduction of a portion of the St. Isaac Work on his website did not constitute fair use. The court evaluated the Archbishop's use of the copyrighted material in light of the four factors set out in 17 U.S.C. § 107 and found that each of the four factors weighed in the Monastery's favor. Feb. 18, 2010 Mem. and Order at 11-15. The Archbishop reiterates the fair use defense with respect to the remaining six Works and attempts to rebut specific points raised by the court in previously rejecting the defense.

"Fair use is an affirmative defense," and the burden of proof is on the accused

---

[4] The Monastery has cataloged extensive examples of verbatim and near-verbatim similarities between the Works and the texts that appeared on the Archbishop's website. See Pl.'s Summ. J. Mem. at 21-31; Pl.'s Reply Mem., App.

[5] For example, regarding Psalm 3 of the Psalter Work, the Monastery's phrasing "without cause" has been replaced by "vainly" in the Archbishop's corresponding website document. In addition, there are slight textual differences between portions of the Monastery's Prayer Book Work and the corresponding text posted on the Archbishop's website (e.g., the Archbishop changes "Friend of man" to "Lover of man" throughout the document). See Pl.'s Summ. J. Mem. at 21-31.

infringer rather than the copyright holder. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994). In determining whether the use of a copyrighted work is fair, a court is to evaluate and weigh as a whole the four factors set out in 17 U.S.C. § 107 (the purpose and character of the use, the nature of the copied work, the extent of the copying, and its effect on the market value of the work). See Núñez v. Caribbean Int'l News Corp., 235 F.3d 18, 21-26 (1st Cir. 2000).

Fair use is a mixed question of law and fact. See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985). "If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." Los Angeles News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1120 (9th Cir. 1997), quoting Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1150 (9th Cir. 1986). See also Blanch v. Koons, 467 F.3d 244, 249 (2d Cir. 2006) (upholding district court's grant of summary judgment on the fair use defense); Núñez, 235 F.3d at 21 ("When the district court, as here, has found sufficient facts to evaluate each of the statutory factors, we need not remand but may determine fair use as a matter of law.").

With regard to the first factor – the purpose and character of the use – this court found that since the Archbishop's placing of the St. Isaac Work on the Internet was not sufficiently transformative, this factor weighed in favor of the Monastery. Id. at 12-13. The Archbishop argues that a work need not be transformative to constitute fair use. Def.'s Opp'n Mem. at 22, citing Campbell, 510 U.S. at 579. Campbell states:

11

> [a]lthough such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

Id. Thus, while it is true that transformative use is not an absolute requirement for a finding of fair use, its absence enhances the significance of the other factors that weigh against a finding of fair use. As the court determined previously, the three other statutory factors (the nature of the copied work, the extent of the copying, and its effect on the market value of the work) all favor the Monastery. The Archbishop does not provide any new evidence (or argument) that would alter the court's prior balancing of these factors. See Def.'s Opp'n Mem. at 23-24. Therefore, the Archbishop's fair use defense also fails with respect to the remaining six Works.

### IV. Digital Millennium Copyright Act (DMCA) Safe Harbor Defense

In his opposition to the Monastery's motion for summary judgment, the Archbishop raises a matinal affirmative defense: he argues that he is immune from liability for infringement under the 1998 Digital Millennium Copyright Act (DMCA), 17 U.S.C. §§ 101, et seq. The Archbishop alleges that he qualifies as an Internet Service Provider (ISP) and therefore falls within the safe harbor provisions of the DMCA, which protect ISPs who are not direct infringers. See Def.'s Opp'n Mem. at 4; Def.'s Surreply Mem. J. at 2-6.

An affirmative defense not pleaded as required by Fed. R. Civ. P. 8(c) is waived, Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp, 15 F.3d 1222, 1226 (1st

Cir. 1994), although "[w]hen there is no prejudice and when fairness dictates, the strictures of [the raise or waive] rule may be relaxed." Jakobsen v. Massachusetts Port Auth., 520 F.2d 810, 813 (1st Cir. 1975). "Moreover, when an affirmative defense that has not been raised in the pleadings has actually been tried by implied consent of the parties, the court must treat the defense as if it had been raised in the original responsive pleading." Conjugal P'ship v. Conjugal P'ship, 22 F.3d 391, 400 (1st. Cir. 1994). Implied consent, however, will be found only when the opposing party "did not object to the introduction of evidence or introduced evidence himself that was relevant *only* to [the affirmative defense]." Lynch v. Dukakis, 719 F.2d 504, 508 (1st Cir. 1983). Compare Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 446 (1st Cir. 1995) (defendant sought on the eve of trial to change the theory of the case by converting a general Rule 12(b)(6) demurrer into a specific defense of ERISA preemption).

The Archbishop did not raise the DMCA safe harbor defense in either his answer or his amended answer. See Def.'s Answer and Affirmative Defenses; Def.'s Mot. to Amend Answer - Ex. B. As a result, under Fed. R. Civ. P. 8(c) and Knapp Shoes, the defense is waived. In the context of this case, fairness does not dictate otherwise. The Archbishop's DMCA safe harbor defense has not been tried by implied consent of the parties.[6]

---

[6]Moreover, the applicability of the DMCA safe harbor provisions to the Archbishop is questionable. See Pl.'s Reply Mem. at 2-3 ("The Monastery disputes that the Defendant qualifies as an ISP or 'service provider' as the statute defines these terms, and therefore disputes that the statute's Safe Harbor provisions insulate him. 17 U.S.C. § 512(k)."); see also Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp., 338 Fed. Appx. 329, 336 (4th

13

In sum, the Monastery has fulfilled its burden of proving the elements of copyright infringement, while the Archbishop has not met his burden of proving any of his affirmative defenses or of raising any material dispute of fact that would require the intervention of a jury. Therefore, the motion for summary judgment will be ALLOWED as to the copyright infringement claim.

V. Damages

The Monastery argues that damages for the Archbishop's breach of contract and his infringement of the copyright in the St. Isaac Work and the other six of the Monastery's Works, as well as attorneys' fees, costs, and other equitable and statutory relief, may be determined by the court if it determines, as it has, that the Archbishop is liable on the remaining infringement claims. Pl.'s Resp. Ct.'s March 31, 2010 Order at 2. Copyright damages are usually measured as the loss in the fair market value of the copyright, that is, by calculating the profits lost as a result of the infringement. Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1173 (1st Cir. 1994). A plaintiff may also recover the infringer's (nonduplicative) profits. Id.

In its Complaint, the Monastery states that it "is entitled to a permanent injunction and an award of its actual damages and any profits of Defendant under 17 U.S.C. §§ 502, 504(a)(1), and 504(b)." Compl. ¶ 51. "[I]t is beyond dispute that a plaintiff who seeks to recover actual damages is entitled to a jury trial." See 3

---

Cir. 2009) (distinguishing between an ISP, which has no control over the content that its users upload to the Internet, and an employer, who is potentially liable for employees' acts of volitional copying).

Nimmer on Copyright §12.10[A]. As a practical matter, however, the Monastery's 30(b)(6) witness testified that as of the day of his deposition, the Monastery could not specify "a monetary quantifiable estimate of harms, damages, and losses" that the Monastery could attribute to the alleged infringement. Corr. Jt. Stmt. Mat. Undisp. Facts ¶ 110. Moreover, the Archbishop has never charged fees to access any of the website material at issue, and the Monastery has pointed to no actual profits that it could recover from the Archbishop. See id. ¶ 107. The issue of actual damages would thus appear to be a damp squib.

The Monastery has also pled the option of electing statutory damages. Compl. at 10 ("In the alternative, and if Plaintiff so elects, award Plaintiff statutory damages in the amount of $150,000 per each of the Copyrighted Works infringed by Defendant, on account of Defendant's willfulness."). When a plaintiff in a copyright infringement action elects statutory damages, it remains the case that the defendant is entitled in most instances to a jury trial. See Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 355 (1998) (holding that the Seventh Amendment provides a right to a jury trial when statutory damages are claimed under Section 504(c) of the Copyright Act); see also Segrets, 207 F.3d at 66. However, where a plaintiff agrees to accept the minimum amount of statutory damages available, the defendant's jury trial right evaporates. See BMG Music v. Gonzalez, 430 F.3d 888, 892-893 (7th Cir. 2005) (holding that a copyright infringement defendant was not entitled to a jury trial on the question of the amount of statutory damages where plaintiff had only requested the statutory minimum);

Twentieth Century Music Corp. v. Frith, 645 F.2d 6, 7 (5th Cir. 1981) (holding that defendants were not entitled to a jury trial in a copyright infringement action in which only statutory minimum damages and injunctive relief were sought).

Should the Monastery elect to receive the minimum amount of statutory damages ($750 per work infringed), the court is prepared to enter a money judgment in its favor for $5,250 (representing the total for infringement of the St. Isaac Work and the six other Works), in addition to any appropriate injunctive relief. Whether to award attorneys' fees is a matter for the court's discretion (with or without the involvement of a jury). See Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994).

## ORDER

For the foregoing reasons, the Monastery's motion for summary judgment is ALLOWED as to liability on the outstanding copyright infringement claims. The Monastery will notify the court on or before December 17, 2010, whether it is willing to elect entry of a final judgment based on the minimum amount of statutory damages. Should the Monastery elect statutory damages in excess of $750 per work infringed, trial on the damages issue will commence at 9:00 a.m. on January 18, 2011.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE