# United States Court of Appeals
## For the First Circuit

————————

No. 11-1262

SOCIETY OF THE HOLY TRANSFIGURATION MONASTERY, INC.,

Plaintiff, Appellee,

v.

ARCHBISHOP GREGORY OF DENVER, COLORADO,

Defendant, Appellant.

————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

————————

Before

Torruella, Circuit Judge,
Souter,* Associate Justice,
and Boudin, Circuit Judge.

————————

Chris L. Ingold, with whom Ingold Law, LLC, Harold R. Bruno,
III, and Robinson Waters & O'Dorisio, P.C., were on brief for
appellant.
Kristen McCallion, with whom Lawrence K. Kolodney, Eric J.
Keller, Fish & Richardson P.C., Mark A. Fisher, and Duane Morris
LLP, were on brief for appellee.

————————

August 2, 2012

————————

————————

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

TORRUELLA, **Circuit Judge**.  Interpretations and studies of theological texts have led to countless disputes throughout the ages.  This appeal concerns a different form of conflict arising from one monastery's translation of certain ancient religious texts, and another monastery's unauthorized use of verbatim or near-verbatim copies of such texts on its Orthodox faith-devoted website.  Seven, a number both religiously and factually significant, is the quantity of works the former monastery contends the latter infringed.  The parties here let fly a legion of arguments and defenses as to why ultimate judgment should rest in their favor.  We have pored over the voluminous record before us and the district court's orders granting summary judgment to the former monastery.  See Holy Transfig. Monas. v. Archbishop Gregory, 754 F. Supp. 2d 219 (D. Mass. 2010) ("Holy Transfiguration II"); Holy Transfig. Monas. v. Archbishop Gregory, 685 F. Supp. 2d 217 (D. Mass. 2010) ("Holy Transfiguration I").  We arrive at the same conclusion as the district court and hold that summary judgment was properly granted as to each of the former monastery's claims.  We accordingly affirm the decision of the district court.

## I.  Background[1]

## A.  A Tale of Two Monasteries

---

[1]  We construe "the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in the party's favor."  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)) (internal quotation mark omitted).

Plaintiff-Appellee Society of the Holy Transfiguration Monastery, Inc. (the "Monastery") is an Eastern Orthodox monastic order located in Brookline, Massachusetts. It was founded in the early 1960s and incorporated as a non-profit organization. In 1965, the Monastery began a spiritual affiliation[2] with the bishops of the Russian Orthodox Church Outside of Russia ("ROCOR"). Although the Monastery concedes it commemorated the bishops of ROCOR for a time (until 1986 to be precise), it considers itself an independent entity in both its organization and governance. Stated differently, the Monastery was not formed at the order or direction of ROCOR or any bishop a part thereof; instead, its formation occurred prior to its spiritual affiliation with ROCOR. On December 8, 1986, the Monastery ceased its commemoration of the ROCOR bishops, thus ending its spiritual affiliation with ROCOR.

Since the Monastery's formation, its members, consisting of approximately thirty-five monks, have worked on translating religious texts, including services, psalms, and prayers, from their original Greek into English. The cardinal works at issue (the "Works") consist of (1) the St. Isaac Work,[3] (2) the Psalter,

---

[2] The record reflects that "spiritual affiliation," often used interchangeably with the terms "ecclesiastical jurisdiction" or "in communion," is a term used when a monastery agrees with the particular confession of faith of a bishop or group of bishops and enjoys their blessing during that time.

[3] The full title of the St. Isaac work is "The Ascetical Homilies of St. Isaac the Syrian."

(3) the Octoechos, (4) the Pentecostarion, (5) the Dismissal Hymns, (6) the Prayer Book, and (7) the Horologion.[4]

Though the Works and their corresponding translations are of ancient texts, they became in demand over the years amongst parishes due to an increasing need for English versions of Orthodox liturgical texts for liturgies conducted in English. The Monastery obliged such requests, but on a limited basis. For instance, it provided copies of its then-in-progress Dismissal Hymns to approximately twelve parishes with specific instructions that no copies be made. Its limited distribution purpose was two-fold: the Monastery hoped to receive feedback as to the quality of the translations for those parishes seeking a linguistically-friendly English-language religious text, and at the same time, help to meet the growing need for religious texts in English language religious services.

Not all were satisfied with the Monastery's vocation. In the late 1970s (before the Monastery's termination of its spiritual affiliation with ROCOR), Defendant-Appellant Archbishop Gregory (the "Archbishop"), a member of the Monastery at that time,

---

[4] The respective known dates of registration for these Works are January 3, 1986 (St. Isaac Work), February 24, 1986 (Psalter), June 24, 1986 (Octoechos), June 24, 1986 (Pentecostarion), December 10, 1987 (Dismissal Hymns), November 16, 1988 (Prayer Book), and December 3, 1997 (Horologion). Of the seven, four works were registered as published works (St. Isaac, Horologian, Prayer Book, and Psalter), and three, as unpublished works (Octoechos, Dismissal Hymns, and Pentecostarion).

obtained ROCOR's permission to leave the Monastery and move west to Colorado where he formed his own monastery, the Dormition Skete. Throughout the years, the Dormition Skete has dedicated itself to painting traditional Byzantine Orthodox icons for both church and private use.  It is only composed of a few members; those relevant to this dispute include the Archbishop and Father Peter, a priest monk[5] in the order who, true to his apostolic name, has served and supported the Archbishop in various capacities.

In addition to forming the monastery, the Archbishop created a website devoted to the Orthodox faith, www.trueorthodoxy.info (the "Website"), over which he has conceded to having authority and ownership.  The asserted purpose of the Website is "to share information about the Orthodox Christian religion with users of the internet."  Created on February 8, 2005, religious works have since been posted free-of-charge to the Website for non-profit, educational purposes.  Of relevance to this dispute are a posting of a portion of the St. Isaac work, done sometime in 2005, and postings of the remaining six Works in August 2007.  To perform such postings, the Archbishop relied on Father Peter, who helped build, design, and program the Website.

---

[5]  At deposition, Father Peter defined the position of "priest monk" as a monk (a member of a monastic order who has withdrawn from the world for religious reasons and assumed certain vows) who also performs religious services.

Like many a missionary before him, the spreading of religious teachings (here, through the posting of translated religious texts via the internet) brought trouble upon the Archbishop -- trouble not isolated to this dispute alone. On January 23, 2006, the Monastery filed a lawsuit in the U.S. District Court for the Eastern District of Michigan against the Archbishop and his publisher at the time, Sheridan Books, Inc. The Monastery alleged copyright infringement of two works, the St. Isaac work (at issue on this appeal)[6] and the St. Andrew work (not at issue on this appeal).[7] The parties ultimately entered into a Settlement Agreement on July 24, 2006. Pursuant to the terms of this agreement, the court dismissed the Michigan lawsuit with prejudice. Notably, the Archbishop, in settling, agreed to the following:

> [T]he Monastery is the owner of the copyrights in and to the translations of [the St. Andrews work and the St. Isaac work] . . . . [The Archbishop] further agree[s] that, in consideration of the overall settlement of the dispute concerning the Works, [he] will not challenge the validity of the Monastery's copyright and/or the registrations in and to the Works at any time in the future. . . . Archbishop Gregory warrants and represents that . . . no copy, duplicate, transcript, reproduction or replica, of any

---

[6]  The electronically posted (and now contested) St. Isaac work consisted of one of the homilies from the Ascetical Homilies of Saint Isaac, specifically, Homily 46.

[7]  The full title of the St. Andrew work is "The Life of Saint Andrew the Fool-For-Christ of Constantinople."

> portion of the St. Isaac Work has been or will
> be printed or published by or for Archbishop
> Gregory and that Archbishop Gregory asserts
> that he does not have any knowledge of the
> existence of any copy, duplicate, transcript,
> reproduction, or replica of any portion of the
> St. Isaac Work in any medium, and <u>will not
> assist in the creation of copy [sic],
> duplicate, transcript reproduction or replica
> of the St. Isaac Work in any medium, at any
> time in the future.</u>

(Emphasis added.)

Despite this agreement, the contested portion of the St. Isaac work remained on the Dormition Skete's Website post resolution of the Michigan dispute, and in August 2007, a collection of the remaining six Works also was posted to the site.

## B.  Seeking Secular Judgment

The Monastery took action.  On December 28, 2007, it filed the Complaint in this action alleging infringement of the Monastery's copyrights in the Works and breach of the Settlement Agreement for the continued display of portions of the St. Isaac work.

In response, the Archbishop promptly removed what he believed at the time to be the allegedly infringing material from the site.  He then filed a motion to dismiss the Monastery's Complaint on February 14, 2008, which the court subsequently denied.  When his efforts proved unsuccessful, the Archbishop answered the Monastery's Complaint on April 24, 2008.  In his Answer, the Archbishop admitted that the Works, including a portion

-7-

of the St. Isaac work, were available on his Website.  However, he
denied both the Monastery's claim of ownership to the Works'
copyrights, as well as its claims of copyright infringement.  The
Archbishop also raised several defenses, including that the
Monastery's Works were made for hire for ROCOR; the Works had been
published without copyright notice and were in the public domain;
the Archbishop made fair use of the Works; and the dispute was a
Church matter, best left to a different hierarchy of laws.

        On October 30, 2009, each of the parties filed cross
motions for partial summary judgment.  The Monastery claimed it was
entitled to partial summary judgment because the Archbishop had
breached the parties' prior Settlement Agreement by posting a
portion of the St. Isaac work on his Website, and because the
Archbishop's posting of the work, in and of itself, constituted
copyright infringement.  The Archbishop riposted, challenging the
Monastery's ownership of copyrights in the Pentecostarion, the
Octoechos, the Psalter, and the St. Isaac works, and asserting that
ROCOR was the true owner of the copyrights at issue.  Staying firm
in his position that the Monastery lacked any legal right to
enforce ROCOR's copyrights against the Archbishop, the Archbishop
argued there was no genuine issue of material fact for the court to
resolve.

        The district court found merit to the Monastery's motion.
Holy Transfiguration I, 685 F. Supp. 2d at 229.  It granted partial

summary judgment in favor of the Monastery as to both the breach of contract claim and allegation of copyright infringement of the St. Isaac work on February 18, 2010.  Id. at 223-26.  It in turn denied the Archbishop's motion, noting that he proffered no valid defense to the Settlement Agreement's enforcement, failed to establish a fair use defense, and could not show a valid ownership claim in the Works.  Id. at 223-24, 226-29.  Regarding the latter finding, the district court noted that the Archbishop's contention that ROCOR was the true owner of the contested copyrights failed, as the ROCOR documents on which he relied had not been authenticated; the court also expressed misgivings as to whether the Archbishop had standing to raise an ownership claim on behalf of ROCOR.  Id. at 228-29 & n.17.

On July 23, 2010, the Monastery moved yet again for summary judgment, this time on its surviving infringement claims against the Archbishop.  The Monastery alleged that the Archbishop infringed its copyrights in the remaining six Works, specifically, the Psalter, the Prayer Book, the Horologian, the Pentecostarion, the Dismissal Hymns, and the Octoechos.

The Archbishop opposed the motion.  He asserted that the Monastery was not the owner of the copyrights at issue; the Works were in the public domain, having been published without copyright notice; and the Works lacked originality.  Holy Transfiguration II, 754 F. Supp. 2d at 224-26.  He also asserted a fair use defense, as

well as a defense under the Digital Millennium Copyright Act ("DMCA"), the latter of which limits the liability of internet service providers ("ISP") for copyright infringement by their users.  See id. at 227-29; see also 17 U.S.C. §§ 101, et seq.

The district court again found in favor of the Monastery. Holy Transfiguration II, 754 F. Supp. 2d at 230.  As before, the court rejected the Archbishop's argument that ROCOR was the true owner of the copyrights and found no merit to his fair use defense. Id. at 224, 227-28.  It additionally held that the Archbishop's evidence in support of his public domain argument was "neither clear nor persuasive," id. at 225, and found that "[t]he distribution by the Monastery of the Works to a select group of co-religionists for restricted purposes constitutes a limited publication as a matter of law," which does not extinguish a copyright, id.  The district court further determined that the Archbishop failed to show the Works lacked originality, as he provided no evidence to support his argument or to counter the Monastery's "detailed side-by-side comparisons, illustrating the significant differences between the Monastery's Works and those" the Archbishop referenced as illustrating the lack of originality between the Monastery's translations and other versions.  Id. at 226.  Lastly, the district court deemed the Archbishop's eleventh hour DMCA safe harbor defense, not previously raised in either his Answer or amended Answer, waived and additionally noted the

-10-

questionable application of the DMCA to the Archbishop.  Id. at 228-29.

The Archbishop now appeals the district court's grants of summary judgment.  The Archbishop reasserts for this court many of his prior arguments, including that ROCOR, not the Monastery, owns the copyrights to the contested Works; the Works lack originality; the Works were placed in the public domain without copyright notices; the Archbishop's use of the Works was fair; and the Archbishop is sheltered from liability pursuant to DMCA's safe harbor provision, and if he is not, he holds neither direct nor vicarious liability for the alleged infringement.  The Archbishop additionally scatters the following claims amidst his prior arguments: the Archbishop was not the alleged direct infringer of the Works; the district court improperly determined that the Archbishop lacked standing to challenge the Monastery's ownership of the St. Isaac work; and the Monastery's course of engaging in litigation constituted an improper attempt to create a monopoly. We begin our journey through the intricacies of copyright law applicable to this dispute.

## II.  **Discussion**

We lay the foundation of the applicable standard of review.  Summary judgment is properly granted where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  We examine the district court's grant of summary judgment with fresh and searching eyes, <u>Airframe Sys., Inc.</u> v. <u>L-3 Commc'ns Corp.</u>, 658 F.3d 100, 105 (1st Cir. 2011), keeping their lenses tinged towards "construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." <u>Carmona</u> v. <u>Toledo</u>, 215 F.3d 124, 131 (1st Cir. 2000).

To establish copyright infringement, a plaintiff must concurrently proceed down two roads and "prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" <u>Situation Mgmt. Sys., Inc.</u> v. <u>ASP. Consulting LLC</u>, 560 F.3d 53, 58 (1st Cir. 2009) (quoting <u>Feist Publ'ns, Inc.</u> v. <u>Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991)).  We address each prong's requisites, <u>i.e.</u>, ownership and copying, and set off first upon the ownership path.

**A.  Validity of Ownership**

The Copyright Act provides that copyright protection extends to the individual who actually created the work.  <u>See</u> 17 U.S.C. § 201(a) ("Copyright in a work . . . vests initially in the author or authors of the work.").  To show ownership of a true copyright, "a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities." <u>Lotus Dev. Corp.</u> v. <u>Borland Int'l, Inc.</u>, 49 F.3d 807, 813 (1st Cir. 1995); <u>see also</u> <u>T-Peg, Inc.</u> v. <u>Vt. Timber Works,</u>

Inc., 459 F.3d 97, 108 (1st Cir. 2006) (the claimant bears the burden of proving a valid copyright and its infringement). It is generally accepted that "a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." Lotus, 49 F.3d at 813 (emphasis in original) (quoting Bibbero Sys., Inc. v. Colwell Sys., Inc., 893 F.2d 1104, 1106 (9th Cir. 1990)) (internal quotation mark omitted).

The Monastery has met its prima facie burden of establishing ownership of the copyrights to all the Works, as it holds a certificate of registration issued by the U.S. Copyright Office for each religious text.[8] See 17 U.S.C. § 410(c); Situation Mgmt. Sys., 560 F.3d at 58 (stating "certificates of copyright are prima facie evidence of [a plaintiff's] ownership of valid copyright interests in its works"). Thus, it now falls to the Archbishop to carry the burden of establishing the invalidity of the Monastery's copyrights. See Lotus, 49 F.3d at 813; CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1513 (1st Cir.

---

[8] According to the record, the St. Isaac, Psalter, Prayer Book, and Horologion Works were registered with the U.S. Copyright Office as published works within approximately five years of their first publication dates. See 17 U.S.C. § 410(c); Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007) (stating "a registration within five years of first publication is accompanied by a presumption of validity of the copyright"). As previously noted, the remaining works, the Pentecostarion, Dismissal Hymns, and Octoechos, were registered with the U.S. Copyright Office as unpublished works.

1996).    Although  the  Archbishop  sets  forth  several  arguments
challenging  the  Monastery's  ownership  of  the  copyrights,  he  fails
to  so  bear  his  evidentiary  burden.    We  address  each  of  his
ownership challenges in turn.

### 1.  Transfer Alert: Who Owns the Copyright?

The  cornerstone  of  the  Archbishop's  argument  is  that  the
Monastery's  works  are  in  fact  owned  by  a  third  party,  ROCOR.    The
Archbishop  argues  that  the  Monastery  was  once  a  part  of  ROCOR  and
its  secession  in  1986  had  the  effect  of  transferring  its  copyrights
in  the  Works  to  ROCOR.

There  are  two  ways  under  governing  law  by  which  a
transfer  of  copyright  may  be  effectuated.    The  first  manner  is  by
"an  instrument  of  conveyance,  or  a  note  or  memorandum  of  the
transfer,  [that]  is  in  writing  and  signed  by  the  owner  of  the
rights  conveyed  or  such  owner's  duly  authorized  agent."    17  U.S.C.
§  204(a).    The  Archbishop  does  not  allege,  nor  does  the  record
reveal,  any  writing  or  instrument  by  the  Monastery  showing  such  an
intent  to  transfer  ownership  of  the  Works'  copyrights  to  ROCOR  or
another  entity.    Because  there  is  no  signed  writing  or  instrument
establishing  a  transfer  of  copyright  to  ROCOR,  we  turn  to  the
second means  of  copyright  transfer,  _i.e._,  by  operation  of  law,  with
the  governing  law  in  this  case  being  the  Monastic  Statutes  for
Monasteries  of  ROCOR  (the  "Monastic  States")  and  the  Regulations  of
ROCOR  (the  "Regulations").

-14-

The Archbishop rests the yoke of his persuasive burden on this latter means of copyright transfer.  Specifically, he contends a transfer by operation of law occurred here because, pursuant to the Monastic Statutes (to which all member monasteries must agree on joining ROCOR) the Monastery expressly accepted that if it ever ceased to be a ROCOR monastery, all of its property would transfer to ROCOR.  The Archbishop cites to the following language from the Monastic Statutes for support:

> The articles of incorporation of the monastery, convent or community must make it clear that it will always be in the jurisdiction of the Synod of Bishops of [ROCOR] and that, <u>in case of its closing or liquidation, its possessions will be handed over to the diocese subject to the Synod of Bishops of [ROCOR], or directly to the Synod of Bishops</u>.

(Emphasis added.)

The Archbishop's argument leads us into a desert of case law on the issue of copyright transfers by operation of law.  <u>See</u> <u>Taylor Corp.</u> v. <u>Four Seasons Greetings, LLC</u>, 403 F.3d 958, 963 (8th Cir. 2005) ("[T]he Copyright Act does not define the phrase 'by operation of law,' and sparse case law addresses the transfer of copyright by operation of law.") (internal quotation marks omitted); <u>Valdez</u> v. <u>Laffey Assocs.</u>, No. 07-CV-4566 (BMC)(LB), 2010 WL 1221404, at *6 (E.D.N.Y. Mar. 26, 2010) (noting sparsity of case law on transfer of copyright ownership by operation of law); <u>Brooks</u> v. <u>Bates</u>, 781 F. Supp. 202, 205 (S.D.N.Y. 1991) (same).  Indeed,

-15-

not even the Copyright Act defines what constitutes a transfer by operation of law. See Taylor, 403 F.3d at 963.

The few cases addressing this question generally concern a transfer by operation of state law, with the transfers at issue typically arising from a corporate merger or dissolution, bankruptcy, foreclosure, and the like. See id. at 963-64; Valdez, 2010 WL 1221404, at *6. Such cases also focus on whether the author of the transfer provided express or implied consent to such change of ownership. Taylor, 403 F.3d at 963; Brooks, 781 F. Supp. at 205 (stating "transfers of copyrights by operation of law . . . depend upon circumstances which establish the author's express or implied consent"); see also Time, Inc. v. Kastner, 972 F. Supp. 236, 238 (S.D.N.Y. 1997). Thus, a transfer by operation of law is a voluntary transfer done on the part of the copyright owner to another. See Advance Magazine Publishers, Inc. v. Leach, 466 F. Supp. 2d 628, 636 (D. Md. 2006) ("[T]ransfers by operation of law are expressly limited to voluntary transfers, except in bankruptcy proceedings.").

The Archbishop's argument differs from the few cases that address transfers of copyright ownership by operation of law. To begin with, the underlying law which the Archbishop asks us to interpret and apply -- ROCOR's Monastic Statutes and Regulations -- contrasts with the aforementioned cases in which state law predominantly served as the guiding light.

Generally, the Supreme Court has cautioned that where parties "seek resolution of a church property dispute in the civil courts[,] there is substantial danger that the State will become entangled in essentially religious controversies." Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich, 426 U.S. 696, 709 (1976); see also Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church et al., 393 U.S. 440, 449 (1969) ("If civil courts undertake to resolve [church property litigation disputes triggering religious doctrine and practice] . . . the hazards are ever present . . . of implicating secular interests in matters of purely ecclesiastical concern."). Against this concern must be weighed the "obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." Jones v. Wolf, 443 U.S. 595, 602 (1979). The Supreme Court often has echoed that civil courts may resolve church property disputes, "so long as [such resolution] involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." Id. (quoting Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 368 (1970)). Where such resolution is possible, the Supreme Court has advocated a "neutral principles of law" approach, "developed for use in all property disputes." Presbyterian Church,

393 U.S. at 449; see also Jones, 443 U.S. at 603; Md. & Va. Churches, 396 U.S. at 368-70 (1970) (Brennan, J., concurring).

A review of the record confirms that we may apply the Monastic Statutes' plain terms without treading upon religious doctrine, church governance, and ecclesiastical laws -- territory that the Supreme Court has made clear lies beyond our civil court jurisdiction. The specific section of the Monastic Statutes that the Archbishop asks us to apply provides in part:

> The articles of incorporation of the monastery [here, appellee] . . . must make it clear that it will always be [under ROCOR] jurisdiction . . . and that, in case of its closing or liquidation, its possessions will be handed over to the diocese . . . ."

Neutrally applying this plain language, we conclude that the Archbishop's position as to ROCOR's ownership holds little water.

We first examine the Monastic Statute language to which the Archbishop expressly directs us. We split the statutory language in two and turn first to its requirement that a monastery's articles of incorporation clearly state ROCOR jurisdiction.

### a. Monastic Statute Requirement that the Monastery's Articles of Incorporation Expressly Affirm ROCOR Jurisdiction

An examination of the Monastery's various articles of incorporation and by-laws[9] does not show language to the effect

_____

[9]  Most of the copies of the Monastery's by-laws and articles of incorporation in the record do not contain a date, making it

that, from the date of its spiritual affiliation onward, the Monastery would permanently be under ROCOR jurisdiction or that it agreed to have its property continually fall under ROCOR's dominion and control.  In fact, a review of all such articles and by-laws reveals no reference whatsoever to ROCOR or to the entities' ecclesiastical affiliation.  The same holds true for a review of the certificates of registration (dating from 1986, the year the Monastery ceased its spiritual affiliation with ROCOR, on through 1997) for each of the respective Works.  Each certificate expressly lists under Name of Author, "Holy Transfiguration Monastery," with no mention of or reference to ROCOR.  The absence of a clear or implicit agreement on the Monastery's part (whether in its articles of incorporation, by-laws, the Works' certificates of registration, or otherwise) to be permanently bound by ROCOR statutory law or to relinquish title in its property to ROCOR does not constitute the type of "express or implied consent to transfer" copyright ownership that courts have held sufficient to support the finding of a transfer by operation of law.  _Valdez_, 2010 WL 1221404, at *6; _see also_ _Taylor_, 403 F.3d at 963.

> **b.  Monastic Statute Requirement that Upon Closing or Liquidation, the Monastery's Possessions Cede to ROCOR**

---

unclear as to how recent or old the various versions are and where they fall in relation to the period of the Monastery's spiritual affiliation with ROCOR.

The Archbishop argues that when the Monastery ceased commemorating the bishops of ROCOR, this act constituted a "closing or liquidation" under the statutes, and thus, all of the Monastery's ownership claims and property interests were transferred to ROCOR. The Archbishop likens the Monastery's termination of ecclesiastical affiliation to a corporate dissolution, merger, bankruptcy, mortgage foreclosure, or the like, the latter of which courts have held may indicate a transfer of copyright by operation of law. Cf. Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718, 719, 721 (9th Cir. 1984) (finding transfer of copyright by operation of law where corporation merged into another, leaving one surviving company that then transferred copyright to subsidiary); U.S. Home Corp. v. R.A. Kot Homes, Inc., 563 F. Supp. 2d 971, 976 (D. Minn. 2008) (similar); Fantasy, Inc. v. Fogerty, 664 F. Supp. 1345, 1356 (N.D. Cal. 1987) (concluding copyright transfer occurred where assets from dissolving corporation were transferred to sole shareholder).

In contrast to these cases -- and even more telling, in contrast to the specific language of the statute -- the Monastery here continued to exist after it terminated its commemoration of the ROCOR bishops; it did not close, liquidate, dissolve, merge into another religious institution, or otherwise discontinue its existence. Instead, it continued to operate as it had prior to its spiritual affiliation with ROCOR, as an independent monastery. The

express terms of the Monastic Statutes are clear: "in case of [a monastery's] <u>closing or liquidation, its possessions will be handed over to the diocese</u>" (emphasis added). Because the Monastery never closed, liquidated, or otherwise ceased its existence, no such "hand[ing] over" of its possessions to ROCOR could have taken place, unless it authorized otherwise. And as we have explained, we find no such authorization or agreement in the record.

### c. Additional Relevant Language in the Monastic Statutes

Lastly, immediately preceding the statutory language referenced and discussed above, the statute states that "[t]he possessions of a monastery, convent or community <u>are its property and registered in its name</u>, which is why each monastery, convent and community <u>must take steps to become incorporated as an entity</u>" (emphasis added). Reading this language, it seems clear that a monastery, on joining ROCOR, remains the owner of its possessions unless and until it becomes incorporated as an entity of ROCOR. Stated differently, if a monastery never so incorporates itself as dictated by the Monastic Statutes, its possessions will remain under the monastery's domain.

Notably, a review of the record reveals no such incorporation on the part of the Monastery. The most the evidence shows is that the Monastery was founded in 1960 independently of ROCOR -- <u>i.e.</u>, not at the order or request of ROCOR -- and incorporated in Massachusetts as a non-profit corporation on

-21-

January 12, 1961, before its spiritual affiliation with ROCOR.  In
1965, the Monastery commenced its spiritual affiliation with ROCOR,
but the only act it seems to have taken reflecting such an
affiliation (the Archbishop pointing us to no contradictory
evidence) is acceptance of an antimension,[10] which the Monastery
returned when it discontinued its affiliation with ROCOR.  We are
far from being authorities as to the weight the giving of an
antimension to another religious body might hold under church law
and offer no ruminations on the matter.  But a review of the
evidence reveals no other act or document confirming that the
Monastery reincorporated itself under ROCOR law.  The giving of a
consecrated cloth does not, under civil law, ring of the type of
alteration in corporate structure that a transfer in authority over
the Monastery's possessions may properly be deemed to have
occurred.

        In sum, with no evidence in the record showing a transfer
of copyright ownership by operation of law, we hold that the
Monastery, and not ROCOR, holds title to the copyrights at issue in
this dispute.

### 2.  No Notice?: No Problem

        The Archbishop casts his next lot and contends that
certain of the Monastery's Works became a part of the public domain

---

[10]   The Monastery defines an antimension as "a cloth signed by a
bishop that is kept on an altar table to indicate that the bishop
has consecrated the cloth to be served on as an altar."

because they were published without copyright notice prior to 1989. There were three paths under the common law pursuant to which a work could be exposed to the public or enter the public domain: (1) exhibition or performance of the work; (2) limited publication; and (3) general publication.  Burke v. Nat'l Broad. Co., 598 F.2d 688, 691 (1st Cir. 1979).  Only one such path, however, would extinguish the creator's copyright in a work; the road to such loss was general publication.  Id.; see Brown, 498 F.3d at 23.  For the most part, the Copyright Act of 1976 abolished the common law of copyright, but even under the 1976 Act, general publication without notice could cause a work to enter the public domain if the copyright owner failed to register the work within five years of the date of first publication.  Brown, 498 F.3d at 23; see also Charles Garnier, Paris v. Andin Int'l, Inc., 36 F.3d 1214, 1224 (1st Cir. 1994).  The Berne Convention Implementation Act of 1988 transformed this legal landscape, and notice is no longer mandatory for works published after that Act's March 1, 1989 effective date. See Pub. L. No. 100-568, sec. 7, § 401(a), 102 Stat. 2583, 2857 (codified at 17 U.S.C. § 401(a)); Garnier, 36 F.3d at 1219.  But the Berne Act does not apply to works published before 1989, so a work published without proper notice prior to 1989 would still become part of the public domain if the copyright owner failed to cure the defective notice in time.  Id. at 1224-26.

On appeal, the Archbishop does not clarify whether his position is that all of the disputed Works passed into the public domain or that only some did.  Moreover, he does not clarify which of the three copyright regimes -- the 1909 Act, the 1976 Act, or the Berne Act -- apply to which works.  Regardless, under all three regimes, lack of proper notice definitely would <u>not</u> render the Works part of the public domain if there had been no "general publication" of the Works.  Because the Archbishop has not established that "general publication" without notice has ever occurred for <u>any</u> of the disputed Works, we may reject his public-domain claim without having to untangle the web of statutory regimes.

A general publication is "when a work is made available to members of the public at large without regard to who they are or what they propose to do with it." <u>Burke</u>, 598 F.2d at 691.  That is, a general publication consists of such a level of circulation within the public sphere that a work may be deemed "dedicated to the public and rendered common property." <u>Id.</u>  Conversely, a limited publication "occurs when tangible copies of the work are distributed, but to a limited class of persons and for a limited purpose." <u>Id.</u> at 692.

The Archbishop's brief arguments on appeal do little to show such a dispersal of the Works that they could be deemed to have entered the public domain.  At most, the Archbishop contends

-24-

that the Monastery "allowed the disputed Works to pass into the public domain and provided the court with evidence of the same," and therefore, the district court erred in granting summary judgment against him.  The evidence to which the Archbishop directs our attention, however, does not show the wide distribution typically associated with a general publication; instead, it simply shows the Archbishop's unsupported assertions that translations of certain Works were disseminated into the public, with a vague reference to the fact that certain Works were sent to people for use in their churches.

The Monastery does not contest this latter proposition. In fact, it concedes it authorized St. Nectarios Press to distribute booklets –– composed of in-progress translations of certain of the Works at issue on appeal expressly attributing copyright ownership to the Monastery –– to certain parishes for their use and editorial critiques.  Any such promulgation though, according to the Monastery, was restricted and should be deemed a limited publication not requiring such notice.

We agree.  Delivery of these booklets to selected religious congregations for the circumscribed purpose of literary feedback rings more of a limited publication (distribution "to a limited class of persons and for a limited purpose") – than of a general publication (distribution to "the public at large without regard to who they are or what they propose to do with [the

-25-

work]"). <u>Burke</u>, 598 F.2d at 691; <u>see also</u> <u>Warner Bros. Entm't,</u>
<u>Inc.</u> v. <u>X One X Prods.</u>, 644 F.3d 584, 593 (8th Cir. 2011)
(distinguishing between a general publication and a limited
publication).

   The Archbishop directs us to nothing more than his own
unsubstantiated contentions that certain Works were "passed around"
in the public sphere for decades without notice. Even accepting
this statement as true, we face the reality that not just any
publication of the Works without notice will insert them into the
public realm; instead, any such injection must be authorized by the
copyright holder, <u>i.e.</u>, the one effectively relinquishing its
copyright. <u>Harris Custom Builders, Inc.</u> v. <u>Hoffmeyer</u>, 92 F.3d 517,
521 (7th Cir. 1996) ("A finding of forfeiture of copyright
protection cannot be based on an unauthorized distribution of the
work without notice because the notice requirement applies only to
copies of works published 'by authority of the copyright owner,'
pursuant to § 401(a)."); <u>see also</u> Copyright Act of 1976, Pub. L.
No. 94-553, § 401(a), 90 Stat. 2541, 2577 (amended 1988) ("Whenever
a work protected under this title is published in the United States
or elsewhere <u>by authority of the copyright owner</u>, a notice of
copyright as provided by this section shall be placed on all
publicly distributed copies . . . ." (emphasis added)); <u>Cipes</u> v.
<u>Mikasa, Inc.</u>, 346 F. Supp. 2d 371, 374-75 (D. Mass. 2004); <u>Zito</u> v.
<u>Steeplechase Films, Inc.</u>, 267 F. Supp. 2d 1022, 1026 (N.D. Cal.

2003) (citing 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 4:04 at 4-22 to 4-23 (2002)) (hereinafter 1 Nimmer). Here, the only copyright holder that could have authorized such publication without notice is the Monastery.  We find no evidence of such authorization in the record, nor does the Archbishop direct us to any material showing to the contrary.[11]

Because any authorized publication of the Works that took place was only to a select group (specific religious congregations) for a particular purpose (editorial feedback), only a limited publication took place.  Thus, the Monastery did not lose its copyright ownership via a general publication.  If any copies of the Works were circulated outside the targeted circle of parishes, it was unauthorized and did not affect the Monastery's ownership.

**3.  Originality of the Works**

The Archbishop next asserts that the Works here were not original, and therefore, not copyrightable.[12]  See Johnson v.

---

[11] The Monastery points to the Archbishop's undeveloped references to booklets lacking a copyright notice during the course of this dispute, but which he contended supported the conclusion of a publication without notice.  The Monastery counters the Archbishop's argument with a sworn affidavit from the publisher of St. Nectarios Press stating that the "versions" the Archbishop references are inaccurate copies of those actually distributed to the public.  Such evidence falls far short of supporting the conclusion that the Monastery authorized publication without notice of the underlying Works and relinquished its copyright.

[12] The Archbishop brings additional challenges to the Works' originality.  Because these arguments better fall into the analytical category of whether copying of the Works occurred, we turn to these points infra.

Gordon, 409 F.3d 12, 17 (1st Cir. 2005) (to establish ownership of
a valid copyright, a "plaintiff must show that the work, viewed as
a whole, is original"); Lotus, 49 F.3d at 813 (showing ownership of
a true copyright requires that a plaintiff "prove that the work as
a whole is original").  Principally, the Archbishop alleges that
the underlying Works are derivative of other works, that is, they
are merely a commixture of various ancient religious works that had
previously been translated into English, with the Monastery making
only "minor edits," "insignificant changes," or "negligible
additions or subtractions" to the translations it relied upon.

       To bolster this argument, the Archbishop proffers
affidavits from a colleague, Bishop John.[13]  The Bishop's sworn
statements compare various texts to the Works and claim that the
former texts clearly demonstrate the duplicative nature of the
latter.  Thus, so the Archbishop postulates, because the
Monastery's translations are nothing more than a nearly identical,
cobbling together of already translated religious texts, the
Monastery cannot claim copyrights to the contested Works.

       The Monastery retorts that its translations are both
unique and entitled to copyright protection, citing to the
Copyright Act's express acknowledgment of the copyrightability of

_____

[13] According to his sworn affidavit, Bishop John is "a hierarch in
the Genuine Orthodox Church of America," who "was ordained to the
holy priesthood by Metropolitan Valentine, First Hierarch of the
Russian Orthodox Autonomous Church" and "[f]or more than 20
years . . . ha[s] been a student of Orthodox Christianity."

derivative works.  17 U.S.C. §§ 101, 103.  Moreover, it notes that courts repeatedly have recognized the validity of copyrights to works that the Monastery claims are comparative to those at issue here.  See, e.g., Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 97 (2d Cir. 2002) (citations omitted) (recognizing copyrightability of translations of religious texts).

The Copyright Act provides that "[c]opyright protection subsists . . . in original works of authorship."  17 U.S.C. 102(a).  Assessing whether a work is original is a matter of law.  Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 34 n.5 (1st Cir. 2001).  Courts assessing the applicability of the Copyright Act's protections to allegedly unique works frequently note that the "originality" bar is set quite low.  See, e.g., Feist, 499 U.S. at 345 ("[T]he requisite level of creativity [required to show originality] is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark . . . .");  Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 430 (4th Cir. 2010) ("Establishing originality implicates only a light burden.").

The Copyright Act makes clear that translations may be original and copyrightable, despite being derivative of another product.  See 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works, such as a translation . . . .");  id. § 103 ("The subject matter of copyright

-29-

as specified by section 102 <u>includes compilations and derivative</u> <u>works</u> . . . .") (emphasis added).  The originality standard for such derivative works is, as set forth above, far from a high one. Specifically, courts have held there is a "'minimal,'" "'low threshold,'" <u>Original Appalachian Artworks, Inc.</u> v. <u>Toy Loft, Inc.</u>, 684 F.2d 821, 824 (11th Cir. 1982) (quoting <u>Durham Indus., Inc.</u> v. <u>Tomy Corp.</u>, 630 F.2d 905, 910 (2d Cir. 1980)), that is "modest at best," <u>Thomas Wilson & Co.</u> v. <u>Irving J. Dorfman Co.</u>, 433 F.2d 409, 411 (2d Cir. 1970), for establishing the originality of a compilation or derivative work.  With this framework in mind, we have two responses to the Archbishop's argument that the Monastery's Works cannot be original or copyrightable because they are composed of an amalgamation of different English translations of religious texts.

     First, the law does not support the Archbishop's argument that such a derivative work or compilation cannot be copyrightable. Courts consistently have held that such works may be copyrighted provided that "there is originality in [the works'] arrangement or selection." <u>M. Kramer Mfg. Co.</u> v. <u>Andrews</u>, 783 F.2d 421, 438 (4th Cir. 1986); <u>see also</u> <u>Apple Barrel Prods., Inc.</u> v. <u>Beard</u>, 730 F.2d 384, 388 (5th Cir. 1984) ("The mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity

-30-

is both original and copyrightable." (citing 1 Nimmer §§ 3.02, 3.03)).  Indeed, in a case that is at least comparable to the Archbishop's framing of the Monastery's Works, the Seventh Circuit held that flashcards containing standard, publicly-known mathematical equations and their solutions were protected under copyright law because "the arrangement, the plan and the manner in which [the equations and answers] were put together by the author, does constitute originality." Gelles-Widmer Co. v. Milton Bradley Co., 313 F.2d 143, 147 (7th Cir. 1963); see also M. Kramer Mfg. Co., 783 F.2d at 439 (citing examples of copyrightable compilations and noting that "[i]n each case the copyright depended on the fact that the compiler made a contribution - a new arrangement or presentation of facts - and not on the amount of time the work consumed").[14]  Thus, even if the Monastery's translations of the religious texts may be deemed nothing more than a blend of various pre-existing English versions, this, in and of itself, does not make the Monastery's gathering of such texts automatically unoriginal.

Second, the record does not support the Archbishop's argument.  The only evidence the Archbishop offers to show a lack of originality in the Works are Bishop John's affidavits, stating the Works contain "insignificant changes" or "negligible additions or subtractions" to other sources he has examined, assessed, and

---

[14]  Even Bishop John concedes that the Monastery "has expended some effort in their copyrighted work."

compared to the Works.[15]  However, the Monastery examined the same
sources the Bishop attested to having compared with the Works.  The
Monastery created a detailed comparison in which it placed its
translations along-side those materials cited by Bishop John, as
well as the Archbishop's translations, effectively demonstrating
notable differences between the Bishop's referenced texts and the
Monastery's (and nearly identical similarities between the
Archbishop's translations and the Monastery's).  Although the
comparison shows certain similarities between the Monastery's Works
and those referenced by the Bishop, the differences in the same
reflect a creativity in the Monastery's word usage, structure, and
overall translation.  Cf. Feist, 499 U.S. at 345 (stating
"[o]riginality does not signify novelty; a work may be original
even though it closely resembles other works so long as the
similarity is fortuitous, not the result of copying").

It is well-accepted that "[o]riginal, as the term is used
in copyright, means only that the work was independently created by
the author (as opposed to copied from other works), and that it
possesses at least some minimal degree of creativity." Id. at 345
(citing 1 Nimmer §§ 2.01[A],[B]).  The evidence in the record
satisfies us that the Monastery has cleared the "extremely low"

---

[15] Bishop John's affidavits do not go into great detail as to the
methodology he utilized to analyze the translations of the
Archbishop's and Monastery's works, its comparison of the latter to
other translations, or the process behind the selection of these
other texts.

creativity bar.  Id.  We therefore affirm the district court's determination that the Monastery's Works were original and thus copyrightable.

Having concluded our traversal of the ownership prong of a copyright infringement claim, we proceed to the second prong of our analysis, i.e., whether copying of the Works occurred. Situation Mgmt. Sys., 560 F.3d at 58.

**B.  Copying**

A party seeking to establish copying of a work's original elements must make a dichotomized showing.  The copyright holder first must factually establish, whether via direct or circumstantial evidence, that the alleged infringer copied the protected work.  Yankee Candle, 259 F.3d at 33.  Secondly, the holder must show that the copying was so flagrantly extreme that the allegedly infringing and copyrighted works were, for all intents and purposes, "'substantially similar.'"  Id. (quoting Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000)); see also Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).  It is accepted that "[p]roof of '[b]oth species of copying [is] essential for the plaintiff to prevail.'" Airframe Sys., 658 F.3d at 106 (quoting 4 Nimmer § 13.01[B], at 13-10 (2011)) (hereinafter 4 Nimmer).  Thus, if a plaintiff cannot show that factual copying occurred but can show such copying rendered the works substantially similar, his infringement claim will fail; likewise, if a plaintiff satisfies the factual copying

prong, but cannot show that such copying produced a substantially similar result, denial of his infringement claim will be warranted. Id. (citing Creations Unltd., Inc. v. McCain, 112 F.3d 814, 816 (5th Cir. 1997); 4 Nimmer § 13.01[B], at 13-10)).  We commence our binary analysis.

### 1.  Actual Copying

Proving actual copying by direct evidence is generally a difficult task, as it is the rare case in which the specific act of copying was witnessed, observed, or recorded.  See Johnson, 409 F.3d at 18 ("Plagiarists rarely work in the open and direct proof of actual copying is seldom available.").  For this reason, parties typically rely on circumstantial evidence to prove that the defendant had access to the protected work and that the resulting product, when fairly compared to the original, was sufficiently similar that actual copying may properly be inferred.  Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 1988) (quoting Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 614 (7th Cir. 1982)).

We have termed the degree of similarity for purposes of indirectly adducing evidence of copying, "probative similarity." Johnson, 409 F.3d at 18; see also Lotus, 49 F.3d at 813 (describing "probative similarity" as when "the offending and copyrighted works are so similar that the court may infer that there was factual copying").  Although similar, this degree of similarity is not to be confused with the degree that a plaintiff must meet after he has

established copying -- when he "must show that the 'alleged infringing work is "substantially similar" to the protected expression in the copywritten work.'" Yankee Candle, 259 F.3d at 33 n.4 (quoting Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998)); see also 4 Nimmer § 13.03[A], at 13-33 ("Although the term 'substantial similarity' often is invoked as a proxy to prove copying as a factual proposition, we have seen that the term 'probative similarity' is to be preferred in that context and the question of 'substantial similarity' arises analytically only thereafter.").

Here, we have the relatively unique case of both direct and indirect evidence of copying. See Segrets, 207 F.3d at 61 (noting the "somewhat unusual[]" instance in which there is direct evidence of copying); see also Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992). Specifically, the Archbishop conceded in both his Answer and in deposition testimony that identical or near-identical reproductions of the Monastery's Works had been reproduced and "were available on his Website." Thus, there is no genuine issue of material fact as to whether the Archbishop reproduced and displayed exact or near-exact copies of the Monastery's Works.

But lest there be any doubts as to the Archbishop's concessions, there is ample circumstantial evidence in the record from which we may infer actual copying. See Coquico, 562 F.3d at 67. As previously stated, the Archbishop admitted to accessing the Monastery's Works and does not dispute that he has copies of the

Works at issue in this case.  TMTV, Corp. v. Mass Prods., Inc., 645
F.3d 464, 470 (1st Cir. 2011) (actual copying established where
evidence showed, among other factors, that defendant-appellant had
access to protected work).  Moreover, a comparison of the Works
with those reproduced on the Archbishop's Website more than
satisfies the "probative similarity" standard, as the texts are
nearly indistinguishable from one another, with only minor textual
differences where such variation exists.[16]  See Lotus, 49 F.3d at
813; see also Coquico, 562 F.3d at 67 ("What we have called
'probative similarity' can, when accompanied by proof of access,
serve as a harbinger of actual copying . . . .").  This evidence
(access to the protected works coupled with probative similarity)
sufficiently supports the Monastery's claim as to actual copying.
And so, with no doubt as to actual copying, we continue onward in
our similarity study.

### 2.  Substantial Similarity

    We traditionally have assessed whether substantial
similarity lies between copyrightable expressions by applying the
"ordinary observer" test.  Under this rubric, two works will be
deemed substantially similar if a reasonable ordinary observer, on
examining both, "would be disposed to overlook [the disparities

---

[16]  Both below and on appeal, the Monastery has provided detailed
comparisons of the parties' respective versions of the religious
texts.  This extensive analysis shows verbatim or near word-for-
word similarities between the Works and the Archbishop's texts.

between the works], and regard their aesthetic appeal as the same." Concrete Machinery, 843 F.2d at 607 (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960)); see also Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966) (describing ordinary observer test as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work"). The district court here applied the ordinary observer test in its two orders. See Holy Transfiguration II, 754 F. Supp. 2d at 226-27; Holy Transfiguration I, 685 F. Supp. 2d at 226. It concluded in each that an average lay observer reviewing the Monastery's Works and the Archbishop's versions of such would be inclined to overlook any differences between the texts and consider them to be, for all intents and purposes, the same. See Holy Transfiguration II, 754 F. Supp. 2d at 226-27; Holy Transfiguration I, 685 F. Supp. 2d at 226.

The Archbishop now attacks the district court's utilization of the traditional ordinary observer test. In essence, he argues that the court should have applied a more differentiating dissection analysis and isolated the original, or protected, components of the Works from the remaining elements. Had it done so, so the argument goes, it would have recognized that the Works consist of non-copyrightable elements, preventing a finding of actionable copying.

In general, the Archbishop's overall argument rests on solid ground: a court's substantial similarity analysis must center

on a work's original elements.  *See* Coquico, 562 F.3d at 68; *see generally* 17 U.S.C. § 103(b).  Such examination may require more than the simple determination that "an overall impression of similarity" between the contested works as a whole exists. Johnson, 409 F.3d at 19; *see also* Yankee Candle, 259 F.3d at 33 ("The determination of whether an allegedly infringing [work] is substantially similar to [another work] is not so simple a task . . . as a strict visual comparison of the two items."). Typically, to properly conduct this examination, a court must "dissect[] the copyrighted work and separat[e] its original expressive elements from its unprotected content," honing in solely on the unique (and thus protected) components.  Coquico, 562 F.3d at 68; *see also* Johnson, 409 F.3d at 19 (noting court's responsibility to examine "juxtaposed works as a whole" and decipher "'what aspects of the plaintiff's work are protectible [sic] under copyright laws and whether whatever copying took place appropriated those [protected] elements.'" (quoting Matthews, 157 F.3d at 27)) (alteration in original).  This distillation process is necessary so as to ensure the purity of the originality that we are analyzing.  *See* Feist, 499 U.S. at 348 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected.").  Indeed, should a work's appearance of similarity rest upon elements that are not themselves copyrightable, this will drive a problematic stake through an infringement claim.  *See* TMTV, 645 F.3d at 470 ("No infringement

claim lies if the similarity between two works rests necessarily on non-copyrightable aspects of the original . . . ."); Matthews, 157 F.3d at 27.  Our review as to the carved out originality components of a work is de novo.  Coquico, 562 F.3d at 68 ("Appellate review of the originality vel non of the constituent elements of the copyrighted work is de novo."); see also CMM Cable, 97 F.3d at 1517 ("[C]ourts  clearly  may  determine  the  question of . . . copyrightability so long as they do so in accord with the familiar rules governing summary judgment.").

### a.  Short Phrases

The Archbishop attempts to guide us in the appropriate textual incisions he asserts are warranted.  Specifically, he argues the district court erred in its comparison of the Works to the Archbishop's versions; instead of comparing the respective texts as a whole, the court should have performed the requisite triage pursuant to which it would have discovered that the only elements unique to the Works are, at most, "short phrases, single words,  and  expressions  that  are  obvious."  Because copyright protection cannot extend to such elements, the Archbishop claims it likewise cannot extend to the Works.

We  are  not  convinced  that  the  district  court's application of the ordinary observer test here was inappropriate or that a deeper dissection analysis was warranted.  An examination of each of the district court's orders shows that it considered the respective  works  as  a  whole  while  also  narrowing  in  on  their

particular textual variations (where present),[17] ultimately concluding that "the slight textual differences between the two [texts] are insufficient as a matter of law to render the Archbishop's versions not 'substantially similar' to the infringed portions of the Works copyrighted by the Monastery." Holy Transfiguration Monastery II, 754 F. Supp. 2d at 227; see Holy Transfiguration Monastery I, 685 F. Supp. 2d at 226 (noting the "minuscule differences" between the respective parties' versions of the St. Isaac texts "are insufficient as a matter of law to render the website copy . . . not 'substantially similar' to the version copyrighted in the St. Isaac Work").

Moreover, while both this court and the Copyright Office have generally recognized that short phrases may not be subject to copyrightability, see 37 C.F.R. § 202.1(a) (listing as "works not

---

[17] For instance, the district court noted the following specific differences in the works' translations:

> [R]egarding Psalm 3 of the Psalter Work, the Monastery's phrasing "without cause" has been replaced by "vainly" in the Archbishop's corresponding website document. In addition, there are slight textual differences between portions of the Monastery's Prayer Book Work and the corresponding text posted on the Archbishop's website (e.g., the Archbishop changes "Friend of Man" to "Lover of man" throughout the document).

Holy Transfiguration Monastery II, 754 F. Supp. 2d at 227 n.5

> The Archbishop's copying [of the St. Isaac Work] omitted footnotes and a total of three words, added a question mark, and changed the spelling of six words. It also added six quotation marks, and changed some headings.

Holy Transfiguration Monastery I, 685 F. Supp. 2d at 226 n.13.

subject to copyright" "[w]ords and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; [and] mere listing of ingredients or contents"); see also CMM Cable, 97 F.3d at 1519, applicability of this law very much turns on the specific short phrases at issue, as not all short phrases will automatically be deemed uncopyrightable, see CMM Cable, 97 F.3d at 1520 n.20 (acknowledging that "not all short, simple, declarative sentences fall within the meaning of [37] C.F.R. § 201.1(a)"); Syrus v. Bennett, 455 F. App'x 806, 809 (10th Cir. 2011) ("[A] short phrase may command copyright protection if it exhibits sufficient creativity.") (quoting 1 Nimmer § 2.01[B], at 2-17).  As so often is the case, context matters.[18]

        Here, we have no context to analyze.  Aside from brief-yet-undeveloped citations to relevant case law, the Archbishop fails to identify -- whether below or on appeal -- the alleged

---

[18] Compare Applied Innovations, Inc. v. Regents of the U. of Minn., 876 F.2d 626, 635 (8th Cir. 1989) (holding test statements in copyrighted psychological test sufficiently original to be copyrightable as derivative works); Salinger v. Random House, Inc., 811 F.2d 90, 98 (2d Cir. 1987) (noting although ordinary phrases might not be copyrightable, their "use in a sequence of expressive words does not cause the entire passage to lose protection") with ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402 F.3d 700, 706-10 (6th Cir. 2005) (denying copyright protection to part numbers and transmission parts catalog partly because did not show originality required for copyright protection); Southco, Inc. v. Kanebridge Corp., 390 F.3d 276, 286-87 (3d Cir. 2004) (similar); Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 541-43 (6th Cir. 2004) (rejecting copyrightability of toner loading software program and lock-out code because lacked creativity warranting protection).

short phrases which he contends are not copyrightable. Judges are not mindreaders. To properly assess whether the alleged short phrases are subject to protection, we must know what they are. We have often admonished counsel that "it is not the job of this court to do [appellant's] work for him." United States v. Rodríguez, 675 F.3d 48, 59 (1st Cir. 2012); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In contrast to the cases to which appellant cites, which specifically reference the contested short phrases and thoroughly explain why those are or are not subject to copyright protection, the Archbishop has left us to sift through the parties' respective translations and weed out the alleged short phrases that he contends represent the only original (yet not copyrightable) portions of the Works.

Left alone with a plethora of ancient religious texts and phrases, we cannot properly know those phrases the Archbishop wants us to touch versus those we should not. And we need not so decipher on our own. We thus deem the Archbishop's dissection argument as to the copyrightability of the Works waived. Rodríguez, 675 F.3d at 59; Zannino, 895 F.2d at 17.

### b. Merger Doctrine

The Archbishop raises an additional challenge to the copyrightability of the Works and the district court's determination as to his liability for infringement. He argues that because there are only a limited number of ways by which the Works at issue could have been translated, the Works consist of non-

-42-

copyrightable ideas that have merged with expression, preventing the final product from being copyrightable. Best described as a reliance on the merger doctrine, we unfurl the Archbishop's argument.

It is accepted that "[t]he merger doctrine denies copyright protection when creativity merges with reality; that is, when there is only one way to express a particular idea." Coquico, 562 F.3d at 68; see also Merkos, 312 F.3d at 99. Thus, the merger doctrine will, where applicable, prevent copyright protection to a work; this is so because

> [w]hen there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression. [Even] [w]hen the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea.

Yankee Candle, 259 F.3d at 36 (quoting Concrete Machinery, 843 F.2d at 606) (second and third alterations in original). Conversely, if a work consists of a more specialized expression, "it moves further away from [merger of idea and expression] and receives broader copyright protection." Concrete Machinery, 843 F.2d at 607 (quoting Atari, 672 F.2d at 617) (alteration in original) (internal quotation mark omitted).

The Archbishop claims the Monastery's Works fall on the former end of this spectrum because there were only a limited number of manners by which the Works (originally in ancient Greek) could be translated into English. Thus (so we presume the argument

-43-

goes, as the Archbishop does not clearly articulate as such), the expression of these once ancient Greek texts effectively merged with the (unstated) idea because the resulting translations were essentially the only viable interpretations that could result from an English-rendition of the ancient Greek works.

Yet again, the Archbishop leaves us in the dark as to what idea(s) he claims has, for all intents and purposes, merged with expression such that copyrightability may not attach.  On a more basic note, though, lies the essence of this dispute: we are dealing here with translations, and "the art of translation involves choices among many possible means of expressing ideas," making the merger doctrine "inapposite to the context presented here."  Merkos, 312 F.3d at 99; see also id. at 97 ("The translation process requires exercise of careful literary and scholarly judgment.").  We thus reject the Archbishop's merger argument and affirm the district court's well-supported finding as to the respective texts' substantial similarity.

### c.  Comparing the Texts

The district court carefully compared each of the allegedly infringing texts with the Monastery's Works.  On reviewing detailed, side-by-side comparisons of the texts, and specifically noting those sections in which slight variations in the texts were present, it found that no reasonable juror could conclude the Archbishop's versions were not "substantially similar"

to the Works.  See Holy Transfiguration II, 754 F. Supp. 2d at 227 & n.4, n.5; Holy Transfiguration I, 685 F. Supp. 2d at 226 & n.13.

Our independent review of the Works and the Archbishop's translations confirms the district court's ruling.  We agree that the Archbishop's translations are, as a matter of law, substantially similar to the Monastery's Works where his versions differed -- if at all -- only in minor textual variations that would likely cause the ordinary observer to overlook the subtle discrepancies and deem the texts essentially indistinguishable.  See Johnson, 409 F.3d at 18; Matthews, 157 F.3d at 28 (substantial similarity requires "the disregard of minor differences in favor of major similarity").

The Monastery having established both elements of an infringement claim -- i.e., actual copying and actionable copying -- we echo the district court's determination that the Archbishop copied the Works.  We thus affirm the district court's grant of summary judgment to the Monastery as to copyright infringement of the Works.  See Johnson, 409 F.3d at 18; Yankee Candle, 259 F.3d at 37 ("Although summary judgment is often inappropriate on the question of substantial similarity, where reasonable minds cannot differ, summary judgment is appropriate.") (internal citations omitted).

**C. Defenses**

The Archbishop next argues that even if we determine copyright infringement occurred, he should not be held liable for such transgressions.    The Archbishop brings four principal defenses: (1) the copyright claim was for <u>direct</u> infringement, and because the Archbishop was not the specific individual responsible for uploading the translations at issue, he may not be held liable for infringement; (2) the Archbishop is immune from liability under the 1998 Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 101, <u>et seq</u>. or other applicable law; (3) the Archbishop's reproductions of the Works constituted fair use; and (4) the Monastery misused its copyright, thereby preventing it from litigating a copyright infringement claim.    We address each <u>seriatim</u>.

### 1.  Direct Infringement Defense

The Monastery contends the Archbishop violated its exclusive right to display the Works.  It specifically directs us to the Archbishop's statement in his Answer, conceding that copies of the Works "were available on his website."  The Archbishop counters that he may not be held liable for direct copyright infringement because he "is not the person who posted the disputed Works on the website."  Relying on <u>Sony Corp. of Am.</u> v. <u>Universal City Studios, Inc.</u>, he argues that only the one who "trespasses into [the copyright holder's] exclusive domain" constitutes a direct infringer of a copyright; because he himself did not

-46-

volitionally copy or post the Works to the Website, liability may not attach to him.  Sony, 464 U.S. 417, 433 (1984).  We disagree with the Archbishop's position.

        As set forth above, the Monastery is the owner of the copyrights at issue.  See supra at Part II.A.  By virtue of its ownership, it holds certain exclusive rights, including the right to perform or authorize reproduction of the Works, to prepare derivatives of the Works, to distribute copies to the public, or to publicly display the Works.  See 17 U.S.C. § 106; see also Cartoon Network LLP v. CSC Holdings, Inc., 536 F.3d 121, 126 (2d Cir. 2008) (stating "[s]ection 106 of the Copyright Act grants copyright holders a bundle of exclusive rights" (quoting Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 607 (2d Cir. 2006)) (internal quotation marks omitted).  An infringer of a copyright is thus "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by section[] 106." 17 U.S.C. § 501(a). The specific exclusive right at issue here is the Monastery's right to display its Works.  We turn to the Copyright Act itself for guidance.

        Section 101 of the Copyright Act defines "copies" as "material objects . . . in which a work is fixed by any method . . . and from which the work can be perceived, reproduced, or otherwise communicated . . . ." 17 U.S.C. § 101.  A work is "'fixed' in a tangible medium of expression when its

-47-

embodiment . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Id. A "display" of a work is defined under the Act as "show[ing] a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process." 17 U.S.C. § 101. Applying these definitions to the facts, we draw the following conclusions.

Here, the Archbishop's verbatim or near-identical versions of the Works constituted a "copy" under the Copyright Act. The translation images were embodied in a medium (here, the computer server and internet) where they could be perceived by, electronically communicated to, and/or reproduced by those who accessed the server. See 17 U.S.C. § 101.

The copies also were embodied or "'fixed' in a tangible medium of expression," as they were loaded on the Archbishop's computer server and posted to his Website. Id.; see Cartoon Network, 536 F.3d at 129 (to determine whether a work is "fixed" in a medium, court must examine whether the work is "embodied" in the medium); Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1160 (9th Cir. 2007) (citing MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 517-18 (9th Cir. 1993) and noting that "a computer makes a 'copy' of a software program when it transfers the program from a third party's computer (or other storage device) into its own memory, because the copy of the program recorded in the computer is

-48-

'fixed' in a manner that is 'sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration'" (quoting 17 U.S.C. § 101)).  The copies likewise satisfy the statute's "transitory duration" requirement, as they were continuously displayed on the Archbishop's Website.  See 17 U.S.C. § 101; see also Cartoon Network, 536 F.3d at 129-30 (discussing meaning of Copyright Act's "transitory duration" requirement).  Before the Monastery served the Archbishop with the Complaint in January 2008, the St. Isaac Work had been posted on the Website continuously since 2005, and the remaining six Works, since August 2007.

Lastly, the Archbishop "display[ed]" the Works publicly -- that is, he "show[ed] a copy of" the Works "by means of a . . . device or process," 17 U.S.C. § 101 -- when he posted the Works on his website.  Although the question of whether a computer has "displayed" a copyrighted work may be a difficult one in other contexts, see, e.g., Perfect 10, 508 F.3d at 1160-62, it is beyond question here that the Archbishop has "displayed" the Works on his website.  We need not delineate the outer bounds of the scope of the term "display" where, as here, the fact that the Works were "displayed" on the Archbishop's website is undisputed.

The Archbishop asks us to overlook the fact that images of the Works were displayed via his computer, and instead, focus on whether he was the specific individual who so electronically placed

the images on the Website. He argues that because he himself did not personally engage or participate in any of the volitional display acts that infringed upon the Monastery's exclusive rights, he should not be held liable.

The Archbishop's "volitional act" position is not a novel one; it is an argument that has been raised -- with varying degrees of success -- in our sister circuits. See, e.g., Quantum Sys. Integrators, Inc. v. Sprint, 338 F. App'x 329, 335-36 (4th Cir. 2009); Cartoon Network, 536 F.3d at 131-32; Parker v. Google, Inc., 242 F. App'x 833, 836-37 (3d Cir. 2007); CoStar Grp., Inc. v. LoopNet, Inc., 373 F.3d 544, 549-51 (4th Cir. 2004). We need not determine whether a volitional act must be shown to establish direct copyright infringement because, regardless of such a holding, the Monastery here still prevails.

Contrary to the Archbishop's contention that he did not engage in infringing acts, the record makes clear that he performed several acts to ensure that copies of the Works were available on his server and posted to his Website. First, the Archbishop was the registered owner of the domain name, "trueorthodoxy.info," i.e., the Website. Second, during deposition testimony the Archbishop "admit[ted] he bears responsibility for and has authority over the content that appears on the [w]ebsite." In fact, he expressly stated:

> Q.    Are you familiar with the website trueorthodoxy.info?

-50-

A.    Yes, somewhat.

Q.    Who owns that website?

A.    I do.

            * * *

Q.    [Referring to one of the Archbishop's
sworn affidavits] Where you say that the
website trueorthodoxy.info is registered to
you.

A.    Yes.

Q.    That's accurate?

A.    Yes.

Q.    And also . . . that you are responsible
for the content of the website.

A.    Yes.


Q.    And that's accurate?

A.    Yes.

            * * *

Q.    Who selects the content that appears on
the website?

A.    I, normally.

(Emphasis added.)

        Third, at deposition the Archbishop conceded his active

involvement in the posting of materials to the server for public

access:

            Q:    Did you -- did you yourself actually
            place content on the website?

                        -51-

A.    No.

Q.    Who did?

A.    Father Peter.

Q.    <u>Did you supervise him in doing that</u>?

A.    <u>To some extent, yes</u>.

Q.    How did you supervise him?

A.    If there's something I liked, <u>I had him put it up</u>.

Q.    So you brought things . . .

A.    <u>I chose what goes up</u>.

        * * *

Q.    <u>[H]ave you been responsible for the content of the website since the inception</u>?

A.    <u>Yes</u>.

Q.    Okay. <u>And you're still responsible for the content now</u>?

A.    <u>Yes</u>.

(Emphasis added.)

        Fourth, the Archbishop confirmed he knew Father Peter generally was uploading religious services to the Website and that he expressly authorized him to do so.  Indeed, the Archbishop appears to believe that this final point, in and of itself, will save him from liability.  It does not.

        A review of the record makes clear that Father Peter acted as the Archbishop's agent in both building and handling the technical aspects of the Website.  Established law confirms that

-52-

agency principles may apply in the copyright context, see, e.g., Metcalf v. Bochco, 294 F.3d 1069, 1072-73 (9th Cir. 2002); see also d'Abrera v. U.S., 78 Fed. Cl. 51, 59 (Fed. Cl. 2007), and that a principal (here, the Archbishop) may be held liable for the authorized acts of its agent (here, Father Peter). See Restatement (Third) of Agency § 1.01 (2006).

The record confirms that the Archbishop held authority and control over the Website, and that he knew of and assented to Father Peter's postings of religious texts to the site. Furthermore, Father Peter's postings to the site clearly fell within his actual authority because he knew of the Archbishop's overall goal of "shar[ing] information about the Orthodox Christian religion with users of the internet," and the materials he posted fell within this ambit. See id. § 2.01 (defining actual authority as "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act."). For these reasons, the Archbishop's attempt to shift the blame onto Father Peter -- because the latter personally performed acts of unauthorized copying -- fails. See Restatement (Third) of Agency § 7.04 ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and (1) the

agent's conduct is tortious, or (2) the agent's conduct, if that of the principal, would subject the principal to tort liability.").

The law on which the Archbishop relies concerning direct infringement liability is equally unpersuasive.  Although the Archbishop contends the Supreme Court's decision in Sony supports his postulation that a showing of personal involvement in the alleged infringement is required, a close reading of the case shows otherwise.  The Supreme Court clearly defined an infringer as "'[a]nyone who violates any of the exclusive rights of the copyright owner,' that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the [statute's listed exclusive rights]." Sony, 464 U.S. at 433 (quoting 17 U.S.C. § 501(a)) (emphasis added).  It also noted that an infringer is "not merely one who uses a work without authorization by the copyright owner, but also one who authorizes the use of the copyrighted work without actual authority from the copyright owner." Id. at 435 n.17 (emphasis added).  Here, the Archbishop repeatedly confirmed his responsibility for and control over the Website, as well as his express authorization to Father Peter to engage in acts that would violate the Monastery's display right.

On careful consideration of this evidence and relevant precedent, we conclude that -- regardless of whether the law mandates a showing of volitional conduct to establish direct

-54-

infringement -- the Archbishop here engaged in sufficient acts of authority and control over the server and material actually posted that he may be held liable for direct infringement of the Works.[19] See generally Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp., 453 F.2d 552, 554 (2d Cir. 1972) ("[C]opyright infringement

---

[19]    The Archbishop additionally points to the Fourth Circuit's decision in CoStar Group as authority for his claim that he cannot be held liable because he, himself, did not personally post the disputed material to the site.  His position is inapposite.  Costar Group provides that "ISPs, when passively storing material at the direction of users in order to make that material available to other users upon their request, do not 'copy' the material in direct violation of § 106 of the Copyright Act," and that "the automatic copying, storage, and transmission of copyrighted materials . . . does not render an ISP strictly liable for copyright infringement."  CoStar Group, 373 F.3d at 555 (emphasis added).  The Archbishop here, however, can hardly be described as a passive conduit who unconsciously and mechanically loaded the images onto his computer and made them available on the Website.  Cf. Quantum Sys. Integrators, 338 F. App'x at 336; CoStar Group, 373 F.3d at 558 (Gregory, J., dissenting) (citing cases and noting "the non-volitional defense to direct infringement claims extends only to 'passive' service providers, through which data flow is 'automatic'").
     Moreover, the Fourth Circuit subsequently limited its CoStar holding in Quantum, stating the appellant in that case (challenging the lower court's finding of infringement) "overstate[d] the 'volitional' requirement purportedly established by CoStar" because the latter concerned passive conduct "typically engaged in by an ISP," and the acts at issue in Quantum were of a more active, volitional, and controlled nature.  Quantum, 338 F. App'x at 336 (internal citation and quotation mark omitted).  Other courts similarly have noted the distinction between active, volitional involvement in infringement versus passive, mechanical, or habitual actions that produce an infringing result, the latter of which generally have been held not to trigger direct infringement liability.  See, e.g., Cartoon Network, 536 F.3d at 131; see also ALS Scan, Inc. v. RemarQ Cmty., Inc., 239 F.3d 619, 621-22 (4th Cir. 2001); Playboy Enters., Inc. v. Webbworld, Inc., 991 F. Supp. 543, 552-53 (N.D. Tex. 1997); Marobie-Fl, Inc. v. Nat'l Ass'n of Fire & Equip. Distribs., 983 F. Supp. 1167, 1176-79 (N.D. Ill. 1997).

is in the nature of a tort, for which all who participate in the infringement are jointly and severally liable."); Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir. 1963).[20]

### 2. Digital Millennium Copyright Act Defense

The Archbishop next raises an argument concerning the DMCA, which provides a safe harbor of immunity for certain service providers. See 17 U.S.C. § 512. To begin with, the Archbishop does not expressly assert a defense under the DMCA itself. Even if he were to have done so, however, any such defense would have been unavailing.

As the district court noted, the Archbishop failed to raise an affirmative defense pursuant to the DMCA in his pleadings. Holy Transfiguration II, 754 F. Supp. 2d at 228-29. The law is clear that if an affirmative defense is not pleaded pursuant to Fed. R. Civ. P. 8(c)'s requirements, it is waived. See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994) (noting Rule 8(c)'s affirmative defense pleading

---

[20]   Because we conclude the Archbishop is liable for direct infringement, we need not address his arguments as to why (despite the Monastery's not raising such a claim) secondary liability cannot attach.   See Ortiz-González v. Fonovisa, 277 F.3d 59, 62 (1st Cir. 2002) (noting distinction between direct infringement versus contributory or vicarious infringement, and concluding act of infringement was only direct and did not trigger secondary liability); see also Dream Games of Az., Inc. v. PC Onsite, 561 F.3d 983, 995 (9th Cir. 2009) (holding that theory of secondary liability not raised below cannot be raised on appeal).

requirement and stating "[a]ffirmative defenses not so pleaded are waived").  Although this rule is not absolute, see Conjugal P'ship v. Conjugal P'ship, 22 F.3d 391, 400 (1st Cir. 1994), no grounds as have been recognized for its relaxation are present here.  See, e.g., id. at 400-01 ("One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel." (quoting Matter of Prescott, 805 F.2d 719, 725 (7th Cir. 1986) (internal quotation marks omitted)); Law v. Ernst & Young, 956 F.2d 364, 375 (1st Cir. 1992) (citing Lynch v. Dukakis, 719 F.2d 504, 508 (1st Cir. 1983)) (noting implied consent lies where opposing party produced evidence as to affirmative defense or failed to object to the introduction of the same).  We thus likewise deem any such defense waived.[21]

Instead of expressly asserting such a defense, the Archbishop argues the DMCA "did not supplant law," directing us to Ninth Circuit precedent in which that court stated the DMCA's limitations of liability provisions did not substantially change "[c]laims against service providers for direct, contributory, or vicarious copyright infringement," which are "generally evaluated just as they would be in the non-online world."  Ellison v. Robertson, 357 F.3d 1072, 1077 (9th Cir. 2004); see also Perfect

---

[21]  We moreover question whether any such defense, even if asserted, holds any merit.  The Archbishop likely would not qualify as an ISP under the DMCA's express provisions, see 17 U.S.C. § 512(k), and even if he did, he has not complied with the specific criteria necessary for an ISP to receive the protections of the DMCA's safe harbor provisions.  See 17 U.S.C. 512(c)(1).

10, 481 F.3d at 758 (DCMA's "safe harbors limit liability but 'do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability'"(quoting <u>Perfect 10, Inc.</u> v. <u>Cybernet Ventures, Inc.,</u> 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002))).  In essence, the Archbishop seems to remold his prior direct infringement claim to argue that even if he does not fall under DMCA's safe harbor provisions, his "passive involvement" in the alleged acts of infringement is not sufficient to trigger secondary liability, and by extension, direct liability.  For the reasons previously set forth, we reject the Archbishop's contention that his authority for and control over the Website, or his express authorization and supervision of Father Peter's postings may be deemed such a level of "passive involvement" that no form of liability may attach to his actions.

### 3.  Fair Use Defense

The Archbishop attempts to carry his evidentiary burden as to another defense, claiming his reproductions of the Works constitute fair use.  See <u>Campbell</u> v. <u>Acuff-Rose Music, Inc.,</u> 510 U.S. 569, 590 (1994)  (stating "fair use is an affirmative defense" for which its proponent bears the burden).  Fair use "creates a privilege for others to use the copyrighted material in a reasonable manner despite the lack of the owner's consent." <u>Weissmann</u> v. <u>Freeman</u>, 868 F.2d 1313, 1323 (2d Cir. 1989).

Specifically, the doctrine serves to mediate "the inevitable tension between the property rights" lying in creative works "and the ability of authors, artists, and the rest of us to express them," providing a degree of protection to each where merited. Blanch v. Koons, 467 F.3d 244, 250 (2d Cir. 2006).

The Copyright Act codifies the fair use doctrine and breaks it into four factors that a court must weigh in assessing whether use of a work is fair or infringing.  See 17 U.S.C. § 107 (listing the purpose and character of a work's use, the nature of the copied work, the extent of the copying, and its effect on a work's market value).  When performing such weighing, a court should carefully balance the relevant interests and apply "an equitable rule of reason," as "each case raising the question must be decided on its own facts."  H.R. Rep. No. 1476, at 65 (1976), reprinted in, 1976 U.S.C.C.A.N. 5659, 5679; see also Sony, 464 U.S. at 448-49.  Here, we have sufficient facts before us with which to assess fair use as a matter of law; we accordingly arrange our scales and begin the weighing process.  See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985) (stating "an appellate court . . . may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work") (alterations omitted) (internal quotation mark omitted).

### a.  Purpose and Character of the Use

The first factor we must consider is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Our task under the first prong is to assess "whether and to what extent the new work is 'transformative,'" that is, "whether the new work merely supersedes the objects of the original creation" or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S. at 579 (internal citations and quotation marks omitted); see also Folsom v. Marsh, 9 F. Cas. 342, 345 (No. 4,901) (C.C.D. Mass. 1841) (Story, J.) (stating for a work to be transformative "[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work").

The Archbishop posits that his use of the Monastery's Works was "productive" because his goal was educational, i.e., to allow Orthodox Christians to sample and learn from the Works' teachings on the Orthodox faith. Because he held no commercial purpose in his use of the Works, the Archbishop contends we should find the first prong to be in his favor. Notably, the Archbishop seems to concede that his use of the Works might not have been transformative per se, but contends nonetheless that "a work need

-60-

not be transformative to be fair;" because his use was productive, we should find in his favor as to "purpose and character of use."

The Monastery counters that the Archbishop's use cannot be deemed transformative because his versions simply supplanted the original Works' purpose (also of a religious educational nature) and failed to make any new or creative point.  Additionally, the Monastery rejects the Archbishop's contention that his use cannot be deemed commercial.  It argues that because the Archbishop has repeatedly infringed the Works (which were expensive to create) free of cost, he has profited in his alleged use to educate others and benefitted from others' interest in his versions.

Regarding the "transformative" or "productive" nature of the Archbishop's versions, the Archbishop is correct that "transformative use is not absolutely necessary for a finding of fair use." Campbell, 510 U.S. at 579.  However, copyright's goal of "promot[ing] science and the arts, is generally furthered by the creation of transformative works," and the law is clear that the lesser the transformative nature of the work, the greater the significance of those factors that may weigh against a finding of fair use.  Id.

The Archbishop's translations are not transformative.  A review of his works reflects minimal "intellectual labor and judgment." Folsom, 9 F. Cas. at 345.  The versions are essentially verbatim or near-verbatim copies of the Works, with only minuscule

alterations of "expression, meaning, or message."  Campbell, 510
U.S. at 579.  Moreover, the Archbishop's translations hold the same
purpose and benefit as the original Works, i.e., to further
religious practice and education.  They thus "merely supersede[]
the object[] of the original" Works.  Id.; see also Worldwide
Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1117
(9th Cir. 2000); cf. Núñez v. Caribbean Int'l News Corp., 235 F.3d
18, 23 (1st Cir. 2000) (holding that combining photographs with
editorial commentary created a new use for the works).  Courts have
admonished that where a copy's "use is for the same intrinsic
purpose [as the copyright holder's] . . . such use seriously
weakens a claimed fair use;" we find the same debilitating effect
on the Archbishop's claim to be true here.  Weissmann, 868 F.2d at
1324; see also Am. Geophys. Union v. Texaco, Inc., 60 F.3d 913, 923
(2d Cir. 1995) (stating "[t]o the extent that the secondary [work]
involves merely an untransformed duplication, the value generated
by the secondary [work] is little or nothing more than the value
that inheres in the original. . . . [T]hereby providing limited
justification for a finding of fair use").

        The Archbishop contends the first factor still favors a
finding of fair use because any copying he did was not for
commercial gain.  But removing money from the equation does not,
under copyright law, remove liability for transgressing another's
works.  The Supreme Court has held that "the mere fact that a use

is educational and not for profit does not insulate it from a finding of infringement." Campbell, 510 U.S. at 584; see also Sony, 464 U.S. at 450 ("Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have."). In effect, the commercial-noncommercial distinction the law draws centers not on whether a user intends to line his own pockets, but rather on "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562. "Profit," in this context, is thus not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages. See Worldwide Church, 227 F.3d at 1117; Weissmann, 868 F.2d at 1324) ("The absence of a dollars and cents profit does not inevitably lead to a finding of fair use."); see also Webster's II New Riverside University Dictionary 939 (1984) (defining the term "profit" as an "advantageous gain or return").

Applying this framework, we agree with the Monastery that the Archbishop "profited" from his use of the Works. Regardless of whether the Archbishop's versions generated actual financial income for himself or the Dormition Skete, he benefitted by being able to provide, free of cost,[22] the core text of the Works to members of

---

[22] At deposition, the Archbishop acknowledged his awareness of the costs he was saving himself by not purchasing the Monastery's Works, stating "[y]es, $120 per book [containing one of the Works]. Now you know why we don't buy their works."

the Orthodox faith, and by standing to gain at least some recognition within the Orthodox religious community for providing electronic access to identical or almost-identical English translations of these ancient Greek texts. For these reasons, we conclude that as to the first factor, the scales tip in the Monastery's favor.

### b. Nature of the Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), requires us to consider two elements: (1) whether the Monastery's Works are factual or creative, see Harper & Row, 471 U.S. at 563, and (2) whether the Works have previously been published, Núñez, 235 F.3d at 23. Here, due to its brief nature, the last factor shall be first.

When interpreting the copyright laws, courts commonly have recognized an author's power to control whether, when, and how to release his material. Harper & Row, 471 U.S. at 564. For this reason, an author's right to control first publication of his expression will weigh against another's use of the author's work before its dissemination. See id. ("[T]he scope of fair use is narrower with respect to unpublished works."). Here, it is uncontested that certain of the Works are unpublished (specifically, the Octoechos, Dismissal Hymns, and Pentecostarion). It also is undisputed that the Monastery took steps to protect these Works, registering them with the Copyright Office. Cf.

Núñez, 235 F.3d at 24 (noting author's failure to control photographs' distribution by referencing, among other factors, their lack of copyright registration).  And so, at least as to these Works, the Archbishop effectively commandeered the Monastery's control over if, when, and how any such release of these Works to the public would take place.

However, the Monastery's remaining Works were published, reducing -- to some extent -- concerns as to the Archbishop's unilateral publication of versions of them.  But that does not tip the fair use balance in favor of the Archbishop, even with respect to the previously published Works.  See generally Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 187 (D. Mass. 2007) (fact that photographs had been published before CBS's use of them "does not mean that this inquiry weighs in favor of fair use, only that [the] photographs do not fall into the category of private works to which the doctrine of fair use is especially unsuited").  We proceed to the second inquiry.

We believe the Works here fall closer to the creative end of the copyright spectrum than the informational or factual end.  See Worldwide Church, 227 F.3d at 1118.  The Works reflected creativity, imagination, and originality in their language, structure, word choice, and overall textual translation.  See 17 U.S.C. §§ 101, 102 (establishing Copyright Act's protection for translations of preexisting works); Feist, 499 U.S. at 345-46

(noting low bar for establishing creativity of a copyrightable work); Merkos, 312 F.3d at 97 (holding English translation of Hebrew prayerbook as sufficiently original to be copyrightable). We conclude that the scales lean away from the Archbishop's contention of fair use as to this second factor.

### c. Amount and Substantiality of the Use

The third factor requires us to consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3); see Campbell, 510 U.S. at 586-87.  Our inquiry here is pliable and not affixed by cold calculations of the percentage of a work used versus unused.  See Harper & Row, 471 U.S. at 565-67 (emphasizing significance rather than quantity of material copied); Núñez, 235 F.3d at 24.  However, even though "'wholesale copying does not preclude fair use per se,' copying an entire work '[generally will] militate[] against a finding of fair use.'" Worldwide Church, 227 F.3d at 1118 (quoting Hustler Magazine Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1155 (9th Cir. 1986)); see also Rogers, 960 F.2d at 311 ("It is not fair use when more of the original is copied than necessary.").

The Archbishop attempts to narrow our focus to the fact that the copying he did of the St. Isaac work (specifically, Homily 46) is only "one of seventy-seven homilies in the St. Isaac work," which is only "3 pages in a work that in [sic] 568 pages or approximately a half percent of the entire work," and that his use

-66-

as to the remaining Works only consisted of postings of small portions of the texts. Our focus, however, is not so limited. See Núñez, 235 F.3d at 24 (noting inquiry as to amount and substantiality of a work's use "must be a flexible one, rather than a simple determination of the percentage used"); see also Campbell, 510 U.S. at 586-89 (treating a single song from an album as a whole work for purposes of fair use analysis); Hustler Magazine, 796 F.2d at 1154-55 (deeming 300-word parody a complete work even though part of 154-page magazine; stating "[a] creative work does not deserve less copyright protection just because it is part of a composite work").

Lifting our eyes to the full extent of the Archbishop's use, we see that he made identical or near-verbatim copies of the Works -- themselves parts of greater texts, but which alone may be qualitatively significant. See Harper & Row, 471 U.S. at 564-66 (use of quotations constituting 300 words of President Ford's entire memoirs amounted to copying of "the heart of the book" that weighed against fair use); Roy Exp. Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broad. Sys., Inc., 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980) (use of approximately one to two minutes from hour-plus long films "quantitatively" and "qualitatively" substantial). Thus, the Archbishop's pleas for us to acknowledge how much of the Works he did not copy are unavailing. See Harper & Row, 471 U.S. at 565 ("'[N]o plagiarist

-67-

can excuse the wrong by showing how much of his work he did not pirate.'" (quoting Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936)).

Courts have cut both ways as to the fair use of verbatim copying. Compare Sony, 464 U.S. at 449-50 (holding identical copying of videotapes under unique circumstances of case "[did] not have its ordinary effect of militating against a finding of fair use"); Núñez, 235 F.3d at 24 (finding newspaper's complete copying of a photograph to be "of little consequence" because "to copy any less . . . would have made the picture useless to the story"); with Harper & Row, 471 U.S. at 565 ("[T]he fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression."); Worldwide Church, 227 F.3d at 1118-19 (rejecting argument that verbatim copying of religious text was reasonable simply because use was religious in nature); Wihtol v. Crow, 309 F.2d 777, 780 (8th Cir. 1962) (where defendant inserted identical copy of plaintiff's original piano and solo voice composition into his choir arrangement, court held "[w]hatever may be the breadth of the doctrine of 'fair use,' it is not conceivable to us that the copying of all, or substantially all, of a copyrighted song can be held to be a 'fair use' merely because the infringer had no intent to infringe").

A telling factor in conducting this analysis is "the purpose and character of the use," as "[c]opying does not become excessive . . . merely because the portion taken was the original's heart." Campbell, 510 U.S. at 586-88; see also Castle Rock Entm't, Inc. v. Carol Publ'g, 150 F.3d 132, 144 (2d Cir. 1998) (noting importance of considering context to determine whether copying is "consistent with or more than necessary to further 'the purpose and character of the use'" (quoting Campbell, 510 U.S. at 586-87)). Here, the Archbishop's copying is for the same purpose for which the Monastery uses its Works -- for religious education and devotional practice. Because the Archbishop's use here was "for the same intrinsic purpose for which [the Monastery] intended it to be used," this third factor weighs against his contention of fair use. Marcus v. Rowley, 695 F.2d 1171, 1175 (9th Cir. 1983); see also Worldwide Church, 227 F.3d at 1118 (holding fact that plaintiff-infringer used verbatim copy of religious text for same purpose as defendant-owner weighed against finding of fair use as to third factor).

### d. Effect on the Market

The fourth and final factor addresses "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Considered "the single most important element of fair use," Harper & Row, 471 U.S. at 566, this factor requires us to consider both (1) the degree of market harm caused

by the alleged infringer's actions, and (2) "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590 (internal quotation marks and citation omitted).

As to the degree of market harm, the Archbishop argues that the Monastery has not shown specific lost sales or profits as a result of the alleged infringement. But the fourth factor of the fair use inquiry cannot be reduced to strictly monetary terms. Statutory law expressly states that it considers not only the impact of a work's use on the potential market, but also its effect on the "value of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). Indeed, "[e]ven copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have." Sony, 464 U.S. at 450.[23] Thus, the Copyright Act looks beyond monetary or commercial value and considers other forms of compensation for a work. See id. at 447 n.28 (explaining that compensation for copyright may take different forms because "copyright law does not require a copyright owner to charge a fee for the use of his works;" noting "the owner of a copyright may well have economic or noneconomic

---

[23] The district court likewise recognized as much, stating "[a] rule that would require a victim of infringement to delay taking action to defend its copyright until actual (and perhaps irreparable) harm had accrued would run contrary to the very purpose of the Copyright Act." Holy Transfiguration I, 685 F. Supp. 2d at 228 n.16.

reasons for permitting certain kinds of copying to occur without receiving direct compensation from the copier").  So do we.

If we were to rule that the Archbishop's use here was fair, this unquestionably would affect the market for translations of ancient religious texts, likely discouraging other institutions from investing in and expending the time, effort, and resources necessary for producing works that, without modern translations, would remain predominantly inaccessible to other religious institutions and their members.  See Núñez, 235 F.3d at 24 (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 110 (2d Cir. 1998)) (internal quotation marks omitted) (acknowledging that the fourth factor is "concerned with secondary uses [of works] that, by offering a substitute for the original, usurp a market that properly belongs to the copyright holder"); see also Weissmann, 868 F.2d at 1326 (finding copying of scientific works not fair use where such a determination "would tend to disrupt the market for works of scientific research without conferring a commensurate public benefit").  To say that use of the Works along the lines of what the Archbishop did here would not affect the value of the Works would be to drastically undercut the import of such texts and their corresponding translations within the religious community at large.

As to our second inquiry, it is without question that if others were to engage in the "unrestricted and widespread" copying

of the Monastery's Works, this would have an "adverse impact on the potential market for the original" Works. Campbell, 510 U.S. at 590 (internal quotation mark and citation omitted). If anyone could freely access the Works, electronically or otherwise, the Monastery would have no market in which to try and publish, disseminate, or sell its translations. The Archbishop himself seemed aware of this danger, conceding that his Website provided explicit instructions so that users could access, download, and print copies of the Works, effectively negating any potential market in the Works. See Harper & Row, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the potential market for the copyrighted work.'" (quoting Sony, 464 U.S. at 451) (emphasis added)). Thus, the Monastery's translations of ancient texts (which the Archbishop does not contest were expensive to create) would have been toiled over, with no possible market in which to reap the fruits of its labor.

In sum, the record shows that the Archbishop offered identical or near-identical versions of the creative Works on his Website for the precise purpose for which the Monastery had created the Works in the first place, thereby harming their potential market value. See Worldwide Church, 227 F.3d at 1120 (assessing market factor and noting as relevant "[t]he fact . . . that [appellee] has unfairly appropriated [the work] in its entirety for

the very purposes for which [appellant] created [it]").  Having
carefully balanced the scales, we conclude that the Archbishop's
defense of fair use fails in full.

### 4.  Misuse of Copyright Defense

And so, we come to the last defense.  Attempting to cloak
himself in copyright misuse's protective armament, the Archbishop
alleges that the Monastery's litigation tactics are nothing more
than a deliberate stratagem to prevent the Archbishop from sharing
ancient religious works with the Orthodox community, thereby
engaging in anti-competitive behavior and creating a monopoly.[24]

"This court has not yet recognized misuse of a copyright
as a defense to infringement."  García-Goyco v. Law Envtl.
Consultants, Inc., 428 F.3d 14, 21 n.7 (1st Cir. 2005).  Moreover,
even if we were to follow the lead of other circuits that have
recognized a copyright misuse defense, see, e.g., Practice Mgmt.
Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516, 521 (9th Cir. 1997),
amended by 133 F.3d 1140 (9th Cir. 1998); Lasercomb Am., Inc. v.
Reynolds, 911 F.2d 970, 973 (4th Cir. 1990), this case certainly
would not be the appropriate vehicle.  Where a misuse-of-copyright

---

[24]  The defense of copyright misuse "derives from the doctrine of
patent misuse," which "'requires that the alleged infringer show
that the patentee has impermissibly broadened the physical or
temporal scope of the patent grant with anticompetitive effect.'"
Broad. Music Inc. v. Hampton Beach Casino Ballroom, Inc., No. CV-
94-248-B, 1995 WL 803576, at *5 n.8 (D.N.H. Aug. 30, 1995) (quoting
United Tel. Co. of Mo. v. Johnson Pub. Co., 855 F.2d 604, 610 (8th
Cir. 1988)).

defense is recognized, a "defendant may prove copyright misuse by either proving (1) a violation of the antitrust laws[,] or (2) that [the copyright owner] otherwise illegally extended its monopoly or violated the public policies underlying the copyright laws." Broad Music Inc., 1995 WL 803576, at *5 (citing Lasercomb, 911 F.2d at 978); Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc., 772 F. Supp. 614, 652 (D.D.C. 1991)). There is no suggestion here that the Monastery has violated antitrust laws, and the claim that it has a "monopoly" on ancient Orthodox texts is belied by the fact that, as the Archbishop emphasizes elsewhere in his briefs, the sacred texts in question are available in English translation through publishers other than the Monastery. Moreover, the Archbishop attempts to raise this defense from a record in which it has never before so much as breathed an appearance. We have stated time and again that "theories not raised squarely in the district court cannot be surfaced for the first time on appeal." Curet-Velázquez v. ACEMLA de P.R., Inc., 656 F.3d 47, 53 (1st Cir. 2011) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991)) (internal quotation mark omitted); Ramos-Baez v. Bossolo-López, 240 F.3d 92, 94 (1st Cir. 2001). We therefore deem the Archbishop's copyright misuse defense waived.

## III.  Conclusion

Our pilgrimage through the complexities of copyright law concluded, we keep our words here few -- for the foregoing reasons, we affirm the decision of the district court.

**<u>Affirmed</u>**.